CENTRAL OF GEORGIA RY. CO. et al. v. RAILROAD COMMISSION OF ALABAMA et al.

(Circuit Court, M. D. Alabama. March 21, 1908.)

1. COURTS—JURISDICTION OF FEDERAL COURTS—"SUIT AGAINST STATE."

A suit in equity against individuals to enjoin them as officers of a state from enforcing an unconstitutional enactment to the irreparable injury of the property rights of the complainant is not one against the state within the meaning of the eleventh constitutional amendment; and it is immaterial whether such officers are specially charged with the enforcement of the statute, or whether such duty devolves on them under the general laws.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 844, 844½.

Federal jurisdiction of suits against states, see note to Tindall v. Wesley, 13 C. C. A. 165.

For other definitions, see Words and Phrases, vol. 7, p. 6778; vol. 8, p. 7809.]

2. CONSTITUTIONAL LAW—VALIDITY OF STATUTES—CONTROLLING FACTORS.

In whatever language a statute may be framed, its purpose and its constitutional validity must depend upon its natural and reasonable effect upon the right involved.

3. SAME—DUE PROCESS OF LAW—EQUAL PROTECTION OF LAWS—COURTS TO BE OPEN—ALABAMA STATUTES REGULATING RATES—CONSTITUTIONALITY.

The group of statutes enacted by the Legislature of Alabama at the special session called in 1907 (Laws 1907, p. 711) relating to railroad rates, which fix maximum freight and passenger rates on intrastate business and provide that for each overcharge or refusal to accept such rates a railroad company shall be subject to an action for penalties, and its officer, agent, or employé acting for it to a criminal prosecution in any county of the state through which its line runs, both proceedings to be instituted by the shipper or passenger affected, and which, if enforced, effectually deprive any railroad company affected of the right to test their validity in the courts without subjecting itself to such a number of suits and prosecutions and such heavy penalties each day it fails to comply with their requirements as to stop its business and bankrupt it, are unconstitutional and void, as depriving such companies of their property without due process of law, and of the equal protection of the laws, and also as in violation of the provision of the state Constitution that "all courts shall be open and every person for any injury done him * * * shall have a remedy by due process of law."

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 701, 847.]

4. SAME—EQUITY—RIGHT TO INVOKE JURISDICTION—EFFECT OF STATE STATUTE.

Under the Constitution and laws of the United States, as well as the Constitution of Alabama, a property owner who is not given an adequate

remedy at law cannot be shut off by a legislative enactment from the right to a seasonable resort to a chancery court for the exercise of its usual preventive remedies, when necessary to protect a property right from destruction.

**5. SAME—VALIDITY OF STATE STATUTE—MODE OF ENFORCEMENT.**

A state statute, the effect of which is to deprive owners of their property without due process of law, or to deny them the equal protection of the laws, is no less a violation of the fourteenth constitutional amendment because it expressly provides that no action for its enforcement shall be taken by the law officers of the state, but gives to private individuals the right to institute both civil and criminal proceedings for its violation, and to invoke the process and powers of the courts to that end under other and valid statutes; such proceedings being in fact as much acts of the state as though directly instituted by it.

**6. COURTS—UNITED STATES COURTS—SUITS AGAINST STATES.**

Where a state statute deprives the owners of their property without due process of law, or denies them the equal protection of the laws, the federal courts have power to enjoin the officers of the state courts from issuing or serving process in any such proceeding, and the eleventh constitutional amendment cannot be invoked to defeat their jurisdiction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 844, 844½.]

**7. STATUTES—SUITS TO ENJOIN ENFORCEMENT OF STATUTE—EFFECT OF REPEAL OF STATUTE.**

In a federal court suits were instituted by railroad companies against the Railroad Commission of Alabama and the Attorney General to enjoin the enforcement of a statute fixing railroad rates and to test its constitutionality, and as provided for by the statute itself injunctions were granted suspending its operation on the giving of bonds by the complainants to repay to shippers any sums collected above the statutory rates in case they should be sustained. Pending each suit, and after claims had been filed by shippers for recovery on the bonds of excess charges, the statute was repealed and substitutes enacted, which were subject to the same constitutional objections, but which expressly deprived the Commission and the Attorney General of any power to take action for their enforcement, leaving it to private parties to bring actions and prosecutions for their violation. *Held*, that such repeal did not abate the suits, and that supplemental bills might be filed therein to enjoin the enforcement of the new acts.

**8. CRIMINAL LAW—PROHIBITION OF EXCESSIVE FINES—VALIDITY OF STATUTES.**

The provision of the Constitution of Alabama that "excessive fines shall not be imposed," while addressed more directly to the courts, also imposes limitations on the exercise of legislative power, and the railroad rate acts of 1907 (Laws 1907, p. 711), which subject any railroad company failing to conform to such rates, even pending a suit to determine their validity, to fines and penalties amounting to several hundred dollars for each separate transaction, are void as in violation of such provision.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 3305.]

**9. CONSTITUTIONAL LAW—EXERCISE OF POLICE POWER.**

The provision of one of the Alabama railroad rate acts of 1907 (Acts Sp. Sess. 1907, p. 60) that it shall be unlawful for any railroad company which fails to keep tickets for sale at its stations at the rates prescribed therein to maintain any fence or gates to prevent intending passengers from reaching the trains, under penalty of fines from $200 to $2,000, is void, as not a legitimate exercise of the police power; the purpose of fences and gates, when maintained in populous localities, being to guard the public from danger, as well as for the benefit of the companies, and the provision having no reasonable relation to the punishment for failure to sell tickets.

**10. SAME—ATTEMPT TO NULLIFY JUDGMENT OF COURTS.**

The fact that a railroad rate statute gives persons who are refused tickets at the rates fixed therein the right to sue the railroad company to recover a penalty in the name of the state does not make the state in fact a party to the suit, and a provision that it shall be no defense to such suit that a court of equity has temporarily enjoined the enforcement of the rates is void for want of constitutional power in the Legislature to nullify orders of the courts, federal or state.

**11. JUDGMENT—PERSONS CONCLUDED—ACTIONS AGAINST PUBLIC OFFICERS.**

The judgment or decree of a court in a suit against public officers to determine the reasonableness of railroad rates as fixed by the state is binding on all persons; the public in such suit being parties by representation.

**12. CARRIERS—STATE REGULATION OF RATES—POWERS OF RAILROAD COMMISSION OF ALABAMA.**

Under section 243, Const. Ala. 1901, which confers power and authority on the Legislature to regulate freight and passenger tariffs, the Legislature cannot delegate such power, and the Railroad Commission of the state, authorized by statute to determine and declare what are reasonable rates, and to fix schedules of rates which shall be the lawful rates, acts under such authority as an administrative, and not a legislative, body, and a court may enjoin pendente lite the promulgation by it of any particular schedule whenever essential to the ends of justice.

**13. CONSTITUTIONAL LAW—DELEGATION OF POWER TO FIX RATES—CONSTITUTIONALITY.**

The provision of the Alabama rate statute of August 7, 1907 (Laws 1907, p. 711), that any rates prescribed by statute may be changed by the state Railroad Commission "from time to time as conditions may in its judgment render it expedient so to do," is void as an attempt to delegate to the Commission legislative power over rates, which by section 243 of the state Constitution is vested solely in the Legislature.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 100.]

**14. CARRIERS—PRELIMINARY INJUNCTION TO RESTRAIN ENFORCEMENT OF RATES—DISCRETION OF COURT.**

Where from the evidence it appears probable that railroad rates prescribed by a state on intrastate business will not afford to the carriers a just or reasonable return on the property devoted to the service, but that such rates will be confiscatory, a federal court has discretionary power to grant a preliminary injunction restraining the enforcement of such rates pending a final hearing.

**15. SAME—CONFISCATORY RATES—REASONABLE RETURN ON INVESTMENT.**

Railroad companies doing business in Alabama *held* entitled to earn a net profit of 8 per cent. on the value of the property employed by them in intrastate business, so long as the business is done without unjust discrimination and at just and reasonable rates, and to a preliminary injunction to restrain the enforcement of rates established by state authority which, as appeared from the showing made, would prevent them from earning such net profit, upon giving bonds to reimburse shippers and passengers for any excess rate exacted in case the rates suspended should be finally held reasonable and just.

**16. STATES—SOVEREIGNTY—EFFECT OF ENFORCEMENT OF RIGHTS UNDER FEDERAL CONSTITUTION.**

The action of a federal court, in the exercise of the powers conferred and the performance of the duties imposed upon it by the Constitution of the United States, established as the supreme law of the land by the voluntary act of the people of all the states, in enjoining officers of a state from enforcing a state law which violates rights secured by such Constitution, involves no question of state rights or of the right to local self-government.

## In Equity.

These are supplemental bills by the several complainants to arrest the execution of certain statutes passed at the called session of the Legislature of Alabama in November, 1907, particular mention of which is made hereafter. It will conduce to a better understanding of the cases to recite briefly the history of the original bills and the events happening after they were at issue which are made the basis of the supplemental bills.

On the 25th of March, 1907, the Atlantic Coast Line Railroad Company, the Kansas City. Memphis & Birmingham Railroad Company, the Southern Railway Company, the Central of Georgia Railway Company, the Nashville, Chattanooga & St. Louis Railway Company, and the Louisville & Nashville Railroad Company, all foreign corporations and the Western Railway of Alabama, the Alabama Great Southern Railroad Company, the Mobile & Ohio Railroad Company, the Seaboard Air Line Railway Company, and the South & North Alabama Railroad Company, domestic corporations. all operating railroads in this state, filed their bills for injunction in the Circuit Court of the United States for the Middle District of Alabama against the Railroad Commission and the Attorney General of Alabama. These bills alleged that the four acts of the Legislature of Alabama hereafter mentioned are unconstitutional, in that they deny to the complainants the equal protection of the law and deprive them of property without due process of law, in violation of the fourteenth amendment to the Constitution of the United States and like provisions in the Constitution of the state. These statutes, ipso facto, forfeited the right of any foreign corporation to do intrastate business if it filed a bill in the federal court to test the reasonableness of rates; fixed the maximum intrastate passenger rates at 2½ cents a mile; made the rates in force on the 1st of January, 1907, the maximum intrastate freight rates, except as curtailed by the statute, which classified and fixed the maximum rates for intrastate transportation on 110 commodities or articles of freight. The statutes, at the time the original bills were filed, charged the Railroad Commission and the Attorney General with the duty of enforcing the rates, and provided that any railroad company might test the reasonableness of any rate or rates, by making the Commission and the Attorney General defendants in a suit in equity, in which event, if the court saw proper, it might, upon exacting bonds for the indemnity of passengers and shippers, suspend the rate laws pending final hearing.

Upon the filing of the bills five days' notice was given to the Attorney General and the Railroad Commission that a motion would be made for a restraining order on March 30, 1907. A restraining order was made that day, and the hearing for a preliminary injunction went over at the request of the respondents until the 19th day of May, 1907. On that day the matter came on again for hearing upon the allegations of the sworn bills. Respondents offered no opposing evidence of any kind, and made no objection to the granting of a preliminary injunction, stating in open court they did not intend to appeal therefrom. Thereupon the court, exacting bonds to refund any. excess to passengers and shippers, if complainants were cast in the suits, issued a preliminary injunction against the enforcement of the rate statutes and the statute forfeiting the foreign railroad company's license to do intrastate business because of the filing of the bills to test the rates, and also made an order, as the state statute authorized, suspending the rate statutes. The court, in the progress of the litigation, declared unconstitutional the act which ipso facto forfeited the right of any foreign railroad corporation to do intrastate business, if it resorted to the federal court to test the reasonableness of the rates. Seaboard Air Line Railway Co., et al. v. Railroad Commission of Alabama et al. (C. C.) 155 Fed. 792. Among the statutes mentioned in the original bills, but as to which no relief was asked or granted, was one which forfeited the right of a foreign railroad corporation to do intrastate business if it removed any cause from a state court to the federal court. The Southern Railway Company, in August, 1907, removed a case from the state court at Talladega to the federal court, and thereupon the state authorities proclaimed that it had forfeited its right to do intrastate business, and avowed a purpose to arrest its operatives and indict

that company for every act of intrastate transportation which it did thereafter, until its right was restored in the manner prescribed by the statute.

The state officials, although they had acquiesced in the preliminary injunctions on the original bills, then began to threaten to arrest the officials and servants of all other railroad companies for nonobservance of the rate statutes, notwithstanding they had been suspended, and the court had declared unconstitutional the act which forfeited the right of a foreign carrier to do intrastate business if it resorted to a federal court to test the reasonableness of the rates. At the instance of the Louisville & Nashville Railroad Company the court on September 4, 1907, enjoined the several solicitors and sheriffs of the state in the counties its road traversed from taking any steps whatever to enforce against that company or its servants the statutes complained of in its original bill. Louisville & Nashville Railroad Co. et al. v. Railroad Commission of Alabama et al. (C. C.) 157 Fed. 944.

In consequence of the attitude of the state authorities towards the Southern Railway Company, that company agreed to abandon its litigation and to put in force a schedule of rates which the Governor demanded, if the state authorities revoked the forfeiture of its license to do intrastate business. Shortly thereafter the Mobile & Ohio Railroad Company, the Atlantic Coast Line Railroad Company, the Kansas City, Memphis & Birmingham Railroad Company, the Alabama Great Southern Railroad Company, and the Atlanta & Birmingham Air Line Railway Company followed the example of the Southern Railway Company, and agreed with the state authorities upon a tariff of rates and to abandon their contest. The Louisville & Nashville Railroad Company, the Central of Georgia Railway Company, the South & North Alabama Railroad Company, the Nashville, Chattanooga & St. Louis Railway Company, and the Western Railway of Alabama, however, refused to agree with the state authorities, and continued to prosecute their original bills and to insist upon the protection of the injunctions issued therein. Thereupon a special session of the Legislature was called by the Governor to deal with the recalcitrant railroad companies. At the called session, many of the laws regarding tariffs for freight and passenger rates and reasonableness of rates were repealed, and other statutory rates prescribed, as well as another mode of testing the reasonableness of the rates. The nature and extent of these changes is hereinafter fully stated. The five railroad companies last named, after the passage of the legislation complained of, filed their supplemental bills, to arrest the execution of these laws, against the Railroad Commission, the Attorney General, the circuit solicitors, and clerks and sheriffs of the several counties in which the railroads were operated, and against certain classes of shippers and passengers, who had threatened to invoke the penalties the laws prescribed if the freight and passenger rates were not put into effect.

In all essential particulars the statements of fact in each of the bills is the same, except as to the value of the different properties and the income therefrom and the legal validity of the provision authorizing the commission to change statutory rates. The bills set out the respective gross earnings and net earnings of the several companies, how much was derived from interstate commerce and from intrastate business, and the cost of conducting the same. They also set forth in detail the facts and figures upon which they claimed that the reduced rates were confiscatory and denied to the complainants adequate compensation upon the value of the property devoted to intrastate commerce. As the supplemental bills are substantially alike as to the questions arising on the preliminary hearing, only one of the cases, that of the Central of Georgia Railway Company, is reported. That bill, after stating prior events in the litigation and the orders made in the beginning thereof, alleges:

"VII. Not a complaint was made, from any responsible source, at least, that the court has exceeded its jurisdiction or interfered with the rights of the state of Alabama and the rightful authority of any of its officials for a period of at least four months, when an agitation was started by his excellency, Braxton B. Comer, Governor of the state of Alabama, and other officials of the state of Alabama, to break down the jurisdiction of this honorable court in this case and in the equity cases which were then being prosecuted in this

honorable court by the 11 other railway companies hereinbefore mentioned, and to thwart the injunction of this court issued in said cases which are hereinbefore described. Gov. Glenn, of North Carolina, had a short time previously, as is now a matter of public history, through the employment of the criminal processes of the state of North Carolina, and by arresting, intimidating, and coercing the officers, agents, and employés-of the Southern Railway Company, forced that railway company to seek the dissolution of an injunction which it had obtained from the Circuit Court of the United States for the Western District of North Carolina, on a bill filed by it to restrain the Railroad Commission of the state of North Carolina from enforcing certain passenger rates made effective on its railroad in the state of North Carolina by the statutes of that state.

"During the early part of August, 1907, the Southern Railway Company removed a damage suit from a state court of Alabama to a federal court in Alabama, contrary to the act of the Legislature of Alabama approved March 4, 1907, entitled 'An act to further regulate the doing of business in the state of Alabama by foreign or nonresident corporations, or corporations organized under or by virtue of the laws of any other state or government than the state of Alabama, and to fix a punishment for a violation thereof,' which provides that, should any corporation, after the 1st day of July, 1907, doing business in the state of Alabama, and having a license to do business therein, being sued in any of the courts of the state of Alabama, file or caused to be filed in said court any petition for removal to any federal court, or cause or procure the removal of said case to federal court, the judge of said court shall forthwith certify a copy of said petition or removal proceeding to the Secretary of State, who shall thereupon immediately cancel said license, and make and enter upon the stub thereof an order of cancellation; and the act further provides that, upon the cancellation of said license, any contracts, agreements, undertakings, or engagements with or by or to corporation shall be null and void. The act further provided that, should any. officer, agent, or employé of such corporation having its license revoked make or attempt to make any contract, agreement, undertaking, or engagement for, with, by, or in its name, shall be guilty of a misdemeanor and upon conviction shall be fined not less than $100, nor more than $1,000, and may also be imprisoned in the county jail, or sentenced to hard labor in the county, for not more than 12 months, either or both, at the discretion of the jury trying the case. Whereupon, in accordance with the terms of said act, the license of the Southern Railway Company was immediately canceled by the Secretary of State. In this situation of affairs his excellency, Braxton B. Comer, Governor of the state of Alabama, in emulation of the example of Gov. Glenn of North Carolina, conceived the idea and purpose to break down, frustrate,' render ineffectual, and destroy the force and effect of the injunction issued by this honorable court in the original bill in this cause, and in the original bills in the causes filed by the 11 other railway companies hereinbefore referred to.

"The Southern Railway Company operates in the state of Alabama, according to the Annual Report of the Railroad Commission of Alabama for the year 1904 (which is the latest available), 1,157 miles of main line; the Alabama Great Southern Railroad Company operates in Alabama 258 miles of main line; and the Mobile & Ohio Railroad Company operates in Alabama 279 miles of main line. These last two named railroad companies are affiliated with and controlled by the Southern Railway. The total mileage operated by these lines in Alabama is 1,694 miles of main line. This system of railways competes at many points in Alabama with this complainant, and with the other railways which filed bills to enjoin the statutory rates of the state of Alabama. Therefore, if the Southern Railway, and its allied and affiliated lines, could be forced to put the rates enacted by the state of Alabama into effect on their lines of railway in Alabama, this would be persuasive upon the other lines of railway operating in Alabama. The Governor of Alabama threatened to enforce upon the Southern Railway Company, its officers, agents, and employés, the harsh and drastic penalties prescribed by the eighth section of the act hereinbefore described, which prohibited it from removing a case from a state court to a federal court, but proposed, without any warrant or authority of law whatever, that the Southern Railway Company, and its

officers, agents, and employés should receive immunity from the penalties and conditions of the said act, under which its license to do business in the state of Alabama had been canceled, provided the Southern Railway Company would dismiss its bill heretofore filed in this cause to enjoin said rates and would put said rates into effect. Whereupon the Southern Railway Company and its allied and affiliated lines entered into negotiations with his excellency. the said Braxton Bragg Comer, governor of the state of Alabama, looking to the settlement of the issues between them, and this negotiation culminated in a contract between the Southern Railway Company, the Mobile & Ohio Railroad Company, and the Alabama Great Southern Railroad Company, of the one part, and his excellency. Braxton B. Comer, Governor of Alabama, of the other part, a true copy of which is as follows:

"'Memorandum of Agreement by and between the Honorable B. B. Comer, Governor of, and acting for, the state of Alabama, and W. W. Finley, president of the Southern Railway and the Alabama Great Southern Railroad, and E. L. Russell, vice president and acting for the Mobile & Ohio Railroad:

"'First. It is hereby understood and agreed by and between all the parties to this agreement that the Southern Railway, Alabama Great Southern Railroad, and Mobile & Ohio Railroad shall have the right and authority, on and from the 1st day of December, 1907, to establish and maintain a straight local or intrastate passenger rate of two and three-quarters (2¾) cents per mile on each of the railroads of the railroad companies herein named.

"'Second. In the case of persons riding on the trains of said railroads, or either of them, who have not provided themselves with regular tickets, the said railroad companies shall have the right and authority to charge and collect from such persons at the rate of three cents per mile over their respective lines.

"'Third. It is further understood and agreed that if any one of said companies shall hereafter voluntarily, or as the final result of litigation, put into effect in Virginia, North Carolina, South Carolina, or Georgia a first-class intrastate straight local passenger fare of less than two and three-quarters (2¾) cents per mile, the said company putting in such less rates shall put in the same rates as the straight local or intrastate passenger fares on its line in the state of Alabama, an intrastate straight local rate for the transportation of persons less than two and a half (2½) cents per mile.

"'Fourth. It is further understood and agreed by the parties hereto that the putting in, in any of the states herein named, of a rate less than two and three-quarters (2¾) cents per mile, brought about by the institution of suit or suits or pending litigation in any one of the said states, or order of any Railroad Commission, is not to be understood and considered as the putting in of such rates voluntarily, or as the final result of litigation, unless such rate or rates so put in are afterwards agreed to be maintained permanently for any cause. It is further understood and agreed that the putting in of special rates, such as excursion rates, second-class rates, or of mileage books, at less than two and three-quarters (2¾) cents per mile in any of the states named, shall not, under any circumstances, be understood or considered as the putting of a rate in any of said states which shall require the two and three-quarters cents (2¾) per mile intrastate straight local rate in Alabama to be reduced.

"'Fifth. It is further understood and agreed that the Southern Railway Company, Alabama Great Southern Railroad, and Mobile & Ohio Railroad, in consideration of the rates authorized to be charged and collected as hereinbefore described, shall issue and put on sale books of the denomination of 500 miles at the rate of two and one-half (2½) cents per mile, to be used by the immediate families of the purchaser of such books, or the members thereof, living in the state of Alabama, the names of the members of such families to be inserted in such books, and books in the denominations of 1,000 and 2,000 miles, respectively, at the rate of two and one-quarter (2¼) cents per mile, good only for the use of the purchaser thereof.

"'Sixth. It is further understood and agreed between the parties to this agreement that, effective 1st day of December, 1907, the railroad company parties hereto have the right and are authorized to charge and collect, and will charge from points on their respective lines in the state of Alabama, on

the commodities described by the Alabama statute approved March 2, 1907, known as the "110 Commodity Rate Act," not more than the same mileage rates that the railroad companies are at present respectively authorized to charge and collect from points to points on its lines in the state of Georgia.

" 'Seventh. It is, however, further understood and agreed that if, on trial, any one of the commodity rates named in the said "110 Commodity Rate Act," or the passenger rates named in this agreement, one or all, should be found to be unreasonably low, the Railroad Commission of Alabama shall give adequate relief by raising, or permitting to be raised. any such rate or rates as may be found to be unreasonably low to what will be found to be reasonable after such trial. If, after such trial, said Railroad Commission should fail or refuse for 30 days to give the relief to which the railroad companies parties hereto, or either of them, then consider it or they are entitled to receive, neither of said companies shall be deemed to have in any way waived or surrendered any of its legal rights to relief in any court of competent jurisdiction; and its rights to such relief shall not be impaired, or in any way prejudiced, by this agreement, or by the fact that said rates had been put into effect and had been given a trial under this agreement. It is further understood and agreed that, if the said companies shall keep the said commodity and passenger rates in effect for six months from the 1st day of January, 1908, the trial thus given shall constitute a reasonable trial as to either or both. It is further understood and agreed that nothing in this agreement shall in any way affect or prejudice the rights of either of said railroad companies, parties hereto, in respect to obtaining any relief as to any other freight rates than the said commodity rates, now or hereafter of force, either before the Railroad Commission of Alabama, or in any court of competent jurisdiction.

" 'Eighth. It is agreed and understood that no right or interest of the railroad companies herein named shall be affected adversely in respect to the rates and matters covered by this agreement by any legislation to be enacted at any extra session of the Legislature of Alabama held prior to the nex' regular session of the Legislature, and that the Governor and Railroad Commission will do all things necessary on the part of the state to protect the companies herein named in respect to the rates and matters covered by this agreement.

" 'Ninth. It is further understood and agreed that in the making of this settlement and the dismissal of the pending litigation, according to the terms of the verbal agreement between the parties hereto made contemporaneously with this instrument. there is to be no liability upon any of the companies herein named growing or arising out of the bonds said companies were required to give on securing the injunction heretofore issued in the pending litigation. It is further understood and agreed that the companies herein named shall under no circumstances incur any liability on their bonds heretofore given. or incur liability for damages on account of their failure to put into effect the disputed rates covering the time from the issuance of said injunction up to the 1st day of October, 1907. when said companies, by an agreement with the state of Alabama heretofore, put into effect the disputed rates. rates involved in the pending litigation, and, further, that the defendants in the rate bills filed by said railroad companies in the federal court at Montgomery will consent to, and aid to have entered, such decrees as may be necessary in the premises.

" 'In witness whereof, the parties to this agreement have caused the same to be executed in triplicate by the representatives heretofore named of the state of Alabama and the railroad companies.

" 'State of Alabama,
" 'By B. B. Comer, Governor.
" 'Southern Railway Company,
" 'By W. W. Finley, President.
" 'Alabama Great Southern Railroad,
" 'By W. W. Finley, President.
" 'Mobile & Ohio Railroad,
" 'By E. L. Russell, Vice President.'

"The Seaboard Air Line Railway and the Atlanta & Birmingham Air Line Railway entered into precisely a similar agreement in writing with his ex-

cellency, B. B. Comer. Governor of Alabama, on November 19, 1907, with the exception that the rates therein provided were to go into effect on January 1, 1908, and that it was provided that said two railroads should be put and maintained in at least as favorable a class as the Southern Railway with respects to rates, and that the Railroad Commission should so provide by appropriate orders and regulations.

"VIII. Neither the Railroad Commission nor any of its members were signatories to the above-stated agreements with the Southern Railway Company and with the Seaboard Air Line Railway; but nevertheless they were actual parties thereto, and consented to the agreement thereby made with the Governor of the state of Alabama.    The Attorney General of the state of Alabama, the Honorable A. M. Garber, publicly stated in an interview published in the Montgomery Advertiser of October 2d as follows: 'This agreement, of course, is based upon good faith.    It means that the Governor, the Railroad Commission, and the Attorney General will do all in their power to carry it into effect.'

"A part and one of the controlling considerations of the agreement on the part of the Southern Railway Company was that the Governor of the state of Alabama and the other officials of the state would not enforce against it the provisions of the statute which is hereinbefore referred to under which its license to do business in the state of Alabama was canceled for removing a personal injury suit to the federal court.    While the Governor of the state and all other officials of the state of Alabama are generally charged with the enforcement of her statutes, in this instance the Governor and other officials of the state of Alabama have consented and agreed that they would not enforce against the Southern Railway Company the penal provisions of said statute, and that provision of said statute under which the license of the Southern Railway Company to do business in the state of Alabama was revoked should be ignored and considered of no effect.    This statute is still of force, and has never been enforced either by the Governor or any authority of the state of Alabama in any respect.    Under the said statutory rate acts as originally passed, the Railroad Commission of Alabama had no power to increase the rates made by said statutes, but an act was passed at the summer session of the Legislature of Alabama, approved July 19, 1907, entitled 'An act to prescribe the powers of the Railroad Commission of Alabama, and to authorize it to change any classification of railroads or of any articles of freight or any rates or charges for the transportation of freight or passengers which have been or which may hereafter be prescribed by statute, or any prevailing rates or charges for such transportation which have been or which may hereafter be by statute made the maximum rates.'

"The special session of the Legislature of Alabama adjourned on Saturday, November 23, 1907.    On Monday, November 25, 1907, the Railroad Commission of Alabama, exercising the power conferred upon it by the above-mentioned act, and in part execution of the agreements made by his excellency, B. B. Comer, Governor of the State of Alabama, on its behalf, with the Southern Railway Company and its allied lines, and with the Seaboard Air Line Railway Company and the Atlanta & Birmingham Air Line Railway, passed an order, effective December 1, 1907, putting into effect on the lines of railway of the said Southern Railway Companies, between points in the state of Alabama, a passenger rate of two and three-quarters (2¾) cents per mile, a rate of two and one-half (2½) cents per mile for families purchasing tickets in denominations of 500 miles, and a rate of two and one-quarter (2¼) cents per mile for mileage books of 2,000 miles; the order of the Railroad Commission being as follows:

" 'The Legislature of Alabama having passed an act entitled "An act to prescribe and regulate passenger rates on all railroads, other than street railroads. carrying passengers between points in the state of Alabama," approved February 14, 1907, wherein the passenger rate was fixed at 2½ cents per mile for adults, and the Commission having been enjoined by the principal railroads operating in Alabama against the enforcement of said statutes, and afterwards said injunction having been withdrawn by the Southern Railway, Alabama Great Southern Railroad, Mobile & Ohio Railroad, North Alabama Railway, Mobile & Birmingham Railroad, Seaboard Air Line Railway, Atlantic Coast Railroad, Atlanta & Birmingham Air Line, and St.

Louis & San Francisco, they putting in operation a 2½ cents a mile fare, pending the result of the litigation in the federal court, and afterwards the Southern Railway, Alabama Great Southern, Mobile & Ohio Railroad, Northern Alabama, Mobile & Birmingham, Seaboard, and Atlanta & Birmingham Air Line, representing that said passenger fare was too low, and proposing to the state authorities to put in operation a two and three-quarter (2¾) cents local passenger fare for adults, a 500-mile family ticket at 2½ cents, a 2,000 mileage ticket at 2¼ cents, and dismissing all litigation instituted against the Commission and state officers charged with the duty of enforcement of said statute, therefore, in the spirit of concession the Commission approved said compromise rate; and, it is hereby ordered the above-mentioned lines shall not charge a greater rate for the transportation of adult persons than 2¾ cents per mile, nor a greater for the transportation of children of 5 years of age and under 12 than one-half of the adult rate, and that the aforesaid carriers shall issue a book or ticket containing 500 miles or good for the transportation over 500 miles of road, to be known as "a family ticket book," for the transportation of such persons named thereon, and that the charge for such family ticket shall not be greater than 2½ cents per mile; that the aforesaid carriers shall issue a book containing tickets to the amount of 2,000 miles to be known as a "mileage book or ticket," good for the transportation only of the persons named thereon, and the charge for such book shall not be greater than 2¼ cents per mile. It is also ordered that the aforesaid carriers shall not be required to accept a single fare for less than 5 cents, and in case of an odd mile shall pay 3 cents for the last mile or fraction of a mile, and that said carriers shall keep and sell at their regular stations tickets not in excess of rates prescribed in this order. This order to become effective December 1, 1907.                    Charles Henderson,

                    " 'President Railroad Commission of Alabama.'

"The Railroad Commission of Alabama will duly carry out the balance of the agreement made on its behalf by the Governor of the state of Alabama with the Southern Railway Company and its allied lines, and with the Seaboard Air Line Railway and the Atlanta & Birmingham Air Line Railway. The act of the Legislature hereinbefore referred to as the 'Passenger Rate Act,' has by virtue of the order of the Railroad Commission last above recited been modified and amended and the rates as applied to the railroad companies referred to in the order have been written into said 'Passenger Rate Act.'

"IX. The Southern Railway Company had, previous to its agreement with the Governor hereinbefore referred to, put into effect the freight and passenger rates prescribed by statute some time in the early part of August, 1907. At this time it was the purpose and intention of his excellency, the said Braxton B. Comer, Governor of the state of Alabama, to cause the orders of this honorable court in the above-described injunction suits to be frustrated and rendered ineffectual by requiring and instructing the solicitors and other prosecuting officials of the several counties through which ran the railroads of this complainant and other railroad companies in Alabama, and their officers, agents, and servants, to be arrested, indicted, prosecuted, and imprisoned, should they or either of them, under the protection of the orders made by this honorable court, and pursuant to the terms thereof, charge, demand, or receive for the transportation of passengers or freight more than the several rates fixed by the statutory rate acts above described, or should they or either of them refuse to receive any article when offered for transportation at the rate of compensation established by statute. His excellency, the said Braxton B. Comer, was at the time of the filing of the original bill of complaint in this cause Governor of the state of Alabama, and is still such Governor, and as such Governor is charged with the duty of seeing that the laws of the state of Alabama are enforced. He knows and is familiar with the bill of complaint in this cause, with the allegations contained therein, with the objects and purposes thereof, and knows of the restraining order heretofore made by this honorable court in this cause, and is familiar with the terms thereof, and as Governor of the state of Alabama he employed special counsel to assist the defendant the said A. M. Garber, Attorney General of the state of Alabama, in defending said cause, and the said Attorney General and the said special counsel have appear-

ed in said cause under said employment, and are representing the defendants therein, and yet his excellency, the said Braxton B. Comer, Governor as aforesaid, has recently on various occasions and in varying language, since the filing of the original bill of complaint in this cause, and since said injunctive order suspending said rates and restraining said parties, openly and publicly repudiated the right of this honorable court to make said order, and has declared that the said order did not operate to suspend the several rates fixed by said several statutes, and has openly and publicly declared that the making of said order by this honorable court is in violation of the sovereign rights of the state of Alabama, and has declared, in spite of the suspension of said rates by said order of this honorable court in this cause, and in spite of the fact that the enforcement of said rates has been restrained and enjoined as aforesaid, that every time a railroad has, since the order was made, charged a greater rate than that prescribed by the statutes, and its officers, agents, and servants have charged, demanded, or received said greater charge, it and they have been guilty of a criminal offense, and that every time any such railroad, or either of its officers, agents, or servants, hereafter makes such a charge, it and they are guilty of a criminal offense, and that they should for each offense be arrested, indicted, and convicted and punished by the courts of the state, and that it is the duty of the solicitors and of the other prosecuting officials of the several counties in which any of said railroads, including the complainant Central of Georgia Railway Company, is operated, to indict and prosecute said railroads and their officers, agents and servants for making such charges in excess of said rates, and that it is the duty of the several courts of the state of Alabama to convict and punish such railroads, their officers, agents, and servants, therefor, without regard to or respect for the order of this honorable court made in said cause, restraining and enjoining the enforcement of the several rates prescribed by the said several statutes heretofore recited, and he has publicly and openly declared his purpose to advise and instruct the several solicitors and other prosecuting officers of said several counties to ignore said order of this honorable court in said cause, suspending said rates and enjoining and restraining the enforcement thereof, and cause to be arrested, indicted, and prosecuted the said several railroads, including the complainant, and their officers, agents, and servants, for each charge made by them in excess of any of the rates prescribed in said statutory rate acts. Among other things, his excellency, the said Braxton B. Comer, has declared that every time a ticket is sold for more than 2½ cents per mile the railroads violate the law, and the person selling a ticket commits a misdemeanor, and it is the duty of every court to so charge the jury, and the duty of every solicitor to make out a case.

"X. All of the railroads of Alabama who filed their bills of complaint in this honorable court to enjoin the enforcement of said rates, with the exception of the complainant, Louisville & Nashville Railroad Company, the South & North Alabama Railroad Company, the Nashville, Chattanooga & St. Louis Railway Company, and the Western Railway of Alabama, have succumbed to the threatening attitude of his excellency, the Governor, and of the prosecuting officers of the state of Alabama, and have put into effect the rates prescribed by the said statutory rate acts. Referring to the putting into effect of said rates by the Southern Railway in the state of Alabama, the Governor openly and publicly stated in substance as follows: 'I think the Southern Railway management was very wise in accepting in good faith the reasonable enacted laws of the state and giving them a fair trial, and it is difficult to understand how any corporation, whether domestic or foreign, can see it to their business interests to place themselves crosswise of the expressed will of the people, and place themselves in defiance of the laws of the state, and seek by injunction of the federal court to place themselves outside of the sympathy of the laws of the state. I wish to thank the Southern Railway officials for their accession to what I am sure is the just demand of the people, and an agreement to obey their laws, and will simply add that a negro crap shooter would be arrested in a minute for any violation of the law, and I shall charge every officer of the state that any violation of our criminal laws, whether by an individual or trust, no matter how small the individual, or how great the trust, is a violation of the law, and must be so charged, and alike made amenable. I am sure

that some of our public service corporations do not fully understand that Alabama is a sovereign state and must dominate its intrastate affairs. I am sure that there is scarcely a citizen of Alabama so scalawag in his views as to wish to help secure the contrary to this. I am sure that the people of Alabama, practically as a unit, demand that the state control its own affairs, and whenever any of our laws, civil or criminal, are violated, the offender must be punished.' He further said in substance as follows: 'I can conceive of no greater mistake than for a public service corporation to attempt to ignore, through an injunction of the federal courts, a state's rights to regulate their business within the state. I think it is a great mistake for local federal courts to attempt to set aside the state's jurisdiction, of its own affairs.'

"XI. Subsequently his excellency, the Governor of Alabama, becoming convinced that the complainant and the Louisville & Nashville Railroad Company and the other four railroad companies hereinbefore mentioned would not yield to the threatening attitude of the officials of the state of Alabama, openly and publicly declared himself in a newspaper interview, which he caused to be published in the Montgomery Advertiser of August 22, 1907, in which, among other things, he said substantially as follows: 'I wish to say, however, that I have not yet lost hope that these public service corporations, which have not yet fallen into line with the purpose of trying the reduced rates, and have assumed an attitude of opposition to state harmony and state regulation, will yet reconsider and will consent to give the new laws a fair trial. I shall use every effort to persuade and induce them to mitigate the friction which is being engendered in the state by co-operation which is in their power to give. It is perhaps needless to say that under section 120 of the Constitution of Alabama, by which I am bound by my oath of office, and which declares that the Governor shall take care that the laws be faithfully executed, I shall endeavor at all times to use all lawful and proper means to secure the enforcement of the laws of Alabama, and during my term of office I shall certainly adopt all lawful and proper means to secure the domination by the state of its domestic affairs. If the statutes already enacted are insufficient, or need modification or amendment, or if legislation is necessary to accomplish the said purpose, I will not hesitate, as often as may be necessary, or from time to time, to call the Legislature together in extraordinary session. Furthermore, if the statutes upon the subjects of freight and passenger charges on intrastate and domestic business are not being observed by October 1, 1907, by all the railroads, under the terms and upon the conditions agreed on with those roads hereinbefore mentioned—that is, the Southern and allied lines, and the Frisco, Seaboard, Birmingham & Atlantic, and Coast Line, and if it shall appear that under the existing laws the state in its just effort to regulate rates is thwarted by any superior power. I will at that time call the Legislature in extra session, to deal with the whole subject and for the purpose of passing such laws as may secure the full regulation by the state of its public service corporations.'

"XII. Complainant, and the other railway companies in Alabama in the same situation with it, not having yielded by the 1st of October, the Governor of the state of Alabama, on the 9th of October, 1907, called a special session of the Legislature of Alabama to assemble on the 7th day of November, 1907. This special session of the Legislature was called in pursuance of the threat hereinbefore stated, mainly for the purpose of passing such legislation as would defeat the jurisdiction of this honorable court in this pending case, and in the other similar cases now pending in this honorable court, brought by other railroad carriers operating in the state of Alabama, and to arrange a scheme or device of legislation so that complainant and the other common carriers by railroad in the state of Alabama could bring a bill in the federal court to test the constitutionality of the laws of the state of Alabama imposing freight and passenger rates, which were to be so framed that the carriers operating in the state of Alabama could not afford to test the validity of said laws, because of the harsh penalties to be inflicted on the common carriers by railroad operating in that state, their officers, agents, and servants.

"XIII. Upon the assembling of the said special session of the Legislature of Alabama, his excellency, the Governor, transmitted a message to the Legislature which dealt mainly with railroad regulation and with the scheme hereinbefore referred to. Special attention is called to the following extracts from

the said message, to wit: 'It is evident that the question at issue is, not so much freight rates or passenger rates, but whether or not the state shall dominate and control its own affairs by limiting the rules and charges of the public service corporations, or whether the railroads shall have the liberty to deny your right to regulate within the state and to ignore your laws and regulations, and every attempt on the part of the state to control them or limit their charges. This proposition I consider so dangerous that, following the advice of your counsel, the Attorney General, and the counsel employed by the state to assist the Attorney General in the presentation of the cause, I recommend and advise the passage of certain bills which the state's attorneys have drawn for the purpose of strengthening the state's position to aid in settling whether or not the people of Alabama have the right to dominate their intrastate affairs and make laws regulating them. I will caution you again that these bills are prepared by the state's attorneys, upon which the state will go to trial, and this legislation is advised because it will be helpful in securing compliance with your statutes fixing passenger and freight rates. You, of course, understand that the railroad interest will be opposed to these acts, and the question will be squarely before you: Whose advice shall we take, the advice of the railroads which are defying your laws, or the advice of the attorneys employed by the state to represent the state in the interest of the people? Whom shall we let dominate and control us, the people or the railroads? * * * The statutes which I recommend are in no sense of the word punitive or destructive. The public service corporations under your laws will be protected and encouraged in every right. Only the dangerous use of power, a condition which is now recognized by every state as dangerous to its citizens, to the property of the state, and to the corporations themselves, is sought to be limited and controlled. These statutes, then, which I advise, and which are recommended by the state's attorneys, are so framed as to be more effective in securing obedience to your statutes regulating rates and regulating the powers of public service corporations. I suggest the passage of these bills as drawn. The changes are amendatory in nature to your former bills and are suggested by further study of the course of events in the litigation now pending. These amendments are made in the same way that an attorney amends his pleadings and brief as his case progresses. Just as in an individual legal contest you would trust your attorneys and follow their suggestions and advice, so in the great legal contest of the state you will observe the same trust and confidence, as the part of prudence and wisdom, for the attainment of a successful issue.'

"XIV. The legislation which was enacted was the legislation which was prepared and submitted to the Legislature by the Governor, with the assistance of the Attorney General of the state of Alabama and other counsel for defendants under the original bill, and constitutes as a whole a scheme or device intended to accomplish the following purposes, to wit:

"(1) The taking away from the Railroad Commission and the Attorney General of all power and authority to enforce the statutory rate acts, so that the present causes of action will be abated as to them and the injunction against them will be functus officio.

"(2) To make the charging by complainant of higher rates than those prescribed by the statutes of the state of Alabama punishable by heavy fines for each offense, which shall be enforceable by civil suits against the complainant herein and other railway companies similarly situated, for forfeitures in the name of the state; the theory of this being that, the suits being brought in the name of the state, their prosecution cannot be enjoined by the federal courts.

"(3) To make the charging or exaction of higher rates than those prescribed by the statutes of the state of Alabama, by the officers, agents, and servants of the complainant, a misdemeanor, punishable by heavy penalties for each offense, so that the enforcement of these provisions of the laws may be set in motion by undisclosed persons, by indictments, or by prosecutions in numerous different jurisdictions of the state.

"(4) To provide actions for damages by shippers and passengers who are charged higher rates of freight or passage than are prescribed by statute, which damages are to be assessed by jury, and may be brought in any county

in the state through which the railroad company operates, and which shall not be barred until the lapse of many years.

"(5) To make the penalties and forfeitures in actions for damages so large in amount, and so numerous, and enforceable at the same time in so many different jurisdictions, that this complainant and others similarly situated will be forced to submit or wager all of their property on the result of the litiga- tion, and so that they shall be embarrassed by the enormous amount of litiga- tion encouraged and instituted by the statutes, that they will be forced to put the rates into effect without a judicial determination as to their constitution- ality and validity.

"(6) To repeal existing laws, which provide for a remedy, and to substitute in their place a law which purports to give a remedy in the state court, but which gives the remedy only by appeal from an order of the Railroad Commis- sion increasing or reducing rates, or refusing to increase or reduce rates, and gives it in such a manner as to practically make submission to the rates pend- ente lite a condition precedent.

"(7) To repeal the rate statutes which are attacked by the original bill of com- plaint in this cause, and to enact in their places statutes which purport to enact different rates (but which, in reality and effect, are but re-enactments of the old statutes, with immaterial modifications); the theory being that by this method the cause of action of the original bill of complaint in this cause, and of other similar bills, will be abated thereby, and the jurisdiction of this honorable court defeated and destroyed.

"(8) At all events, to defeat the jurisdiction of this honorable court in these present cases, and make it impossible for the complainant, and others similar- ly situated, to proceed at all in the federal courts of Alabama.

"XV. The following are the statutes which were passed at the special session of the Legislature of Alabama which convened November 7, 1907, and which constitute the scheme or device previously described:

"(1) An act approved November 23, 1907, entitled 'An act to exclude from the Railroad Commission and the members thereof and the Attorney General all power, authority or duty to enforce any rates, fares, or charges for the trans- portation of property or passengers which have been or which may hereafter be prescribed by statute, or the making the maximum rates by statute or any law now existing or which may hereafter be enacted prescribing such rates, charges or fares, or any rates, fares or charges which have been or may here- after be established by the Railroad Commission's orders establishing the same, and all power and authority to instruct, direct or request the Attorney General to institute any legal proceedings to enforce such rates, fares, charges, statutes or orders.'

"(2) An act approved November 23, 1907, entitled 'An act to repeal sections 18, 36, 37, 38, 39, 40, 42, 43 and 45 of an act of the Legislature of Alabama en- titled "An act to create the Railroad Commission, to be known as the Railroad Commission of Alabama, to define its duties and powers and provide for its mode of procedure, and prescribe penalties for violation of its orders." ' Sec- tion 18 of said act charged the Railroad Commission with the enforcement of all statutory freight and passenger rates, and with the power to prevent and punish any violation of the statutes establishing such rates.   Sections 36, 37, 38, 39, and 40 provided the method for contesting in the courts the statutory freight and passenger rates, and the rates made by the Commission, or or- ders of the Commission making rules and regulations.   Section 42 provided that in the trial of any cause provided for or arising under said act, or any cause in which was involved the validity, fairness, or reasonableness of rates or charges or orders of any kind made and established by the Railroad Com- mission, such rates or charges or orders shall be prima facie presumed to be valid, fair, and reasonable until the contrary shown, and the burden shall be on the party attacking said rates or orders to show that same are invalid, un- fair, or unreasonable.   Section 43 of said act provided for a revocation of the license to carry on business in this state of any foreign corporation which should institute a case in the federal court, or remove one there, involving rates made by statutes of the state of Alabama, or by the Commission, or in- volving the rules or regulations made by order of the Commission.   Section 45 provided a penalty of not less than $50 nor more than $1,000 for the viola-

tion of rates made by the Commission, and provided for the institution of suits to recover the same through the Attorney General or the solicitors.

"(3) An act approved November 23, 1907, entitled 'An act to amend sections 5, 29, 35, 41 and 52 of the act entitled "An act to create a Railroad Commission,"' etc. Section 5 relates to a matter which is not necessary to refer to in this connection. Section 29 is amended so as to cut off all reference therein to evidence on complaints under the provisions of the thirty-sixth section of the act, which latter section relates to suits to contest the validity of rates and their reasonableness. Section 35 is amended so as to eliminate from this section reference to section 36 of the act. Section 41 is so amended as to take away from the Railroad Commission the power of applying for mandamus with respect to its rules and regulations. Section 52 is so amended as to take away the power of the Attorney General to represent the Railroad Commission in any proceedings with reference to rates, but preserves his power to represent them in proceedings in matters other than those relating to rates.

"(4) An act approved November 23, 1907, entitled 'An act to repeal an act entitled "An act to provide the manner in which any person, company or corporation owning or operating as a common carrier any railroad in whole or in part in this state may contest the validity or reasonableness and fairness of any maximum rate established by statute to be charged by railroads for the transportation originating and terminating within the state of articles, and have the same annulled or the enforcement thereof enjoined or restrained."' This act, which was repealed, provided that any person, company, or corporation should have the right to contest the validity or fairness or reasonableness of and the right of the Railroad Commission of Alabama to enforce any rate or rates of compensation established by statute for the transportation of freight within the state of Alabama, by filing a petition or complaint, if such contest be instituted in a state court, in the circuit court, or chancery court of Montgomery county, Ala., or other court in said county having a concurrent jurisdiction with said circuit court or chancery court, making the Railroad Commission of Alabama defendant therein, and in said petition the validity, fairness, or reasonableness of said rates may be contested. It was further provided that the rates might be suspended upon complying with certain conditions with reference to giving bond, and it was particularly provided that 'no preliminary injunction or interlocutory order or decree suspending or restraining any of the rates established by statute, or the enforcement of said rates, or any of them, should be granted by a judge, except upon hearing after not less than five days' notice to the Railroad Commission of Alabama, and no judge shall grant such injunction or interlocutory order or decree without requiring as a condition precedent to the issue thereof the filing of bond under certain conditions referred to in the act.' Under the provisions of this statute the freight rates were suspended by the interlocutory order of this honorable court in the original bill in this cause.

"(5) An act approved November 23, 1907, entitled 'An act to provide for and authorize appeals from any action or order of the Railroad Commission of Alabama, affecting or relating to, or reducing or increasing, or refusing to increase any rates, fares or charges by common carriers, for the transportation of property, freight or passengers specifically prescribed by statute, or made the maximum rate by statute, or established by said Railroad Commission.' This act provides a method of contesting the final action or order of the Railroad Commission of Alabama, reducing or increasing, or refusing to reduce or increase, any rates of freight or passenger either made by statute or by the Commission by appeal 'to the chancery court or other court having chancery jurisdiction of Montgomery county, Alabama.' This act does not permit of any contest of rates made by statute until there is some final action or order of the Railroad Commission upon said statutory rates. This act provides that an appeal shall be taken within 30 days from the date of the order of the Commission, and that the appeal shall be granted as a matter of course, and that within 60 days from the perfecting of the appeal the Railroad Commission shall certify to the appellate court a complete transcript of all the proceedings, and that the trial of the appeal in the appellate court shall be de novo. The second section provides that no appeal shall suspend the order of the Commission until the appellate court shall, after consideration of the

testimony taken before the commission, so direct. The act is so arranged that, before the railway company can get the benefit of it, some application must be made to the Commission to increase the rates made by the statute, or the Commission must reduce the statutory rates. The Commission can consider the question as long as it pleases and make up the judgment at its pleasure, and in the meantime the statutory rates will be and remain in force. After the Commission has pronounced the judgment, and the appeal is taken, the Commission has 60 days within which to certify its proceedings to the appellate court, after which the appellate court must determine for itself, and then solely on the evidence certified by the Commission, the question whether the rates shall be suspended during the prosecution of the appeal. This act specially provides that, 'when the appeal is taken by the common carrier or railroad corporation, the Railroad Commission shall be the appellee.'

"(6) An act approved November —, 1907, entitled 'An act to amend section 2 of an act entitled "An act to prevent any officer, agent or employé of any person, company or corporation owning or operating as a common carrier any railroad, in whole or in part in this state, from charging or receiving for the transportation originating and terminating within the state of any article a greater or higher rate of compensation than that established by statute where a rate for the transportation of such article has been established by statute, or from refusing to receive such article for transportation at the rate established by statute."' This amendatory act provides that the agents of a corporation violating the statutory freight rate act shall be guilty of a misdemeanor and for each offense shall be fined a sum not exceeding $500. The section amended provided for a penalty of not more than $1,000 nor less than $200 and in addition for imprisonment in the county jail for a period of six months. The amendatory act also provided that superior officers of the company might be called to account in any county in which the inferior officers violate the act, and that the inferior officers called for witnesses will get indemnity from prosecution for testifying. The act by its terms goes into effect 10 days after its passage and approval.

"(7) The act approved November 23, 1907, entitled 'An act to prohibit common carriers and their officers, agents and employés from publishing, exacting, charging and receiving any higher or greater rate of compensation for the transportation of property or passengers than that specifically designated and prescribed by statute, or made the maximum rate by statute, or than that established by the Railroad Commission, and from refusing to receive property or passengers for transportation at such rates; to provide penalties for a violation thereof and fix a period within which proceedings may be instituted for the recovery of such penalties, and the procedure to recover the same.' Section 1 of this act makes it unlawful for a common carrier to publish, exact, or charge a higher rate for freight or passengers than that prescribed by statute or by the Commission. Section 2 provides that the corporation shall forfeit to the state of Alabama a sum not exceeding $2,000 for each offense to be determined by the court. Section 3 makes each publication, exaction, or charge for the transportation of a passenger or for the carriage of freight in excess of the statutory rate or rates established by the Railroad Commission a separate and distinct offense. Section 4 provides that every officer, agent, or employé of the common carrier violating the act shall be guilty of a misdemeanor, and upon conviction shall be fined not exceeding $500 for each offense, to be determined by the court. Section 5 provides that a civil action to recover forfeitures provided by section 2 may be brought in the name of the state of Alabama in any county in which the defendant does business in the state of Alabama, and that the forfeitures may be consolidated into one action in any county. This section further provides that no suit for such forfeiture shall be instituted by the Railroad Commission, the Attorney General, or solicitor; but any citizen of the state may institute and prosecute such suit in the name of the state of Alabama without his name appearing in the complaint; but such complaint shall be signed by the citizen instituting the suit, or for him and in his name by his agent thereunto authorized in writing, and by the attorney said citizen may engage to represent the state as plaintiff. 'One-half of the amount recovered in such forfeiture suits shall be paid to the person bringing the suit and the other half to the state.' It is further provided that

'such suit instituted by any citizen shall be and be deemed to be a suit by the state of Alabama against such common carrier or railroad corporation.' It is further provided that 'if on the trial of such suit the defendant should set up in defense in substance or effect, that it has been enjoined or restrained by a temporary or permanent order at the suit of any person or corporation from putting into effect or charging the rates or fares established by statute, or by order of the Railroad Commission, or from complying with the statutes or orders establishing such rates or fares, it shall be competent for the plaintiff to set up in reply, in substance and effect, that the procuring of the injunction was collusive or that the procuring or continuing thereof was not in good faith resisted, and upon the trial of such issue or issues the burden shall be on the common carrier or railroad corporation to show to the reasonable satisfaction of the jury, or the court, if the cause be tried by the court, without the intervention of a jury, that said injunction was not obtained by collusion between the parties to the suit in which said injunction was granted, or that the procuring or continuing thereof had been in good faith resisted.' This act by its terms goes into effect 10 days after its passage and approval.

"(8) An act approved November —, 1907, entitled 'An act to prohibit railroads and other common carriers or terminal companies or other companies or persons controlling access to passenger trains from preventing access to regular trains carrying passengers by the use of fences, gates or by any means whatsoever by any person desiring to take passage on said trains between points within this state, when such person has offered to purchase a ticket at the rate prescribed by statute or fixed by the Railroad Commission, and the sale of such ticket at such rate has been refused; to prescribe the penalty for violations thereof, the period within which proceedings may be instituted to recover such penalties and the procedure for the recovery of the same.' Section 1 provides that whenever a railroad company fails to keep for sale, or to sell on demand at any of its regular stations, tickets at the prescribed rates, it shall be unlawful for such company, or any terminal company, or any person controlling access to passenger trains, to prevent by the use of fences, bars, gates, or any means whatsoever, intending passengers from taking passage on trains at such stations. Section 2 provides that every corporation violating this act shall forfeit to the state of Alabama a sum of not less than $200 nor more than $1,000 for each offense, to be determined by the court. Section 3 provides that the officers, agents, or servants of the company violating the act shall be guilty of a misdemeanor, and upon conviction fined not less than $100 nor more than $500 for each offense. Section 4 provides that a civil action to recover forfeitures provided by section 2 may be brought in any county in which the company does business at any time within 10 years from the commission of the acts prohibited by section 1. This section also provides for the institution and prosecution of suits, forfeiture suits, in identically the same language as used in the act referred to in the preceding paragraph, and also provides that a temporary restraining order or injunction pendente lite enjoining the enforcement of the rates shall be no defense to suits for recovery of such forfeitures. This act by its terms goes into effect 10 days after its passage and approval.

"(9) An act approved November —, 1907, entitled 'An act to make railroad and other common carriers liable in damages to passengers or persons desiring to become passengers for refusing to carry such persons between points in this state at which regular stops are made to take on and let off passengers at the rate which has been or may be hereafter prescribed by statute, or the rates which have been or may hereafter be established by the Railroad Commission; to authorize actions to recover such damages and prescribe the period within which such actions may be brought, and the procedure.' Section 1 of this act provides that any person who desires in good faith to become a passenger and is refused transportation at the rate of fare prescribed either by statute, or by the Commission, may maintain an action for damages against said railroad company or other common carrier, and recover such damages as the jury may assess at any time within ten years and in any county in which the railroad does business or in any county through which the passenger would have been carried to reach his destination. Section 2 provides that any person acting on behalf of the company within the scope of his employment

and refusing such transportation shall be the act of the railroad company. Section 3 provides that the refusal of the railroad company to sell a person a ticket at stations where tickets are kept for sale at the prescribed rates shall be prima facie evidence of a refusal to carry, and it shall not be necessary for such person to tender the exact amount of fare due for such transportation. When an excess charge is made by an employé through inadvertence or mistake, it shall not be construed as a refusal within the meaning of section 1 of this act. Section 4 provides that it shall be no defense to such action that a temporary restraining order or injunction pendente lite has been granted or issued in a proceeding in which the plaintiff is not named as a party, nor shall such action be continued on the ground that suit is pending in another court wherein is drawn in question the validity or reasonableness of the rates, or on the ground that such injunction or restraining order has been granted. This act by its terms goes into effect 10 days after its passage and approval.

"(10) An act approved November 23, 1907, entitled 'An act to authorize the recovery of damages by any person who has been ejected from any regular passenger train of any railroad in this state for refusal to pay a greater or higher rate of fare than that prescribed by statute, or by the Railroad Commission, and to prescribe the period within which such action may be brought.' This act provides that under the circumstances referred to in the title a person ejected may recover such damages as the jury may assess, which action may be instituted at any time within 10 years from the date of the accrual of the cause of action.

"(11) An act approved November 23, 1907, entitled 'An act to further regulate railroads and other common carriers, to secure reasonable rates, and to prevent unjust discrimination in their public service, and to further prescribe the powers, duty and authority of the Railroad Commission with respect to said railroads and other common carriers, and to fix the penalties for violations of regulations and of the orders of said Railroad Commission.' This act provides for the further regulation of railroads in various matters relating particularly to furnishing facilities and to furnishing information to the Commission on a variety of subjects. Section 13 of the act provides that the printed reports of the Railroad Commission published by its authority shall be admissible in evidence in any court in Alabama without further proof, and that any schedule or rates or order of the Commission shall be admissible in evidence upon the certificate of the Commission, or any member thereof, or of the Secretary of the Commission. Section 14 provides that, when a shipment of freight passes over the whole or part of two or more railroads, the Commission shall have the power to prescribe their continuous mileage rates or joint rates as it may in its judgment see fit. Joint rates are the sum of two local rates less 10 per cent., and as the rate per ton per mile decreases with the distance joint rates are much lower than the continuous mileage rates. Section 15 provides that 'the domicile of the Railroad Commission is hereby fixed at the capital of the state in Montgomery, Montgomery county, and no courts other than those of Montgomery county shall have or take jurisdiction, in any suit or proceeding brought or instituted against said Commission.'

"(12) An act approved November 23, 1907, entitled 'An act to repeal an act of the Legislature of Alabama, entitled "An act to fix and establish the maximum rates to be charged by railroads now operating or which may hereafter operate as common carriers in whole or in part in the state of Alabama, for the transportation originating and terminating within the state of certain articles, and for this purpose to classify said articles and said railroads," approved March 2, 1907.' This act repealed the act hereinbefore referred to as the 'Old Commodity Rate Act.'

"(13) At the same special session of the Legislature of Alabama eight separate acts were passed, all approved November 23, 1907, each entitled 'An act to fix and establish the maximum rates to be charged by railroads now operating or which may hereafter operate as common carriers in whole or in part in the state of Alabama, for a transportation originating and terminating in the state of certain articles or commodities to be known as "Group ———," and for this purpose to classify railroads.' These eight acts are hereinafter referred to as the 'New Commodity Rate Acts.' The old commodity rate act,

which was repealed at the special session of the Legislature as stated in the paragraph immediately preceding this paragraph, covered about 110 different commodities. These eight acts cover substantially the same commodities as were covered by the old commodity rate act, with a few immaterial exceptions, to be hereafter noted. The 110 commodities included in the old commodity rate act were classified into eight groups, and each one of the eight new acts dealt separately with one of the eight groups; the said eight acts being identical in all respects, except with reference to the commodities grouped therein and the rates applicable thereto. The rates prescribed for the several commodities in the new commodity rate acts are substantially the same as those prescribed for the same commodities in the old commodity rate act, with some exceptions to be hereafter noted.

"XVI. Now that the acts have been passed at the special session of the Legislature of Alabama in pursuance of the proclamation and message of the Governor, and the scheme or device which is hereinbefore set forth has become crystallized, it is the purpose and intention of the Governor of the state and the other officials of the state charged with the execution of her laws to put the said scheme or device into effective operation. The design is that a multitude of actions for damages shall be brought against complainant by persons who intend to be or become passengers or shippers of freight, that a multitude of forfeiture suits shall be brought against complainant in different jurisdictions at the same time, and that its officers, agents, and employés shall be prosecuted for misdemeanors and fined, and that all the machinery provided by the laws of the state of Alabama shall be put in motion through the solicitors and sheriffs of the various counties through which complainant operates its railroad, and the process of the state courts will be employed to render ineffectual and frustrate the jurisdiction of this court and to coerce the complainant to put into effect the rates prescribed by the said statutory rate acts.

     ＊   ＊   ＊   ＊   ＊   ＊   ＊   ＊   ＊   ＊   ＊   ＊

"XXVII. Complainant alleges and avers that the rates of freight and passenger traffic which it is now permitted to charge in its domestic business in the state of Alabama, and those which it is compelled to charge by reason of circumstances beyond its control, do not yield a fair return upon a fair valuation of its property. Complainant is vested, as a right incident to its ownership, with the lawful right to charge for such passenger and freight business rates which yield a fair return upon a fair value of its property, and also with the lawful right to charge for each class of business such rates as will yield a fair return upon a fair valuation of that portion of its property which is devoted to each particular service. The passenger rates imposed upon complainant by the said 'Passenger Rate Act,' and also the freight rates imposed upon complainant by the said eight freight rate acts, hereinbefore described as the 'New Commodity Rate Acts,' are unjust and unreasonably low, and are confiscatory of the property of complainant. And thereupon complainant alleges and avers that said 'Passenger Rate Act' and the 'New Commodity Rate Acts are unconstitutional, null, and void, in that they deprive complainant of its property without due process of law and deny it the equal protection of the law, contrary to the fourteenth amendment of the Constitution of the United States.

"XXVIII. Under the Constitution of the state of Alabama (section 243) it is provided: 'The power and authority of regulating railroad freight and passenger tariffs, the locating and building of passenger and freight depots, correcting abuses, and preventing unjust discriminations, and extortions, and requiring reasonable and just rates of freight and passenger tariffs, are hereby conferred upon the Legislature, whose duty it shall be to pass laws from time to time, regulating freight and passenger tariffs, to prohibit unjust discriminations on the various railroads, canals and rivers of the state, and to prohibit the charging of other than just and reasonable rates, and enforce the same by adequate facilities.' Complainant alleges and avers that the rates imposed upon it by the said passenger rate act and by the said new commodity rate acts are unreasonable and unjust, and that, therefore, the said acts are unconstitutional, null, and void, in that they are contrary to the above-

recited 'section of the Constitution of Alabama, which is a limitation upon the power of the Legislature of the state of Alabama in this respect.

"XXIX. Article 4, par. 95, of the Constitution of the state of Alabama, provides: 'There can be no law of this state, impairing the obligation of contracts by destroying or impairing the remedy for their enforcement; and the Legislature shall have no power to revise any right or remedy which may have become barred by the lapse of time or by any statute of this state. After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action or destroy the existing defense to such suit.' The scheme or purpose of the legislation hereinbefore set forth is to take away the cause of action of the complainant set forth in its original bill. This scheme is sought to be accomplished particularly by the following acts:

"(1) The act which excludes from the Commission and the Attorney General all power and authority to enforce rates, which act is more particularly set forth and described in article XV, paragraph 1, of this supplemental bill.

"(2) The act which repeals certain sections of the act entitled 'An act to create the Railroad Commission,' etc., and particularly section 18 of said act, which repealing act is set forth and more particularly described in article XV, paragraph 2, of this supplemental bill.

"(3) The act which repeals certain sections of the act entitled 'An act to create the Railroad Commission,' etc., which particularly repeals section 41 and section 52 of said act, which repealing act is set forth and more particularly described in article XV, paragraph 3, of this supplemental bill.

"(4) The act which repeals the old commodity rate act, which repealing act is set forth and particularly described in article XV, paragraph 12, of this supplemental bill.

"(5) The new commodity rate acts, which are set out and more particularly described in article XV, paragraph 13, of this supplemental bill. The new commodity rate acts are but a re-enactment in another form of the old commodity rate act, which has been repealed as aforesaid.

"Complainant charges and alleges that the above-recited acts, referred to in paragraphs 1, 2, 3, 4, and 5 of this article, constitute a scheme or device to take away the cause of action of this complainant, and that the said acts are each separately and collectively unconstitutional, null, and void, and contrary to article 4, § 95, of the Constitution of the state of Alabama, in that they seek to take away the cause of action of this complainant in its original bill in this cause.

"XXX. Three of the acts which were passed at the special session of the Legislature of Alabama, and which are respectively set forth and described in article XV, paragraphs 7, 8, and 9, of this supplemental bill, to wit: The act entitled 'An act to prohibit common carriers and their officers, agents and employés, from publishing, exacting, charging or receiving any higher or greater rate of compensation, for the transportation of property or passengers, than that specifically designated and prescribed by statute,' etc. The act entitled 'An act to prohibit railroads and other common carriers or terminal companies, or persons controlling access to passenger trains, from preventing access to railroad trains carrying passengers by the use of fences, gates, bars, or by any means whatsoever,' etc. The act entitled 'An act to make railroad corporations and other common carriers liable in damages to passengers or persons desiring to become passengers for refusing to carry such persons between points in this state,' etc. The first of these acts above recited in the fifth section thereof provides as follows: 'If on the trial of such suit the defendant should set up in defense, in substance or effect, that it has been enjoined or restrained by a temporary or permanent order, at the suit of any person or corporation, from putting into effect or charging the rates or fares established by statute, or by order of the Railroad Commission, or from complying with the statutes or orders establishing such rates or fares, it shall be competent for the plaintiff to set up in reply, in substance or effect, that the procuring of the injunction was collusive or that the procuring or continuing thereof was not in good faith resisted, and upon the trial of such issue or issues, the burden shall be on the common carrier or railroad corporation, to show to the reasonable satisfaction of a jury, or the court, if the cause be

tried by the court without the intervention of a jury, that said injunction was obtained by collusion between the parties to the suit in which said injunction was granted, or that the procuring or continuing thereof had been in good faith resisted.' The second of the above-recited acts provides in the fourth section thereof that, 'it shall be no defense to any suit to recover such forfeiture that temporary restraining order or injunction pendente lite has been granted or issued, which undertakes to enjoin or delay the enforcement of the rates prescribed by statute, or any of them, or the statute or order prescribing such rates, or that the common carrier or railroad corporation has been enjoined or restrained by temporary restraining order or injunction pendente lite. from putting in force such statutory rates or charges, or the rates or charges established by the Railroad Commission or the statute or order prescribing such rates, at the suit of any person or corporation.' The third of the above-recited acts provides in section 4 thereof that 'It shall be no defense to any such action that a temporary restraining order or injunction pendente lite has been granted or issued, in a proceeding in which the plaintiff in said action is not named as a party, in enjoining the enforcement of the rates prescribed by statute, or any of them, or the statutory rates established by the Railroad Commission, or any of them, or the statute or order prescribing such rates, or that the Railroad Commission or other common carrier has been enjoined or restrained by such temporary restraining order or injunction pendente lite in a proceeding in which the plaintiff in said action is not named as a party from putting in force such statutory rates or such rates established by such Railroad Commission at the suit of any person or corporation; nor shall any such action be continued (except by consent) on the ground that a suit is pending in another court, wherein is drawn in question the validity, fairness or reasonableness of the rates or fares prescribed by statute, or established by the Railroad Commission, or on the ground that such injunction or restraining order has been granted.' Complainant thereupon alleges and charges that the said three acts in this article heretofore specifically described are unconstitutional, null, and void, in that they each deny complainant due process of law and deny to it the equal protection of the laws, all contrary to the fourteenth amendment to the Constitution of the United States. The said three acts are unconstitutional, null, and void, in that they conflict with article 4, § 95, of the Constitution of the state of Alabama, which is hereinbefore recited, and which provides that after suit has been commenced on any cause of action the Legislature shall have no power to take away such cause of action.

"XXXI. The scheme of legislation is so arranged that such a multiplicity of acts and prosecutions will be brought against complainant and its officers, agents, and employés. and such an enormous amount of penalties will be inflicted upon them in that event, that if complainant does not comply with said statutory rate acts (notwithstanding the rates prescribed thereby are unreasonable and unjust and confiscatory) that complainant will be constrained and compelled either to put the said rates into effect or submit to confiscation of its property. The legislation is of such a character and so framed as to deny complainant the opportunity for a judicial review of its rights. The scheme or device to deprive complainant of a judicial review, by imposing upon it and its officers, agents, and employés enormous penalties, and harassing it with a multiplicity of suits, is sought to be accomplished with the following acts passed at the special session of the Legislature of Alabama:

"(1) The act making it a misdemeanor on the part of the officers, agents, and employés of complainant to charge a higher rate than prescribed by statute for articles offered for transportation. This act is more particularly described in article XV, paragraph 6, of this bill.

"(2) The act to prohibit railroads and their officers, agents, and employés from charging higher rates of passenger and freight than authorized by statute or rules of the Commission. This act is more fully set forth and described in article XV, paragraph 7, of this bill.

"(3) The act which prohibits railroads from preventing passage on their trains, by means of fences, gates, or bars, to passengers who have offered to pay the fare prescribed by statute. This act is more fully set forth and described in article XV, paragraph 8, of this bill.

"(4) The act which provides for an action for damages to passengers or persons who are refused transportation at the rate of fare prescribed by statute, which act is more fully set forth and described in article XV, paragraph 10, of this bill.

"The acts above referred to in paragraphs 2 and 3 of this article provide for each offense a forfeiture not exceeding $2,000, to be determined by the court, and that this forfeiture shall be prosecuted by civil suit in the name of the state, one half thereof to be paid to the prosecutor and the other half to the state. The said acts also provide that for each offense the officers, agents, and employés of a railway company who shall charge or exact higher rates than prescribed by statute shall be guilty of a misdemeanor. The actions for damages provided for by the acts described in paragraphs 4 and 5 of this article leave the amount of damages to be determined by the jury, which means in substance that the jury may find punitive or exemplary damages against the defendant. All the acts provide that the forfeitures, suits, prosecutions for misdemeanors, and the actions for damages may be brought in any county in the state through which complainant operates its lines of railway, without regard to the locality in which the action originates; this being designed to permit prosecutors or plaintiffs, as the case may be, to select the most favorable jurisdiction to them. In the operation of the lines of railroad of complainant within the state of Alabama it receives and carries every day thousands of passengers, and also carries on its lines of railroad in Alabama thousands of shipments of commodities described in the 'New Commodity Rate Acts.' Therefore hundreds, and perhaps, thousands, of actions may be brought against complainant for damages and for forfeitures under the statutes above recited, and thousands of prosecutions may be brought against its officers, agents, and employés for misdemeanors. The forfeitures incurred by the complainant, and the liability to damage incurred by it, and the penalties and fines to which its officers, agents, and employés will be subjected, are unusual and unreasonable in number or amount, as that complainant is allowed to come into court and make its claim of defense, subject only to the condition that upon failure to make good its claim or defense the penalties for such failure either appropriates of its property or subjects it to extravagant and unreasonable loss. The said statutes place upon complainant as a penalty for its failure to make good its claim or defense a burden so great as to practically intimidate it from ascertaining that which it believes its rights. It is designed by the acts above recited in this article to so burden the challenge thereof in the courts that the complainant will be necessarily constrained to submit rather than to take the chances of the penalties imposed. No such penalties or conditions are imposed upon any other persons in the state of Alabama for testing their legal or constitutional rights in the courts.

"Complainant therefore alleges and avers that said acts of the Legislature of Alabama, set forth in this article, deny to it the equal protection of the laws and take its property without due process of law, contrary to the fourteenth amendment to the Constitution of the United States. Complainant further alleges and avers that said acts recited in this article are unconstitutional, null, and void, in that they conflict with the following articles of the Constitution of the state of Alabama: Article 1, § 13, Bill of Rights: 'That all courts shall be open; and that every person, for an injury done him, in his lands, goods or person or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial or delay.' Article 1, § 35: 'That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty and property, and when the government assumes other functions, it is usurpation and oppression.' Article 1, § 36: 'That this enumeration of certain rights shall not impair or deny others retained by the people; and to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.'

"XXXII. The 'Passenger Rate Act,' hereinbefore described, and the 'New Commodity Rate Acts,' do not provide for any method of contesting the validity, reasonableness, or constitutionality of the rates of passenger and freight thereby prescribed, and under the laws of the state of Alabama not only is no

method provided for a judicial review thereof, but the scheme or device of the law is such as to prevent a judicial review thereof, and especially to prevent a judicial review in the federal courts. The thirty-sixth, thirty-eighth, thirty-ninth and fortieth sections of the act entitled 'An act to create the Railroad Commission,' etc., which provide a method of contesting statutory freight and passenger rates made by the Commission, have been repealed by a repealing act, which is set forth and described in article XV, paragraph 2, of this bill. The act to provide for a method of contesting the validity and fairness of statutory maximum freight rates has been repealed; the repealing act being set forth and described in article XV, paragraph 4, of this bill. A new act has been enacted, which is set forth and described in article XV, paragraph 5, of this bill, and which provides a method for contesting rates; but this act does not apply to statutory rates unless said statutory rates have been either increased or reduced by action of the Railroad Commission, nor does this act provide for a suspension of rates pendente lite, except under conditions which are unfair, unreasonable, and unjust, and which are set forth more at length in article XV, paragraph 5, of this bill. Complainant therefore charges and avers that the said statutory rate acts are unconstitutional, null, and void, in that they deny to the complainant the equal protection of the law and take its property without due process of law, contrary to the fourteenth amendment to the Constitution of the United States. Complainant further charges and avers that the said acts are unconstitutional, null, and void, and contrary to section 13 of article 1 of the Constitution of the state of Alabama, which provides 'that all courts shall be open, and that every person, for an injury done him in his lands, goods, person, or reputation, shall have a remedy by due process of law, and right and justice shall be administered without sale, denial or delay.'

"XXXIII. Complainant alleges and charges that the several acts passed at the special session of the Legislature set forth in article XV of this bill, with the exception of the act set forth in subdivision 11 of said article together and collectively constitute a scheme or device to deprive complainant and other carriers by railway in Alabama similarly situated of a right and opportunity to a judicial review of the question whether said rates enacted by the said 'Passenger Rate Act' and by the 'New Commodity Rate Acts' are reasonable and just, and to so burden the challenge of said rates that the complainant will be compelled to submit to said rates and put them into effect, and to take away the cause of action now pending in this court, and to abate the action as to the present defendants, and to deprive the federal courts of all jurisdiction in the premises in the future and force the complainant either to go into the state courts for its remedy or to put the rates into effect contrary to the fourteenth amendment of the Constitution of the United States, contrary to article 1, § 13, of the Bill of Rights of the Constitution of the state of Alabama, and contrary to article 4, § 95, of the Constitution of the state of Alabama.

"XXXIV. The 'Passenger Rate Act' hereinbefore set forth provides that all railroads in the state of Alabama more than 100 miles in length shall charge and receive for passengers not more than 2½ cents per passenger per mile. Under the agreement between the Governor of the state of Alabama and the Southern Railway, the Alabama Great Southern Railroad, and the Mobile & Ohio Railroad, which is hereinbefore referred to, and to which agreement the Railroad Commission of Alabama are actual parties, although not signatories thereto, the railroad companies parties thereto will be permitted to charge on and after December 1, 1907, 2¾ cents per mile per passenger between points on their lines in the state of Alabama, 2½ cents per mile for mileage books (for families) in denominations of 500 miles, 2¼ cents per mile for mileage books in denominations of 1,000 and 2,000 miles, and will be permitted to charge and collect from passengers who have not provided themselves with tickets at the regular stations 3 cents per mile. A few days ago, to wit, on November 18, 1907, his excellency, B. B. Comer, Governor of Alabama, made an agreement with Seaboard Air Line Railway and the Atlanta & Birmingham Air Line Railway in all respects similar to the agreement made with the Southern Railway Company and its allied lines, with the exception that on the Seaboard Air Line Railway and the Atlanta & Bir-

mingham Air Line Railway the rates are to go into effect on the 1st day of January next. The Railroad Commission, having the power and authority, under the statute passed at the summer session of the Legislature, to either reduce or increase passenger fares or freight rates which may have been then prescribed or might thereafter be prescribed by statute, did on the 25th of November, 1907 (which is recited at length in article VIII of this bill), in accordance the arrangement and the agreement with the above-recited railroad companies, authorize and empower them to put into effect on their lines the rates of fare for passengers provided by their agreement with the Governor. The said order of the Railroad Commission, therefore, is written into and is a part of the statute hereinbefore referred to as the 'Passenger Rate Act' as modified and changed by order of the Railroad Commission hereinbefore recited, is discriminatory, unjust, and unreasonable, in that it fixes a higher scale of passenger rates for the Southern Railway Company, Alabama Great Southern Railroad, Mobile & Ohio Railroad Company, Seaboard Air Line Railway, and Atlanta & Birmingham Air Line Railway than said 'Passenger Rate Act" permits and authorizes this complainant to charge on its railroad, although the passenger traffic is carried on, on complainant's railroad and on the other railroads above named, under precisely the same or similar conditions, and complainant therefore charges and alleges that the said 'Passenger Rate Act' is unconstitutional, null, and void, and contrary to the fourteenth amendment to the Constitution of the United States, in that it denies to complainant the equal protection of the laws, and it is further unconstitutional, null, and void, and contrary to article 243 of the Constitution of Alabama, which limits the Legislature of Alabama 'to prohibit the charging of other than just and reasonable rates.'

"XXXV. The 'New Commodity Acts' classify the railways of Alabama in four classes. The railways in class 1 are permitted to charge the maximum tariff for the commodities named in the several acts, plus 5 per cent.; class 2 is permitted to charge the maximum rate, plus 20 per cent.; class 3 is permitted to charge the maximum rate, plus 25 per cent.; and class 4 is permitted to charge the maximum rate, plus 50 per cent. The 'Old Commodity Rate Act, also classified the railroads into four classes. Class 1 was permitted to charge the maximum rate; class 2 was permitted to charge the maximum rate, plus 20 per cent.; except in classess B, C, D, F, J, K, L, M, P, and R; class 3 was permitted to charge the maximum rate, plus 25 per cent., except in classes B, C, D, F, J, K, L, M, P, and R: and class 4 was permitted to charge the maximum rate, plus 50 per cent., except on classes C, D, F, J, L, and P. Both the 'Old Commodity Rate Act' and the 'New Commodity Rate Acts' classify complainant in class 2. The 'New Commodity Rate Acts' take the Alabama Great Southern Railroad from class 1, which it occupied under the 'Old Commodity Rate Act' and put it in class 3, thus increasing the rates it is permitted to charge on the commodities covered by the acts 25 per cent. The Southern Railway Company, under the 'Old Commodity Rate Act,' was classified in class 2. Under the 'New Commodity Rate Acts' it is put in class 3, thus increasing the rates it is permitted to charge on said commodities 5 per cent. The change of classification of the Alabama Great Southern Railroad and the Southern Railway permitted both of said railroads to charge commodity rates 5 per cent, higher than complainant. The Alabama Great Southern Railroad earns gross about three times as much per mile in the state of Alabama as complainant, and the Southern Railway Company earns gross in all lines in Alabama about $1,000 per mile more than does complainant. It is provided, by the agreement heretofore referred to, entered into between his excellency, B. B. Comer, Governor of the state of Alabama, and the Southern Railway Company and its allied lines, the Alabama Great Southern Railroad and the Mobile & Ohio Railroad, and also in the agreement between his excellency, B. B. Comer, and the Seaboard Air Line Railway and the Atlanta & Birmingham Air Line Railway, that said railway companies shall have the right to charge and collect, on their respective lines in the state of Alabama, on commodities prescribed by the Alabama statute approved March 2, 1907, known as the '110 Commodity Rate Act' (which is referred to in this bill as the 'Old Commodity Rate Act') not more than the mileage rates that the said railroad companies are at

present allowed to charge and collect in the state of Georgia, and the latter agreement provides that the Seaboard Air Line Railway and the Atlanta & Birmingham Air Line Railway shall be put and maintained in at least as favorable a class of railroads as the railways of the Southern Railway Company. The Mobile & Ohio Railroad Company earns gross in the state of Alabama more than twice as much per mile than does the complainant. Both of the agreements hereinbefore stated commit the Railroad Commission thereto, and as the Railroad Commission has the power and authority, in pursuance of the act passed at the summer session of the Legislature, which is hereinbefore referred to, to increase or decrease the rates prescribed by statute, said agreements have been written into the said 'New Commodity Rate Acts.' Complainant alleges and charges that the 'New Commodity Rate Acts,' as modified and changed by the agreement hereinbefore recited, are discriminatory, unjust, and unreasonable, in that they fixed a higher scale of freight rates for the Southern Railway Company, Alabama Great Southern Railroad, Mobile & Ohio Railroad Company, Seaboard Air Line Railway, and Atlanta & Birmingham Air Line Railway than the said 'New Commodity Rate Acts' permit and authorize this complainant to charge on its railroad, and complainant therefore charges and alleges that the said 'New Commodity Rate Acts' are unconstitutional, null, and void, and contrary to the fourteenth amendment to the Constitution of the United States, in that they deny to the complainant the equal protection of the laws, and they are further unconstitutional, null, and void, and contrary to article 243 of the Constitution of Alabama, which limits the Legislature of the state of Alabama 'to prohibit the charging of other than just and reasonable rates.'

"XXXVI. The forty-third section of the act approved February 23, 1907, which section provides that if any foreign corporation operating any railroad in the state of Alabama, shall, without the consent of the adversary party, institute in any federal court any suit, action, or proceeding of any kind having for its object the annulment, suspension, injunction, or restraining of any rate or charge made by the Railroad Commission, or any rate or charge made by statute, or any rate or charge made the maximum rate by statute, or shall become a joint actor in such proceeding with any other person, company, or corporation, or shall voluntarily become a party therein, or shall, without the consent of the adversary party thereto, remove such cause to the federal courts, said acts or either of them of such foreign corporation shall ipso facto forfeit its right to engage in or carry on the business of transportation originating and terminating within this state of property or persons, and its license or right to engage in such business shall be ipso facto revoked, has been repealed by an act approved November ---, 1907, entitled 'An act to repeal sections 18, 36, 37, 38, 39, 40, 42, 43, and 45 of an act of the Legislature of Alabama, entitled "An act to create the Railroad Commission to be known as the 'Railroad Commission of Alabama,' define its duties and powers, and provide for its mode of procedure, and prescribe penalties for violation of its orders." ' The forty-third section of the above-recited act, which has been repealed as aforesaid, is set forth in article XI of the original bill of complaint in this cause. But the act approved March 6, 1907, entitled 'An act to provide for the revocation of the license or right to engage in or carry on the business of transportation originating and terminating in this state of freight or passengers, of any foreign corporation, which is now engaged, or which may hereafter engage in such business or the business of a common carrier in this state, in the event said corporation shall, for any of the purposes specified in this act, institute in any federal court any suit or proceeding or shall remove or cause to be removed to any federal court any suit or proceeding instituted in any state court for any of the purposes stated in this act,' which is also set forth and described in article XI of the original bill of complaint in this cause, has not been repealed. The complainant, therefore, charges and alleges that the said act last above described is unconstitutional, null, and void, and contrary to section 10 of article 1 of the Constitution of the United States, in that it is a plain and manifest attempt to pass a law impairing the obligation of the contract heretofore made, and then and now existing, between complainant and the state of Alabama, and the said act is further unconstitutional, null, and void, and

contrary to the fourteenth amendment to the Constitution of the United States, in that it applies only to foreign corporations, and not to domestic corporations of the state of Alabama. and thus denies to complainant, a foreign corporation, the equal protection of the laws; and the said act is further unconstitutional, null, and void, and contrary to the fourteenth amendment to the Constitution of the United States, in that it deprives complainant of its property without due process of law. Complainant further alleges that the said act is unconstitutional, null, and void, and contrary to section 13 of the Constitution of the state of Alabama, which provides that 'all courts shall be open, and that every person, for every injury done him or his lands, goods, person or reputation, shall have.a remedy by due process of law, and right and justice shall be administered without sale, denial or delay.' It is also contrary to section 240 of the Constitution of the state of Alabama, which provides 'all corporations shall have the right to sue and shall be subject to be sued in all courts in like cases as natural persons.' Complainant further by special reference adopts and reiterates all of the allegations contained in article XII of its original bill in this cause, which is hereto attached and made a part of this bill.

"XXXVII. On November 25, 1907, the Railroad Commission passed an order, to become effective December 10, 1907, which order establishes joint passenger rates on all the railroads in Alabama, and requires the joint charge for such joint traffic to be at the rate of 2¾ cents per passenger per mile, the joint rate to be divided between the participating railroads according to their mileage. The said order is as follows:

" 'Railroad Commission of Alabama v. Southern Railway, Alabama Great Southern Railroad, Mobile & Ohio Railroad, Northern Alabama Railway, Nashville, Chattanooga & St. Louis Railway, Seaboard Air Line Railway, Atlanta & Birmingham Air Line Railway, Louisville & Nashville Railroad, Central of Georgia Railway, Atlantic Coast Line Railroad, Western Railway of Alabama, and St. Louis & San Francisco Railroad.

" 'First. Show cause why the Commission should not fix and establish joint passenger rates or fares to and from all points within the state and apportion each road its pro rata of such joint rates. Second. Why baggage should not be checked to and from all points within the state.

" 'This cause, coming on to be heard October 14th, was adjourned after taking testimony for a number of representatives of different railroads until October 21st, for the convenience of representatives of railroads who could not be present at the original hearing, and it appearing at the time that this citation was made that very few of the roads had joint passenger tariffs, or would sell tickets beyond the terminus of their respective lines, or check baggage beyond said terminus,. but during the interim of the notice and hearing such joint rates had been promulgated by different roads, taking effect October 13th, and said tariffs having been filed with the Commission, the Commission, on· investigation, finds that said joint rates have been established without uniformity or reference to the business of any particular road, but in many instances the flat rate of 3 cents was charged on some of the lines with the largest passenger travel, while others with a small amount of travel were based on 2½ cents rate, and the Commission, unable to see the justice or equity of such a distribution of the revenue from these joint rates, hereby disapproves the joint passenger rates as filed by the railroads, and in their stead it is hereby ordered that joint rates be published and made effective December 10th, to and from all coupon points on the following roads (as above named), based on 2½ cents per mile for adults, and children between the ages of 5 and 12 years at one-half fare, and that baggage shall be checked from such points as tickets are purchased to destination. But nothing in this order shall be construed to prevent longer lines meeting short line rates.

" 'Charles Henderson, President Railroad Commission of Alabama.' .·

"The revenues of complainant from its passenger traffic as hereinbefore set forth do not now .yield a fair return upon a fair value of its property, and any reduction thereof is unreasonable, unjust, and confiscatory. The joint rate prescribed by said order reduces the joint rates which now prevail on complainant's railroad.one-quarter ,of a cent per passenger per mile. The-

rate prescribed by the 'Passenger Rate Act' is 2 cents per passenger per mile. The incongruous result is thus produced that under the statute complainant is required to charge 2½ cents per mile, while under the order of the Commission it is permitted to charge on joint passenger business one-quarter of a cent more. Complainant alleges and avers that said joint rates prescribed by the aforesaid order of the Commission are unreasonable, unjust, and confiscatory, and, therefore, that the order is unconstitutional, null, and void, and contrary to the fourteenth amendment to the Constitution of the United States, in that it deprives complainant of due process of law and denies it the equal protection of the law, and that said order is further unconstitutional, null, and void, in that it violates section 243 of the Constitution of Alabama.

"XXXVIII. Complainant further alleges that the defendants Charles Henderson, William D. Nesbitt, and John G. Harris, constituting said Railroad Commission, having since the institution of this suit by complainant threatened and given it out in speeches that they, as such Commission, had power and authority, notwithstanding the injunction pendente lite issued against them herein, to reduce complainant's freight and passenger rates between points in Alabama, or to fix the same at less than the rates charged and collected by complainant for the same service at the time of the institution of this suit March 25, 1907, and said defendants, constituting said Commission, unless restrained and enjoined herein, will further reduce complainant's freight and passenger rates, or fix the same at less than complainant charged and collected at the last-mentioned date, and now charges and collects between points in Alabama, and have already taken steps to do so, when under complainant's previous system of rates it does not and cannot receive or realize a fair, just, or reasonable return or income on the fair value of its properties or investments in Alabama devoted to intrastate traffic, and any reduction of either its freight or passenger rates, or of its rate for carrying any article of freight, or carrying passengers between points in Alabama, would be unjust and unreasonable, and operate to still further prevent complainant from receiving or realizing such return or income to which it is entitled, all of which fully appears from Exhibits B and C, filed and made a part of its original bill in this suit.

"XXXIX. It is made the duty of every circuit, county, city or other solicitor, in the circuit, county, or other territory for which he elected or appointed, by section 5516 of the Criminal Code of Alabama of 1896 'to draw all indictments, and to prosecute all indictable offenses, and prosecute or defend any criminal actions in the circuit or other courts, in the defense or prosecution of which the state is interested.' All misdemeanors, under Code, § 4891, are indictable offenses. Under Code, § 5537, the solicitors are authorized to appoint deputy solicitors to represent the state in the county courts. Under Code, § 3739, it is made the duty of the sheriff 'to execute and return the processes and orders of the courts of record of this state, and of officers of competent authority, with due diligence, when delivered to him for that purpose according to law.' Under Code, § 934, it is made the duty of the circuit court clerks, and their deputies, 'to sign and issue all summons, subpœnas, writs, executions, and other processes under the authority of the court.' The duties conferred upon the clerks of the city courts are substantially the same.

"XL. Complainant shows that it is the purpose and intention of his excellency the said Braxton B. Comer, in accordance with his publicly expressed views, to instruct the several solicitors and prosecuting officers in the several counties through which complainant operates its railroad, or any part thereof, to ignore and defy the order of this honorable court issued upon the original bill in this cause, and in which injunction has been issued suspending and enjoining the enforcement of said freight and passenger rates, and will cause to be indicted, arrested, and prosecuted in their respective counties the complainant and its officers, agents, and servants for every charge made whereby a rate in excess of those prescribed by the said statutes is demanded or received, and for every refusal by them, or any of them, to receive any article offered for transportation at the rate of compensation prescribed by

statute, and that the several solicitors and their prosecuting officers will. under said instructions and directions, and in pursuance of the several statutes of the state of Alabama hereinbefore recited, conferring power and authority upon them in this behalf, cause the complainant, and its officers, servants, and agents, to be arrested,. indicted and prosecuted for each of said charges and refusals and that the sheriffs of each of said counties will, in person or through their deputies or assistants, arrest and imprison the officers, agents, and servants of complainant upon said charges and indictments. Unless the defendant railway company, and its officers, servants, and agents, charge the rates for freight and passengers prescribed by the statutes of the state of Alabama hereinbefore referred to, numerous civil actions for forfeitures will be brought against complainant, and actions for damages by passengers and shippers of freight, and prosecutions for misdemeanors against its officers, agents, and servants, and the clerks of the circuit courts of the several counties through which complainant operates its railroad in the state of Alabama, and their deputies, and the clerks of the city courts, and their deputies, will, under instructions from the Governor of the state of Alabama and from other officials of the state of Alabama, sign and issue summonses, subpoenas, writs, executions, and other processes upon such civil actions as may be sued out in their several courts, and on such indictments as may be brought in their several courts. Complainant further alleges that its officers, agents, and employés will, if they charge, demand, exact, or receive any. higher rates for freight or passengers than those prescribed by the said the 'New Passenger Rate Act' and the 'New Commodity Rate Acts,' subject themselves to prosecutions for misdemeanors and to fines for each offense, and, if they do not or cannot pay such fines or penalties, they will be imprisoned. As each charge for freight or passengers at a higher rate than that prescribed by the statutes is made a separate offense, a multitude of prosecutions will be brought against the officers, agents, and servants of complainant. Complainant further shows that many of its agents and servants are telegraphers, engaged daily and hourly in communicating by telegraph to other agents and servants of complainant the facts concerning the movements and operations of freight trains carrying both interstate and intrastate commerce, and of passenger trains carrying both interstate and intrastate passengers, as well as the United States mails, and are engaged also in receiving freight and passengers, as well as in the discharge of other necessary duties connected with the transportation of both interstate and intrastate commerce on the said trains, and many of the agents and servants of the complainant are conductors on its passenger trains, which carry daily both interstate and intrastate passengers, as well as said United States mails, and among their several duties is that of demanding and collecting from passengers cash fares, where they fail to purchase tickets at the stations at which they board said trains, and should the complainant's servants be arrested from day to day and time to time, and thus prevented from discharging their several duties to the public as well as to complainant, and which they are employed to perform, the public at large, as well as the complainant, will suffer and sustain great and irreparable loss and damage, and the interstate freight and passenger trains, as well as the United States mails which are daily carried thereon, will be greatly delayed and interfered with, if not altogether stopped, and complainant would be therefore unable to keep its said agents and servants in the discharge of their several duties, or to employ or keep in the discharge of their several duties other competent agents and servants to take the place and discharge the duties of those who may be arrested under prosecutions for misdemeanors. Complainant further shows that, by reason of the arrest, indictment, and imprisonment of the officers, agents, and servants of complainant about to be done as aforesaid, the railroad properties of the complainant in Alabama will be ruined and destroyed, and the carrying of the United States mails over its lines of railway in Alabama will be prevented, unless the restraining order and injunction hereafter prayed for be immediately granted. Complainant alleges that the enforcement of the provisions of said acts against its officers, agents, and employés in the manner specified above will interfere with and stop commerce among the several states in which com-

plainant is engaged on the several lines of railway operated by it in the state of Alabama, all of said lines being used and employed in interstate commerce, and will stop the carriage of the United States mail, the said lines of railway being post roads of the United States, all of which is unconstitutional, null, and void, and violative of article 1, § 8, par. 7 of the Constitution of the United States, under which the power to establish post roads is conferred on Congress.

"XLI. The defendant I. Cellner, who is a representative of the class of passengers who use trains of the complainant for passage between points in the state of Alabama, and all the persons of his class and who are similarly situated, will, unless enjoined and restrained by this honorable court, bring civil actions for forfeitures against complainant, and will institute prosecutions for penalties against the officers, agents, and servants of complainant, and will institute actions for damages against complainant, as authorized and directed by the several acts passed at the special session of the Legislature of Alabama, which are hereinbefore particularly described, if complainant or its officers, agents, or servants charge or receive higher rates of fare for passengers than those prescribed by the 'Passenger Rate Act.' The defendant Greil Bros. Company, which is a representative of the class of shippers of freight who use the trains of the defendant railway company for the shipping of freight between points in the state of Alabama, and all persons of its class who are similarly situated, will, unless enjoined and restrained by this honorable court, bring civil actions for forfeitures against the complainant, and will institute prosecutions for penalties against its officers, agents, and servants, and will institute actions for damages against complainant, as authorized and directed by the several acts passed at the special session of the Legislature of Alabama, which are hereinbefore particularly described, if complainant or its officers, agents, or servants charge or receive higher rates of freight than are prescribed by the 'New Commodity Rate Acts.' The defendant I. Cellner has actually threatened and maintained that he would avail himself of the several acts hereinbefore recited, which were passed at the special session of the Legislature of Alabama, and bring actions for damages against complainant, and civil suits for forfeitures against it, and would prosecute its officers, agents, and employés for misdemeanors, if complainant or its officers, agents, and employés refused to carry him as a passenger on its lines of railroad in the state of Alabama, between points in the state, at the rate prescribed by statute. The said defendant Greil Bros. Company has actually threatened and maintained that it would avail itself of the several acts hereinbefore recited which were passed at the special session of the Legislature of Alabama, and bring actions for damages against complainant and civil suits for forfeitures against it, and would prosecute its officers, agents and employés for misdemeanors, if complainant or its officers, agents, and employés refused to ship its freight which comes within the scope of said 'New Commodity Rate Acts,' at the rates prescribed thereby. The persons who will become passengers and shippers of freight between points in the state of Alabama on the lines of railroad of the complainant, and who will be affected by the said 'Passenger Rate Act,' and the 'New Commodity Rate Acts,' are so numerous that complainant cannot without manifest inconvenience and oppressive delay in the suit bring at this time all of such persons before the court as parties defendant in this bill, and, besides, it is impossible at this time to name such parties, because complainant cannot know definitely all persons who may in the future become passengers or shippers on its lines of railway. The said defendant I. Cellner is made party hereto to represent all the adverse interest of persons who may become passengers on complainant's lines in Alabama, and the said defendant Greil Bros. Company is made party defendant hereto to represent all the adverse interest of persons who may become shippers of the commodities described in the 'New Commodity Rate Acts' on the lines of complainant in Alabama.

"XLII. In the operation of the lines of railroad of complainant within the state of Alabama it receives and carries every day thousands of passengers affected by the rates made by the above-described 'Passenger Rate Act,' and also carries on its lines of railroad in Alabama thousands of shipments of the commodities described in the several commodity rate acts which are

hereinbefore described as the 'New Commodity Rate Acts'; and under the 'Passenger Rate Act' complainant is required to charge passenger rates which are not higher than those imposed by the said act, and, however unreasonably low said rates may be, complainant acts at its peril if it charges any higher rates, and under said 'New Commodity Rate Acts,' hereinbefore referred to, complainant is required to charge rates of freight no higher than those which are imposed by said acts, and, however unreasonably low said rates may be, complainant acts at its peril if it charges rates higher than those imposed by the said acts. In the hundreds and perhaps thousands of actions that may be brought against complainant by the defendants herein, and by other persons in the state of Alabama, to recover forfeitures imposed by the several acts hereinbefore described, or by private individuals to recover damages, and in the hundreds and perhaps thousands of indictments which may be brought against its officers, agents, or employés for misdemeanors for violations of the said acts, the rates of passenger and freight imposed by the several acts hereinbefore referred to are deemed and taken as a sufficient evidence that the rates therein fixed are just and reasonable, and in all of the said actions for forfeitures, penalties, or damages, and in all the indictments for misdemeanors, the plaintiffs therein have nothing to do but to produce the said acts and to prove that the rates for passenger and freight charged are in excess of those fixed by the said acts, and if the defendants in said actions should be permitted to introduce any evidence in their defense the burden would be thrown on them to prove affirmatively that the rates of passenger and freight, as the case may be, charged by them, were just and reasonable, and that the rates imposed by the said acts were unjust and unreasonable. The question as to what are reasonable rates for freight and passenger traffic is an extremely difficult one, and requires for its determination inquiry into numerous facts, to prove which requires the presence of many witnesses, and the introduction of a great mass of statistical evidence. Under the terms of the penalty acts hereinbefore referred to, complainant, if it shall charge higher rates of passenger and freight than those which are imposed by the said 'Passenger Rate Act' and the said 'New Commodity Rate Acts,' will be subject to civil actions for forfeitures in every county in the state through which it operates its railroads, and such actions may be brought by a multitude of different persons. Complainant under the terms of said acts may incur a penalty of $2,000 for each offense, and will subject itself to penalties and suits within the limit of a single day of such a large amount as to practically amount to confiscation of its property. All of the officers, agents, and servants of complainant, under the terms of the said acts, may be prosecuted for misdemeanors and fined in every county in the state through which complainant operates its lines of railroad, and the said officers, agents, and servants, by a violation of the said acts, subject themselves to prosecutions for misdemeanors for each and every offense. The same witnesses, the same books, and the same documents would be needed as evidence in all of these cases. The penalty suits, prosecutions, civil forfeitures, and actions for damages will be so large in amount, so numerous, and may be instituted in so many independent different jurisdictions at the same time, that it will be physically impossible for complainant, and its officers, agents, and servants to defend these actions, suits for damages, forfeitures, penalties, and prosecutions. The expense which complainant and its officers, agents, and employés would incur in defending said actions, prosecutions, and forfeiture suits would be enormous. Complainant and its officers, agents, and servants would also be subjected to great expense in employing counsel to defend such suits, and the loss of time of its officers, agents, and employés in giving the necessary attention and time thereto would prevent the operation of the railroad. The pendency of such suits, aggregating such an enormous amount, will have the tendency to depreciate the value of its property, and will result in great and irreparable loss and injury to the defendant railway company and to your orator and the bondholders represented by it.

"XLIII. In the multitude of actions referred to above the same question will be involved in all of them, and that question can be tried and the merits

fairly and fully determined in this case. The damages to accrue against complainant and the injury to complainant will be great and irreparable.

"XLIV. Complainant is remediless in the premises under the strict rules of common law, and can have adequate relief only in a court of equity, where matters of this nature are properly relievable, unless a writ of injunction, as hereinafter prayed, is immediately granted: and unless a restraining order is granted as hereinafter prayed, the damages to accrue against complainant and the injury to complainant will be irreparable."

Complainant prayed for a preliminary injunction, and on final hearing for a perpetual injunction against the execution of the several statutes heretofore recited, and that the Attorney General and the Railroad Commission, the clerks of the several courts, the solicitors, and sheriffs in the counties through which complainant's road is operated, be enjoined, respectively, from issuing any summons in any civil suits, the sheriffs from serving the same, or arresting any of complainant's officers, or servants or putting them in jail, and the solicitors from indicting its employés or servants, or from causing them to be arrested and imprisoned under any indictment or warrant, or otherwise, on account of any charge based upon any violation by the complainant, or its officers and servants, of the terms of said acts of the Legislature as to the rates and orders made thereon by the Railroad Commission; also that the individual shippers named and all other persons in the same class be enjoined from instituting or prosecuting in any court any civil actions for the forfeitures, and all actions for damages, and any criminal prosecutions against complainant or its servants, etc.: also enjoining the defendants above named, and all other persons, individuals, or corporations, from bringing or prosecuting any suit, either at law or in equity, or proceeding in equity in the nature of quo warranto, mandamus, or injunction, for enforcing or declaring the revocation of the right or license of complainant to carry on intrastate business in Alabama in consequence of the filing of the supplemental bill in this court.

The Central Trust Company of New York, trustee for the bondholders of the Central of Georgia Railway Company under what is known as the "Second Preference Mortgage," interest on which is payable only from the net earnings of the Central of Georgia Railway Company, also filed its bill against that company, and the other officers and persons named in the bill of the Central of Georgia Railway Company, praying the same relief as that asked by the Central of Georgia Railway Company, and also that the company be enjoined from putting the reduced rates in force. Affidavits were offered on both sides as to the value of the several railroads, their income from all sources, their cost, and the mode of conducting their business, and other pertinent matters as to the probable effect of the reduced rates. The applications for the preliminary injunctions were heard together, and the oral argument at the bar extended over a period of ten days, with the understanding that counsel might argue any matter deemed pertinent with leave to present such questions by formal modes after the court announced its opinion, when judgment would be rendered thereon.

Lawton & Cunningham and Steiner, Crum & Weil, for Central of Georgia Ry. Co.

John C. Spooner, Albert Rathbone, and Henry V. Poor (Hugh Nelson, of counsel), for Central Trust Co. of New York.

Henry L. Stone, Gregory L. Smith, Cabaniss & Bowie, George W. Jones, and J. Manly Foster, for Louisville & N. R. Co. and South & N. A. R. Co.

Gregory L. Smith, Claude Waller, and A. R. Goodhue, for Nashville, C. & St. L. Ry. Co.

Geo. P. Harrison and Steiner, Crum & Weil, for Western Railway of Alabama.

Alex. M. Garber, Atty. Gen., S. D. Weakley, Horace Stringfellow, and H. C. Selheimer, for respondents.

JONES, District Judge (after stating the facts as above). These cases involve the rights of the owners and the public in the use of vast properties devoted to state and interstate commerce, the relations of the states to the United States, the extent of its judicial power in the enforcement of the Constitution and laws, the power of the state under its own Constitution, and the rights of citizens under both the state and federal Constitutions. Counsel were invited to present their views unhampered by any limitation as to time or the mode of raising the issues, and the court has had the benefit of able and extended discussion at the bar.

If it be true, as respondents insist, that these cases are suits against the state, the bills must be dismissed, regardless of the merits of the grievance disclosed. Looking to the record, we find that complainants, who are citizens of other states and citizens of this state entitled to come into this court by reason of the federal question, seek to prevent certain citizens of Alabama from doing acts, under color of its laws, which complainants claim will illegally destroy a property right, protected by the Constitutions both of the state and of the United States. More fully stated, the case is this: Complainants are common carriers. Being engaged in that calling, it is competent for the Legislature to fix their maximum rates. The Legislature has done so. The rates so fixed are prima facie lawful. The Legislature has no power to fix rates which are unreasonable. The courts are the final arbiters of such questions. The carriers claim that the rates fixed are illegal, in that they do not permit an adequate return on the value of their property, and will deprive complainants of their property without due process of law, in violation of the fourteenth amendment and provisions of the Constitution of this state for the protection of property rights. Respondents insist the rates are reasonable, and permit an adequate return upon the value of the property, and threaten by civil suits against the carriers, and by indictments and prosecutions against complainants and their servants, to compel the carriers to observe the statutory rates. This is the entire scope of the controversy between the parties before the court. Plainly, in form, at least, the cases fall within the very letter of any definition of "cases in equity," and "controversies between citizens of different states," of which this court is given jurisdiction by the Constitution and laws, and the state is not sued.

## The Bills are Not Suits Against the State.

In Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 390, 14 Sup. Ct. 1047, 1051, 38 L. Ed. 1014, the insistence was that the suit was against the state. The Supreme Court said:

"We are unable to yield to this argument. So far from the state being the real party in the case and upon whom the judgment effectively operates, it has, in the pecuniary sense, no interest at all. Going back of all matters of form, the only parties pecuniarily affected are the shippers and the carriers, and the only direct pecuniary interest which the state can have arises when it abandons its governmental character and as an individual employs the railroad company to carry its property. There is a sense, doubtless, in which it may be said the state is interested in the question, but only in a governmental sense. It is interested in the well-being of its citizens, in the just and

equal enforcement of its laws; but such governmental interest is not a pecuniary interest which causes it to bear the burden of an adverse judgment. Not a dollar will be taken from the treasury of the state, no pecuniary obligation of it will be enforced, and none of its property will be affected by any decree which may be rendered. It is not nearly so much affected by the decree in this case as it would be by an injunction against officers staying the collection of taxes; and yet free ... and unquestioned exercise of jurisdiction of courts, state and federal, has been indulged in restraint of collection of taxes illegal in whole or in part."

In Missouri Railway Co. v. Missouri Railroad Commission, 183 U. S. 53, 60, 22 Sup. Ct. 18, 46 L. Ed. 78, it was insisted that the state was the real plaintiff, and, as the state was not a citizen within the meaning of the removal acts, a mandamus proceeding to compel the railway company to observe the rates could not be removed to the United States Court on the application of the railway company. The Supreme Court, however, held that the state was not the real party, and that the suit, other conditions permitting, could be removed. It said:

"It is not an action to recover any money for the state. Its results do not inure to the benefit of the state as a state, in any degree. It is a suit to compel compliance with an order of the Railroad Commissioners in respect to rates and charges. The parties interested are the railway company on the one hand and they who use the bridge on the other—one interested to have the charges maintained as they have been; the other, to have them reduced in compliance with the order of the Railroad Commission. They are the real parties in interest, in respect to whom the decree will operate."

It was also urged in that case that the "state had a direct pecuniary interest in the result of the litigation by virtue, first, of its possible liability for the costs, and, second, because, if the litigation were pushed to the extreme, there might be penalties imposed which would, when collected, possibly inure to the school fund of the state." The Supreme Court decided that did not alter the nature of the suit. It said:

"Whatever may be the result of any subsequent or ancillary proceeding, the direct effect of this suit is to obtain a decree of the court commanding the railway company to comply with the orders of the Commission. Such a decree is similar to the ordinary decrees of a court of equity. It is a familiar rule that a court of equity may enforce compliance with its orders and decrees by penalties upon the delinquent. So that, if this possible pecuniary result is sufficient to make the state the party plaintiff, it would follow that in Missouri the state is the real party plaintiff in every equity suit, because in every equity suit penalties could be imposed. Neither can it be held that the state's voluntary assumption of the costs, if the litigation is adverse to the Railroad Commissioners, makes it the real party plaintiff. That is simply an incidental matter, and does not determine its relation to the state, any more than its payment of the salary of the judge, the fees of the juror, or any other expense of the litigation. We are of opinion, therefore, that the party named in the record as the plaintiff is the real plaintiff, and that the voluntary assumption by the state of the costs in some contingencies of the litigation, or the indirect and remote pecuniary results which may follow from disobedience to the orders of the court, do not make it the party to whom alone the relief sought inures, and in whose favor a decree for the plaintiff will effectively operate."

The same ruling was made in Smyth v. Ames, 169 U. S. 518, 18 Sup. Ct. 418, 42 L. Ed. 819.

In McNeill v. Southern Railway Company, 202 U. S. 559, 26 Sup. Ct. 724, 50 L. Ed. 1142, the Supreme Court reiterated the doctrine of the earlier cases. It said:

> "We think the real object of the bill may properly be said to have been the restraining of illegal interference with the property and interstate business of the railway company; the asserted right to interfere which it was the object of the bill to enjoin being based upon the assumed authority of a state statute, which the bill alleged to be in violation of the rights of the railway company, protected by the Constitution of the United States. In this aspect, the suit was not in any sense a suit against the state."

## Statement of Respondents' Legal Propositions.

II. Respondents answer that the reason of these decisions cannot control the disposition of the supplemental bills, since the officials whose action was enjoined in the cases cited were "specially charged" with the execution of the laws; that this feature is wholly wanting in the supplemental bills, though it is positively averred in them that the state officials will enforce the rate legislation; that the officials who are defendants have now no official power to enforce the rate legislation; and that the laws which authorized them to be sued have been repealed. They insist the supplemental bills are suits against a sovereign state, of which this court has no jurisdiction. They go further, and urge that the original bills, which it is now admitted were not suits against the state at the time they were filed, have now become such suits, because, subsequent to their filing, the Legislature has stripped the defendants therein of all power to enforce the rate legislation, and repealed the legislation which permitted them to be made defendants in a suit by the carrier to determine the reasonableness of the rates. Irrespective of these defenses, they assert that the due process of law for which the Constitution provides is satisfied here, no matter how inadequate may be the remedy at law for the full protection of the right asserted, if in each case as it arises complainants be afforded in that particular case a fair trial in a court of justice according to the usual modes of procedure applicable to cases at law. While they do not assert in so many words the doctrine as the court here puts it, they inevitably deny, either that the usual remedies of equity in such cases form any part of the "law of the land," which complainants are entitled to invoke, or, else that the state, in its discretion in ordering persons and things within its dominions, may so adjust the relations of officials to the execution of a statute that no court can prevent its immediate enforcement, although the statute be unconstitutional and the officer be about to execute it, and the arrest of such action of the official be absolutely necessary, at the very threshold of the litigation, to save a property. right from destruction. Counsel raise many other important questions which will be noticed in the order of their presentation.

## By None of the Tests can the Bills be Held to be Suits Against the State.

Alabama is a sovereign state, except in the particulars wherein its rights and powers are curtailed by the Constitution of the United States. The full sovereignty of Alabama is not vested in any one of

the departments of its government, or in all of them combined, since the people have retained some of their power. Const. Ala. § 36. The government of the state is not to be confounded with the state itself. One is the servant; the other is the sovereign. Under our free institutions, no official can truthfully declare, "I am the state." The Constitution of the state distributes the sovereign power of the people among three co-ordinate departments, giving each so much of that power as deemed requisite to the accomplishment of the task committed to it. These three departments combined, save as limited by the state and federal Constitutions, represent the sovereignty of the people of Alabama. All the powers of these departments are subject to the checks and limitations of the Constitution of the state and of the United States. Within the scope of their delegated authority, the acts of state officers are the state's acts. When they transgress the limits of their authority, it is not the state which acts, "for as it can act and speak only by law, whatever it does say and do must be lawful," but is "the mere wrong and trespass of individuals, who falsely speak and act in its name." Poindexter v. Greenhow, 114 U. S. 290, 5 Sup. Ct. 914, 29 L. Ed. 185. If the acts of officers of these departments, outside of the scope of the power intrusted, cannot be effectively stayed when necessary to save the liberty and property of the citizen from illegal invasion under color of state laws, because such proceedings are suits against the state, which the citizen cannot maintain, there is an end of real constitutional government and liberty, and the enthronement in their stead of official absolutism. "The Constitution deals with substance, not shadows. Its inhibition was leveled at things, not the name. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." Cummings v. Missouri, 4 Wall. 277, 325, 18 L. Ed. 356.

Scrutinize as we may the insistence here, the acceptance of the argument in support of it inevitably leads, in its final complexion, to the fatal admission that somewhere in our constitutional system a safe shelter can be found for legislative evasion of its most sacred commands. Stripped of sophistry, the naked proposition is that the power of the Constitution to protect a property right must surrender to the deftness and cunning of the draughtsman in adjusting the relations of the officer to the execution of an unconstitutional statute; that the phrase maker, not the fundamental law, determines whether a constitutional right has any virtue. Mr. Justice Lamar, in an elaborate review of the decisions on this subject, in Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363, declared:

"The general doctrine of Osborn v. Bank of United States, 9 Wheat. 738, 6 L. Ed. 204, that the Circuit Courts of the United States will restrain a state officer from executing an unconstitutional statute of the state, when to execute it would violate the rights and privileges of the complainant which have been guaranteed by the Constitution and would work irreparable damage and injury to him, has never been departed from."

In Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584, the court declared:

"It is the settled doctrine of this court that a suit against individuals for the purpose of preventing them, as officers of the state, from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the state within the meaning of [the eleventh] amendment."

In this respect, the principle applied in the great judgment of Chief Justice Marshall in Osborn v. Bank, decided years before the adoption of the fourteenth amendment, has always been enforced. The effect of the fourteenth amendment upon the scope of the eleventh amendment was not directly passed upon by the Supreme Court, although involved in some cases, until the case of Prout v. Starr, supra, where it is said:

"It would be most unfortunate if the immunity of the individual state against suits by citizens of other states, provided for in the eleventh amendment, were to be interpreted as nullifying other provisions which confer power on Congress, * * * all of which provisions existed before the adoption of the eleventh amendment, which still exist, and which would be nullified and made of no effect if the judicial power of the United States could not be invoked to protect citizens affected by the passage of state laws disregarding the constitutional limitations. Much less can the eleventh amendment be successfully pleaded as an invincible barrier to judicial inquiry whether the salutary provisions of the fourteenth amendment have been disregarded by state enactment."

The Supreme Court has settled, beyond the pale of further controversy, that when the state is not an actual party to the record, and the judgment in the suit cannot take the state's property, or fasten liens upon it, or direct the disposition of funds in its treasury, or compel the state, indirectly, by controlling its officers, to perform any contract, or to pay any debt, or to govern the exercise of any discretion vested in the official in the execution of valid statutes, the state is not a real party, and the proceeding cannot be held to be a suit against the state. The state is not a party here. No decree which can be rendered here can invade its rights in any of the particulars named. The supplemental bills are not, therefore, in any sense suits against the state. Poindexter v. Greenhow, 114 U. S. 284, 5 Sup. Ct. 903, 962, 29 L. Ed. 185; Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363; In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785, 37 L. Ed. 689; Tindal v. Wesley, 167 U. S. 204, 17 Sup. Ct. 770, 42 L. Ed. 137; Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447; Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584.

If we give any force whatever to the purpose which called forth the eleventh amendment, it destroys all foundation for respondents' argument, which one of complainants' counsel aptly describes as an assertion:

"If you make it anybody's business to enforce the legislation, a suit to prevent it is not a suit against the state. If you make it nobody's special business, and anybody can enforce the law, then a suit to stop it is a suit against the state."

Certainly, if, as the courts have repeatedly held, it is no invasion of the sovereign's prerogatives to prevent his chosen minister from obeying an illegal command which he is specially charged to execute, what warrant is there, in any system of logic, for claiming that this same sovereign can have any just cause of complaint, when restraining hands

are laid upon an official to prevent his doing a like illegal act, as to which the sovereign has laid no special command upon him?

## Whether or Not Officer is "Specially Charged" to Execute the Statute, Whose Enforcement is Enjoined, Cannot Determine the Nature of the Suit or the Extent of the Remedy.

It is undeniable here, if complainants prove their bill, and for the purpose of this hearing it must be assumed that they may, that they will suffer irreparable wrong, unless they can immediately arrest the action of private individuals and the officials under the invalid statutes. Whether an officer or private individual be "specially charged," or whether it be left to his discretion, to enforce the unconstitutional statute, sheds no light whatever upon the validiy of the statute, or the nature of the case, or of the wrong suffered, and cannot alter in the slightest degree the scope of the suit, or the effect of the judgment which may be rendered as to the execution of the statute. The injury and the wrong are the same in both cases. The character of the duty, and the validity of the statute which exacts it, are not changed by the fact that it is imposed by a special statute, instead of being fixed by the general law. The duty is the same in each case. When the contingency arises which calls for the performance of the duty under the general law, the officer is as peremptorily charged to execute it as when the duty arises under a special statute; and when he acts the consequences are the same, whether he acts under the compulsion of a special duty or simply volunteers to put the laws in motion. The officer's relations to the execution of the statute are material only in determining in the particular case whether he is a proper or necessary defendant to the suit to arrest the operation of the statute. The presumption from the special charging of the duty is that the officer will perform it, and, is therefore, the equivalent of an allegation that he will attempt to execute the statute. He stands, as regards the threatened property right, in the same attitude as the officer, who, though not specially charged, nevertheless threatens to enforce the statute. If the circumstances of the case, and the nature of the right about to be invaded, are such that the acts of the officer will result in irreparable injury and a multitude of suits unless his action be restrained, the courts must restrain an officer who, though not specially charged, threatens to execute the statute, just as it would an officer who is "specially charged," and upon the same principle upon which it would proceed against a private individual, who threatened a like wrong.

## Legislative Cunning Cannot Overthrow the Force of a Constitutional Provision.

III. Every well-informed layman is aware that the great purpose of all civilized government is to protect life, liberty, and property. The protection of rights of property is next in importance only to protection of life and liberty. Indeed, there is little real liberty where rights of property are not respected and enforced. All enlightened governments seek to secure these rights from impairment by arbitrary acts of government, as well as from invasion by private individuals. Nowhere is this duty of government to protect property

rights more emphatically proclaimed than in our state Constitution of 1901, which, in section 35, declares:

"The sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty and property, and when the government assumes other functions, it is usurpation and oppression."

The purpose of the fifth and fourteenth amendments to the Constitution of the United States is to prohibit, on every foot of American soil, all illegal acts of government, state or federal, invasive of the right to life, liberty, or property. Our constitutional systems, which parceled out the sovereignty of the people among separate and independent departments, each of which was forbidden to enter the orbit of the other, had left little play for the arbitrary exercise of the executive prerogative concerning the enjoyment of these rights. These amendments were designed chiefly to secure the enjoyment of these rights against arbitrary exercise of legislative power, and to give effective protection against such assaults upon the fundamental rights of the citizen, whenever attempted under the forms of law. It is well settled that a state cannot do or effect indirectly what it cannot do or effect directly, and that, in whatever language a statute may be framed, its purpose and its constitutional validity must depend upon "its natural and reasonable effect" upon the right involved. Henderson v. Mayor, 92 U. S. 259, 268, 23 L. Ed. 543; Joseph v. Randolph, 71 Ala. 499, 46 Am. Rep. 347. "It is the duty of the courts to be watchful of the constitutional rights of the citizen. A close, literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it were more in sound than in substance." Boyd v. United States, 116 U. S. 616–635, 6 Sup. Ct. 524, 535, 29 L. Ed. 746.

Effect and Purpose of the Statutory System for Enforcing Rates.

The statutes whose execution is here prayed to be arrested involve the business of carriers transacted in very many places, upon hundreds of miles of railway, in the operation of which a multitude of trains and thousands of employés are engaged. They transport daily thousands of passengers and thousands of parcels of freight. The transportation of every passenger and every piece of freight, and demanding or receiving greater compensation than the prescribed rates, is made a separate offense. The carrier, in a day's business, if it does not observe the rates, will necessarily commit several thousand violations of the statutes, for each of which he is subject to a fine of not exceeding $2,000; and his employés, who knowingly engage in any violation of the rates, are subject to a fine of not less than $100 nor more than $500 for each offense. So far as the nonobservance of the statute involves a private wrong, any person may bring his civil action to redress it, and may swear out warrants for violations of the rate statutes so far as they constitute public offenses. No one who reads the history of the times aright can fail to realize that these suits and prosecutions would be begun and relentlessly pursued until the carrier put in the rates. Under such conditions, nonconformity to the rates for a single day would result in the forfeiture of the carrier's property worth many millions of dollars, and subject his servants and employés

to arrest and imprisonment, preventing the carrier from discharging his duties to individuals and the public. The inevitable outcome of the situation thus brought about by the legislation, if the rates be unreasonable and respondents' contention be correct, is that the carrier must at once observe the statutes, and thereby be deprived of property without just compensation, or else, in order to avoid the taking of his property, must refuse to obey the statutes, and thereby assume the frightful burden and costs of defense of a multitude of indictments in the law courts, in different places, at the same time, which, even if successful, would entail as great losses as the injury resulting from obedience to the statute, and, in addition, be forced to wager his entire property upon the successful outcome of his defense at law. Under this deliberately planned system of laws for enforcing the rate legislation and hampering the defenses thereto, the carrier, no matter what course he takes, is confronted with ruin.

Only a cursory examination of the practical operation of the statutes passed at the called session is needed to demonstrate that their intent is not only to enforce the rates, but also, as far as possible, to take from the carrier all effective means for the protection of his rights, if he desires to contest the rates. The design of the present statutes is to compel the rates to be put in force as soon as promulgated, no matter how destructive the result, by withholding any effective means to prevent the enforcement of rates until they have long been in operation. In the interval elapsing, under the present statutes, between the promulgation of the rates and the time when the carrier can get into the chancery court and have the rates enjoined, there must, in any event, be many days' delay. During that interval, as we have seen, he has no means of defense against the rates except by meeting innumerable suits at law and indictments and trials in the criminal courts. He is not permitted, as other persons would be under the same circumstances, to submit to the statutory rates and perform the service under protest, and sue to recover the balance necessary to make a fair reward for the use of his property. This mode of defense is deliberately prohibited. The demand or receipt of rates greater than those prescribed by statute is made as grave an offense as the refusal to transport at the rates fixed by statute, and necessarily every such suit would subject him to the statutory penalties. Under the present statutes, there is no tribunal which can absolve the carrier from the penalties incurred while he is contesting the rates in the courts. If the court of equity enjoins the execution of the statute, under its equity powers, pending final decision, and the carrier be cast in the suit, he remains exposed to the numberless penalties incurred while the case was in the courts. Every way of escaping this peril is blocked against him. A failure to observe the rates for a single day to make a test case, would subject his property to confiscation. He must incur that risk to make a test case of any sort, no matter how short the test. If one test case be made, he must observe the rates thereafter, in order to prevent confiscation from future penalties, during the long period necessary to determine the right in the courts. If, to conserve all his rights, he resists from the outset, he must waste his substance in meet-

ing innumerable assaults upon the right, although successful in finally beating them off in the courts. There is nothing in the nature of the right the carrier asserts, or the act out of which it grows, which can justify the erection of such barriers to its assertion. The service, the act of transportation for which the reward is claimed, whatever may be said of the charge for it, is not only lawful in itself, but laudable. The law requires it to be performed. The carrier's only offense is that he differs with the authorities as to the reasonableness of the reward the statute allows him for the use of his own property. It is the mere assertion of a conscientious difference of opinion as to the worth of the service. The exercise of the right is not harmful in itself, does not imperil either life, liberty, or property, nor the public peace or morals, or revenues of the state, and does not defy its authority. No one is guilty of a defiance of the law who seeks to test the validity of a statute in an orderly way in the courts of the country. No other property owner, no other person who renders service to another, is so hampered in the defense of a property right in the courts of justice, and subjected to such heavy burdens, even when he makes good his defense, and to such frightful penalties if he fails. It is idle to say that the carrier can be lawfully put in this plight, when he seeks to vindicate such a right in the courts, because he exercises a public calling, and has been granted a franchise by the state. The right to demand an adequate reward for the use of one's property is as much under the protection of the Constitution as a man's house or farm. True, the nature of the carrier's business and the obligations resulting from it to the public are such that he may incur liabilities and suffer penalties regarding the conduct of that business, which could not be entailed or enforced, under like circumstances, against persons not so engaged. When he comes into a court of justice to defend his property right, he is not exercising his calling as a carrier at all, but insisting upon a constitutional right secured to all alike. Justice must be done, without respect of persons, and is not subject to classification.

## State Cannot Prevent Resort to Equity, in Proper Case, Either Under Its Own Constitution and Laws, or Under the Constitution and Laws of the United States.

Viewing the question solely under our state Constitution, it is not competent for the Legislature to take from the property owner the right of resort to a court of equity for preventive remedies for the protection of a property right, if his case falls within the established principles upon which courts of equity usually administer such relief. From its earliest history the state has administered equitable remedies in its courts of chancery. Authority to administer such relief in cases falling within equitable cognizance is inevitably included in the judicial power, which the state Constitution and laws vest in the courts of chancery. Whether or no the Legislature can abridge this equity power of the courts, by providing exclusive remedies at law, it is certain the Legislature cannot so legislate regarding a right, if it falls within the protection of a court of equity, that the property owner, who is not given an adequate remedy at law, can be shut off from a seasonable

resort to the chancery court for the exercise of its usual preventive remedies, when necessary to preserve a property right from destruction. The fourteenth amendment and the state Constitution alike require "the law of the land" to be administered in the courts of Alabama. The state courts of equity have always intervened for the protection of a property right, when necessary to save it from irreparable injury.

In these cases, however, the right to resort to equitable remedies does not at all depend upon the Constitution and laws of Alabama. The equity power to afford such relief, in proper cases, is part of the judicial power brought into being by the Constitution of the United States, a large part of which is distributed to the Circuit Courts of the United States, which are under duty and have authority to afford all those remedies for the protection of a property right which were administered by the High Court of Chancery in England at the time of the adoption of the Constitution of the United States. Although, therefore, the state law may afford an adequate remedy at law in a particular case, or, as in these cases, attempt to prevent any efficient remedy in its own courts of equity, yet, if the case properly falls within the principles upon which the High Court of Chancery in England at the time of the adoption of the Constitution of the United States gave a remedy, the courts of the United States cannot withhold it. Mississippi Mills v. Cohn, 150 U. S. 204, 14 Sup. Ct. 75, 37 L. Ed. 1052.

## Right of Federal Court to Enjoin Illegal Use of State Power to Destroy a Constitutional Right.

IV. Section 1 of the fourteenth amendment ordains:

"Nor shall any state deprive any person of life, liberty or property without due process of laws; nor deny to any person within its jurisdiction the equal protection of the laws."

Congress is given power "to enforce" its provisions "by appropriate legislation." It has enacted "appropriate legislation," under which the courts enforce the rights secured by this section. In Chicago & Burlington Railroad Co. v. Chicago, 166 U. S. 226, 233, 17 Sup. Ct. 581, 583, 41 L. Ed. 979, it is said:

"It must be observed that the prohibitions of the amendment refer to all instrumentalities of the state, to its legislative, executive, and judicial authorities, and therefore whoever, by virtue of public position under a state government, deprives another of any right protected by that amendment against deprivation by the state, violates the constitutional inhibition, and as he acts in the name and for the state, and is clothed with state power, his act is that of the state. This must be so, or, as as we have said, the prohibition has no meaning, and the state has clothed one of its agents with power to annul or evade it." Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676; Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; Scott v. McNeal, 154 U. S. 34, 14 Sup. Ct. 1108, 38 L. Ed. 896.

It is a maxim of constitutional law that, when "the end is required, the means are given." Authority and duty to prevent an evil inevitably carry with them authority and duty to overcome all the means by which that evil can be accomplished. The amendment is directed against the wrongful use of state power. It is the wrongful use of state power,

and not who uses it, which determines when the prohibitions of the amendment apply. Citizens may swear out warrants of arrest, and go before grand juries and secure indictments, in order to enforce penalties, and thus compel submission to state statutes. The citizen, it is true, is not ordinarily vested with state power; but in this instance valid laws of the state permit him to put state power in motion to enforce the statute. The result is, to quote the language of one of complainant's counsel:

"Any one can sweep across the state like a blizzard or sirocco, and with his informations consume the property of these defendants. The enforcement of the acts does not depend upon the officers of the state. They have put it in the power of anybody to enforce them."

When the Legislature refrains from putting any special duty upon the officer, and expressly denies him power to enforce a statute, and leaves the state power to enforce the statute solely in the keeping of private citizens, and the citizen avails himself of the state power thus left at his disposal, can it reasonably be affirmed that state power has not been used, and wrongfully used, to that end, if the statute be invalid? Is not the individual, pro hac vice, made the state's officer in the initial steps for enforcing the invalid statute? Whether this be so or not, when warrants are sworn out, indictments found, or suits brought to enforce an unconstitutional statute, valid laws of the state are set in motion to enforce that statute, and declare the duty, as the case may be, respectively, of clerks, to issue summons and capiases, of sheriffs to serve summons and complaint and to make arrests, and of the solicitors to prosecute indictments. These lawsuits, indictments, arrests, and prosecutions are the means for bringing about the forbidden end. Without the use of such instrumentalities, the invalid enactment cannot be enforced, and the wrong cannot be accomplished. If the use of these instrumentalities be not restrained, the wrong will be done. The defense, to be effective, must be as broad as the assault, and deal with it in every form. It is inevitable, therefore, that the courts, in order to prevent the consummation of the wrong and to perform their duty under the Constitution of protecting property rights, must not only have the power, but must exercise it, to enjoin the lawsuits, the arrests, and the prosecutions. The exercise of such power is not only "appropriate," but it is the only means for the effective prevention of such wrong. In the exercise of such power in preventing the wrong, the court exerts no unusual or extraordinary authority, but simply follows ancient principles of justice, brought over by our ancestors from across the seas, and applies them to new conditions created by modern affairs and industrial development; and new state policies, whereby state officers are prevented from taking any steps, of their own motion, to bring offenders to justice. If the Constitution is to be followed, the court must arrest the wrongful use of the state's machinery of justice, put in motion by private citizens to enforce an unconstitutional statute, whenever necessary to prevent invasion in that way of rights the amendment secures, and on the same principles upon which it would interfere, when put in motion by officials specially intrusted with the duty of enforcing the illegal enact-

ment. If such proceeding against individuals wrongfully using state power to accomplish the forbidden end could be treated as suits against the state, the fourteenth amendment would necessarily authorize them. It was adopted long after the eleventh amendment. While both must be given a distinct field of operation as far as possible, yet to the extent of irreconcilable conflict the latest expression in the Constitution of the sovereign will of the people must control in all cases, where deprivation of property is attempted, without due process of law, by aggressive or affirmative action of state officials. If we hold that the protection of the amendment can be eluded, when private persons, and not officials, set state power in motion for the illegal destruction of a right it protects, it involves the maintenance of the baleful constitutional doctrine that the supreme law of the land can be halted and rendered helpless by the mere form in which the wrongdoer chooses to clothe his defiance of it.

The fourteenth amendment was not involved in Poindexter v. Greenhow, supra, though it was in Chicago & Burlington R. R. Co. v. Chicago, supra. Some have criticised the doctrine declared in those cases, as to when the action of state officials is the action of the state, as involving the inconsistent assertion that the action of an officer outside of the Constitution and laws of the state is not the action of the state, and yet, nevertheless, when the officer does so act, such conduct on his part is state action, which invokes the operation of the fourteenth amendment. The inconsistency, however, is more seeming than real. It is true that an unconstitutional act is no law, and the courts must ordinarily treat transactions under it as though the statute had never been passed. Yet, when the officer sets the state's machinery of justice in motion to enforce an unconstitutional enactment, he accomplishes his purpose by the use of valid laws of the state. Whether the particular statute sought to be enforced be unconstitutional or not, the laws of the state which provide for arresting, indicting, prosecuting, and punishing persons charged with offenses against the state are valid laws of the state, and state power is used in such prosecutions, in law and in fact, as effectually as when the prosecution is for the violation of a valid enactment of the state. It is, therefore, literally true, in the constitutional sense, although the effort be made to enforce an unconstitutional enactment, that the acts of state officers in the courts to that end are acts of the state, and wrongful use of its power, within the purview of the fourteenth amendment.

### Fitts v. McGhee Controlled by Subsequent Decisions.

V. In answer to all this, respondents cite Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535, and sturdily insist that it forbids the court to entertain these bills. Whatever doubt arose at one time as to the exact scope of the doctrine of that case has long since been dispelled by subsequent decisions on all the questions of which it treats. If it were not for the zeal of counsel in urging their insistence, the court would not make other answer than the citation of those decisions. The uniform doctrine of the Supreme Court at the time of that decision had always been that a suit against an officer of the state to arrest his action under an unconstitutional enactment which threat-

ened irreparable injury to a property right secured by the Constitution and laws of the United States is not a suit against the state, and the opinion in that case is careful to state that it is not intended to "impinge upon the principle" which justifies such suits. Reagan v. Farmers' Loan & Trust Company, supra, holds that a suit like this is not a suit against the state, and it is cited without disapproval in Fitts v. McGhee. The subsequent cases of Prout v. Starr, Gunter v. Atlantic Coast Line, and McNeal v. Southern Railway Co. likewise hold that such suits are not suits against the state, and Fitts v. McGhee is cited in them as authority for the ruling. It is equally clear that the court did not intend in Fitts v. McGhee to lay ( )wn any invariable rule that a court of equity has no power, in any event, to enjoin the execution of an invalid statute by criminal proceedings, when necessary for the protection of a property right, nor to hold that equity could not afford such relief when no other injury was to be apprehended than the institution of formal judicial proceedings to enforce the invalid criminal statute. That was the very situation in which the Supreme Court held such relief was proper in Reagan v. Farmers' Loan & Trust Co., Smyth v. Ames, and Prout v. Starr, supra. In Smyth v. Ames the Supreme Court affirmed an order which enjoined the Attorney General, as Attorney General, "from bringing or aiding in bringing or causing to be brought any proceeding by way of mandamus, injunction, civil action, or indictment to enforce" the provisions of the statutes there under consideration. In the still later case of Mississippi Railroad Commission v. Illinois Central Railroad Co., 203 U. S. 335, 27 Sup. Ct. 90, 51 L. Ed. 209, the Commission "threatened by suit to enforce the order" to stop certain trains at certain stations as ordered by the Commission. The statute affixed a penalty of $50 for each time the railroad company failed to stop its trains in obedience to the orders of the Commission. The equity of the bill was based upon the fact that "complainant would, therefore, be compelled to comply with the order, or be subject to a multiplicity of suits for penalties arising from each and every violation of the order, which imposed a direct burden upon interstate commerce," etc. The resort to judicial proceedings in the courts of the state was the only action threatened, and was what the Supreme Court held was properly enjoined. In Reagan v. Farmers' Loan & Trust Co., supra, Smyth v. Ames, supra, and Scott v. Donald, 165 U. S. 107, 17 Sup. Ct. 262, 41 L. Ed. 648, decided before Fitts v. McGhee, and in other subsequent cases, the Supreme Court has held there is no adequate remedy at law in cases of this kind. One of the latest cases on this point is Cleveland v. Cleveland City Railroad Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102, where the Supreme Court said:

"Respecting the contention that the case presented by the record was not within the jurisdiction of the equity court, it suffices to say, in view of all the controversies, confusions, risks, and multiplicity of suits which would result by the resistance of the respondents to the enforcement of the ordinance, and in view of the public interest and the vast number of people to be affected, the case is one within the jurisdiction of a court of equity."

The doctrine applies with much more force to the operation of a trunk line of a railway traversing the entire limits of a state.

Counsel say that the street railroad cases ought not to give the rule here, since a municipal corporation, and not the state, was the defendant. That fact, however, can make no difference in the righteousness of the principle or its application here. This is not a suit against the state. The same observations apply to the cases of Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 23 Sup. Ct. 498, 47 L. Ed. 778, and Dobbins v. Los Angeles, 195 U. S. 223, 241, 25 Sup. Ct. 18, 49 L. Ed. 169, where it was ruled, where property rights will be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a court of equity.

Counsel for respondents argue that the decision in Prout v. Starr went off on the ground that Prout was bound by a stipulation made by his predecessor, upon which judgment had been rendered, and from which no appeal could then be had, and that the decision is not, therefore, authority on the other point. That view is untenable. Prout insisted the proceeding against him was a suit against the state, and that the federal court could not enjoin him from enforcing the criminal laws of the state in the state courts. It was necessary to decide both questions. If the original proceeding against Prout's predecessor had been a suit against the state, the court below would have been without jurisdiction to entertain it, its orders would be void, and the Supreme Court would not have enforced the stipulation against Prout. If the controlling issue had been whether the judgment on the stipulation was res adjudicata as to a party who stood in privity with the original defendant, the court would not have gone beyond that question. Its habit is to refrain from discussing grave constitutional questions when possible to avoid them. It was necessary in that case to discuss the eleventh amendment, and the court, for the first time, treated of the bearing of the fourteenth amendment upon the eleventh amendment, and spoke of evasions of the "salutary provisions" of the former, under the cloak of the latter, when the citizen sought relief from official wrongs under color of unconstitutional statutes. It is sought to withdraw these cases from the influence of the doctrine of the Prout Case, because the Attorney General there was enjoined after the statute had been declared unconstitutional. Power to perpetually enjoin its operation after final judgment inevitably carries with it the power to maintain the status quo until the facts can be ascertained upon which the validity of the statute at any time depends. United States v. Shipp, 203 U. S. 563, 27 Sup. Ct. 165, 51 L. Ed. 319. Otherwise, in cases like these, where the nature of the investigation compels long delay before any final judgment can be pronounced, the citizen would, in the meantime, be without any protection from the operation of an unconstitutional statute. The Constitution affords an ever-present protection to life, liberty, and property and has just as much power to protect a property right against the operation of an invalid enactment the moment after its passage as at any other period. Mr. Justice Harlan concurred in the subsequent cases cited, which decided all the points covered by Fitts v. McGhee. He concurred in the result in Prout v. Starr, though not "in all the reasoning" upon which it was based. That great judge, instead of concurring as he did, would certainly have dissented

in some one of the decisions we have cited, if he had intended 'to enunciate in Fitts v. McGhee any doctrine contrary to the principles declared in the subsequent cases.

### Fitts v. McGhee Analyzed.

VI. Moreover, a careful analysis of the facts in Fitts v. McGhee will show that the court did not intend to decide, and did not in fact decide, any new doctrine as to' what constitutes a suit against the state. The bill in that case was twice amended, but in each posture of the bill as amended it was a suit against the state. It was a mere effort of the owners of an incorporated bridge company to settle in a suit against the state and the state officials, who were not shown to be personal wrongdoers or to have threatened any personal wrong, the constitutionality of the statute which fixed rates of toll alleged to be confiscatory, etc. The dismissal of the state from the bill, and afterwards of the Governor, whose term had expired, leaving the controversy with the Attorney General, at the time the supplemental bill was filed, and then bringing in the solicitor, did not change the nature of the suit in this respect, so as to authorize the complainants in such a suit to obtain relief against the enforcement of the alleged confiscatory statute. Complainant's case, as made by the original and amended bills, leaving out of view for the present the supplemental bill, to which different considerations apply, was in substance this:

"We are the owners of an incorporated bridge. The Legislature, after chartering us, fixed rates of toll which are confiscatory. Numerous persons who used the bridge have threatened to sue us before justices of the peace for penalties inuring to them only. These same persons have threatened to procure the Governor and Attorney General to commence mandamus proceedings, and to institute suits for the forfeiture of the bridge franchise, in order to compel us to observe the confiscatory rates. We know, of course, that the Governor and Attorney General have nothing to do with these statutory penalties, which can be recovered only in a personal suit by the individuals aggrieved. We cannot affirm that either of these officials has been approached by the persons who used the bridge to bring either of the apprehended legal proceedings; much less can we say that these officials are about to do so. Nevertheless, while we have no better basis than our fears, we do fear that our property rights will be violated by the action of the Governor and Attorney General; and we therefore ask the court to prevent these officials, and all other persons, from taking the apprehended proceedings, so that in such a suit we can test our rights with the public and fix the status of our bridge as to the tolls."

When the case went to the Supreme Court, counsel for the bridge company denied that the suit was in reality one against the state, and cited a number of cases to sustain their view. The court replied:

"The officers in those cases had either 'committed or were about to commit some specific wrong or trespass to the injury of plaintiff's rights,' and these officers thus became personal wrongdoers. You do not charge any personal wrong on the officers here. They did not appear 'to be about to commit' any wrong, and you have not shown that they are under any duty to enforce the statutes of which you complain; nor have you alleged in any way that they are 'about' to put these laws in execution. You are, therefore, suing them only in their purely representative capacity, and not as individuals, who, as officials, under an unconstitutional statute, have done or threatened to do you any wrong. When the state's officers occupy that attitude, you cannot sue them in their purely representative capacity, without regard to any

threatened wrong on their part, in order to dictate the policy of the state government as to the execution of the statute concerning your bridge. Under such circumstances, your suit against these officials is nothing but a suit against the state."

That was the turning point in the case, and it was to emphasize the distinction between the attitude of the officials in the cases cited and that in hand that the court spoke of the officers being "specially charged," "specially directed," or holding "special relations to the particular statute" alleged to be unconstitutional. The court was merely defining these "special relations" to an unconstitutional statute, which would authorize a suit against the official to prevent his execution of it, without falling within the reason forbidding suits against the state. This test was several times emphatically declared. It was, in the language of the court, that the officers "were committing or were about to commit some specific wrong or trespass to the injury of plaintiff's rights." It is a self-evident fact that "specially charging" the officer could not, of and in itself, effect the wrong. The officer must in fact attempt, or be about to attempt, the execution of the statute, so that, if not prevented, wrong would be done. If he is not "specially charged" to do it, and has not threatened to do it, there can be no ground upon which to place the apprehension of injury, or upon which to base a suit on that account. The court did not intend to assert that there was any legal difference betweeen the wrong and the remedy, simply because the wrong was consummated in one instance by an officer "specially charged," while in the other the same wrong was consummated by an official who, though not "specially directed," nevertheless executes an unconstitutional statute, in the exercise of the option the law left him in that respect. The solicitor was brought into the case long after the suit was commenced against the state, and the Governor and Attorney General merely as such, and not as personal wrongdoers, of which suit, for the reasons stated, the court never had jurisdiction. Mr. Justice Harlan was careful to say that:

"Whether the owners of the bridge and the plaintiffs, as their representatives, were denied by the state fair and reasonable compensation for the use of their property by the public, was a question which could not be considered in this case. That is not a matter to be determined in a suit against the state; for of such a suit the court could not take cognizance."

The suit, as thus presented, being still a suit of which the court could not take jurisdiction at the time the supplemental bill was filed, it was immaterial whether the statute relating to the tolls was valid or invalid. The court in that kind of a suit had no authority to determine and protect the right. Hence the solicitor, although he was acting, and, if the toll statute were confiscatory, had become a wrongdoer, within the meaning of the decisions cited to the court, could not be brought into the case by the supplemental bill, for the purpose of testing the statute, for two reasons: The court had no jurisdiction in that case to determine the validity of the right which was claimed to be destroyed by the prosecution of the indictments; and, in the second place, the court never having obtained jurisdiction of the matter to which the indictments related, though they were found long after the equity suit was commenced in the federal court, the state court ob-

tained prior jurisdiction. It would have been entirely improper, therefore, to interfere with the solicitor's prosecution of these indictments. In prosecuting them, he neither violated any valid order of the court, nor did he seek by the indictments to transfer to another tribunal the trial of the "very matter" of which the equity court had first acquired jurisdiction. If that had been the posture of the matter, the equity court would have had the right to maintain its exclusive jurisdiction, by injunction against any criminal or other proceeding which sought to transfer the very matter which stood for judgment before it to some other court. This is the doctrine stated in Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 43 L. Ed. 399, which is cited in Fitts v. McGhee, regarding the authority of a court of equity to interfere against criminal proceedings, under an invalid statute, when invoked to protect a property right. While many of the expressions in the opinion in Fitts v. McGhee, supra, "went beyond the case," and were not "necessary to the ascertainment of the very right in question," the judgment there was rested upon the two controlling considerations we have pointed out, and the case is, therefore, reconcilable with the doctrine of the subsequent and prior decisions that when an official is "about" to execute an unconstitutional statute, to the injury of a right secured by the Constitution, the suit to arrest his action is not a suit against the state.

### Jurisdiction of the Court Not Affected by the Repealing Laws.

VII. The original bills have not been converted into suits against the state by reason of any legislation enacted at the called session, or because, since their filing, the defendants have been stripped of all official power to enforce the rate statutes. The original bills charge that the defendants in them will do so. The defendants, however, are proper parties, irrespective of any duty or purpose to execute the rate statutes. The Railroad Commission is still the rate-making power. The state statutes endeavor to leave the Commission practically supreme in that respect. Save in the matter of enforcing rates after they are made, it is not shorn of any of its original authority. By the filing of the original bills this court has obtained exclusive jurisdiction to determine whether the statutes attacked therein can have any present or final operation, and, among them, whether the statute, which makes the rates in force on January 1, 1907, the maximum rates, save wherein other statutes have reduced them, shall finally be enforced or denied operation. The subject-matter of the controversy before the court, in view of the challenge of the right to confine the carrier to the rates in force on that date, necessarily presents a controversy as to the rightfulness of any reduction below those figures. If the Commission, one of the defendants in this litigation, were at liberty at this stage of the proceedings to step within the disputed area as to the reasonableness of the tolls, and make reductions, it would utterly defeat the power of the court to maintain the status quo pending final decision, unless it made new orders on further supplemental bills concerning what is really only another form of raising a question which is already pending in the court, and which it still has the right to decide.

It is the policy of our laws—indeed, their express command—that

litigation to determine the reasonableness of rates shall not be waged, except in suits where some tribunal intrusted with the duty of caring for the public interests in the matter of rate is made a party.  The confusion, distress, and uncertainty which would result if such questions were determined in suits between carriers and private parties is apparent on the face of such a situation.  There might be collusion.  The burden of contesting rates would deter private parties from undertaking it.  To leave such issues to be determined in suits by private parties, which would be prosecuted in different localities, in great numbers, in different courts, at the same time, in which variant decisions would frequently be reached, even on the same state of facts, would result in business paralysis and legal pandemonium.  Uniformity and fixedness, which, next to the reasonableness and fairness of the rates, is so essential to the welfare of all who deal with the carrier or buy and sell in the markets, would be utterly destroyed.  It was the realization of the evils of allowing such matters to be tested in suits between private parties, so often adverted to in the decisions of the courts, which caused the Legislature of Alabama, in the first instance, wisely to provide for a suit against the Railroad Commission and the Attorney General in a court of equity, wherein, by one comprehensive suit, the whole matter could be contested and adjusted in a way which would bind the carrier, the shipper, the passenger, and the public authorities alike.  The legislation enacted at the called session, so far as concerns the parties to such litigation, substitutes the state itself as the adversary party in an appellate proceeding whenever an appeal is taken from an order increasing rates, and, when the carrier appeals from an order reducing rates, makes the Railroad Commission the appellee.  That is the only change in its policy as to the parties with whom the contest as to rates shall be waged.  The original defendants in these suits are not rendered improper parties in the further progress of this litigation, which was initiated in the very mode invited at the time by the state statutes, because subsequent statutes endeavor, at one and the same time, to effect the same wrong originally complained of by a different means and to take away the remedy given for the redress of the original wrong.  The suits, when brought, were well brought against the proper defendants under the law in force at the time, even if it be conceded that the right to maintain the suits depends upon the state law.  Rights lawfully acquired under a valid law while in force are not destroyed by the repeal of the act which gave them.  The presumption is, when a statute is adopted providing a new mode for redressing an existing property right, that it is not intended to operate retrospectively upon pending suits, unless the words of the statute force that conclusion.  However that may be as to a case pending in the state courts, state statutes cannot legislate out of the equity court of the United States a case, properly brought therein, to enforce a right secured by the Constitution and laws of the United States.

### Original Bills Not Abated, but Supplemental Bills Well Filed.

VIII.  The original bills have not abated, and do not require any revivor, by reason of the repeal of the commodity rate statute and the substitution of another schedule of rates, or by the withdrawal from

the Commission and the Attorney General of official power to enforce the rates statutes, or by the repeal of the act which authorized them to be sued. The legislation passed at the called session affects the subject-matter of the litigation in the original bills in one respect only. Those bills sought to arrest the operation of the statute which forfeits the right of carriers to do intrastate business if they venture into this court to test the reasonableness of the rates, and also to arrest the operation of the statute fixing passenger fares at 2½ cents per mile, and the statute forbidding any increase of rates above those in force on the 1st day of January, 1907, as well as to enjoin the commodity rates. The grievance alleged as to the commodity freight rates might be stricken out of the bills, and still leave a perfect cause of action as to the other matters, which the subsequent legislation has not affected in any way. The original bills have merely become "defective" in the sense of equity rule 57, because, as originally filed, they set up a grievance as to the rates embodied in the commodity rate act, whereas, in consequence of the change in the legislation, the grievance as to the freight rates after the legislation at the called sessions is as regards what are known as the "Eight Group Acts," which take the place of the former freight rates. The change in legislation has happened subsequently to the filing of the original bills, and after they were at issue. The parties have not changed. The subject-matter of the litigation remains absolutely unaltered, and the right to relief as originally prayed is perfect as to three of the grievances. The bills as to three matters need no support from the supplemental matters. The grievance as to the new matter is different in degree, and not in kind. The scope of the relief prayed is not enlarged. This is not a case where the right asserted on either side has gone out of a party to the suit, and must, therefore, be waged thereafter with a different person, who is to be brought into the litigation. Under such circumstances, neither justice nor technicality will be subserved by refusing to allow the question to be raised by supplemental bill. If the new matter had been brought forward, as respondents insist should have been done, by an original bill in the nature of a supplemental bill, such a bill would be so closely related to the case made by the original bill that the court would unhesitatingly consolidate the suits. The supplemental bills are properly filed as such.

IX. There is another view equally conclusive of the right to maintain the original bills, regardless of the repeal of the commodity rate act and the act authorizing suits against the Commission. While the commodity rate act was in force, the carriers failed to observe it. The court enjoined shippers from bringing suits to enforce it, providing, in the meanwhile, for the protection of their rights by exacting indemnifying bonds, and allowing shippers to file claims for excess charges in this court. The carriage of every parcel of freight, under such circumstances, has ripened into an executed contract to pay each shipper any excess rate collected, if the rate statutes be not adjudged invalid. Each of these shipments, being an executed contract, gives a vested right of action for the excess charges, which it is not competent for the state to take away. M. & G. R. R. Co. v. Peebles, 47 Ala. 317.

Shippers not only did business with the carrier upon the terms specified in the orders made on the issue of the preliminary injunctions, but, as permitted by those orders, have filed their claims against some of the complainants to recover the excess in the rates charged them, and have thus become quasi parties to the suit. The commodity rate act is as effective and binding, as to completed transactions under that act while it was in force, as if it had never been repealed. As the statute is prima facie valid—strictly speaking, voidable, and not void, until so declared—the only way of escape for the carrier from the liabilities thus incurred is to bring his suit to procure a judicial determination of the invalidity of that act, as applied to him, during the time that it was in force. The object of the suit cannot be defeated by a repeal of that statute. The right of action after "suit has been commenced" to be rid of such liability cannot be taken away by subsequent legislation, among other reasons, because section 95 of the Constitution of Alabama of 1901 ordains:

"After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action," etc.

A cause of action may consist as well in the right of the plaintiff in a suit to maintain a bill to get rid of an obligation threatened to be enforced against him by the defendant therein as in the right of the plaintiff to institute such a suit against a defendant to compel him to pay a debt or perform any other obligation. A familiar instance of a cause of action like that sought to be enforced by the original bill, as to the commodity rate act, is where a bill is filed to remove a cloud upon a title, which is purely a defensive proceeding. In United States v. Schooner Little Charles, 1 Brock. 347, 355, Fed. Cas. No. 15,612, Chief Justice Marshall said:

"It is a general principle that jurisdiction, once vested, is not divested, although a state of things should arise in which original jurisdiction could not be exercised."

In that case it was contended that the court had lost its jurisdiction by losing possession of the things to be condemned; that the stipulation substituted for vessel was so irregularly taken that it could not be enforced, and, therefore, could not be considered as a substitute for the thing seized. Chief Justice Marshall said:

"The court will not render a judgment which operates on nothing; but this reason will not apply in any case, where the judgment will have any effect whatever—if, for example, the liability of the officer for making a seizure, for damages, be dependent on it."

The Supreme Court has always so held. Kirby v. American Soda Fountain Co., 194 U. S. 141, 24 Sup. Ct. 619, 48 L. Ed. 911; Cooke v. United States, 2 Wall. 218, 17 L. Ed. 755.

If the Legislature, instead of substituting the "Eight Group Act" for the "Commodity Rate Act," had repealed the latter absolutely, enacting no other in its place the liability for the excess rates charged before that act was repealed, if that act be valid, would remain upon the carrier, and, that being so, the jurisdiction of this court to determine the question remains. Hollingsworth v. Virginia, 3 Dall. 378, 1 L. Ed. 644, which is cited to support the contrary view, has no application here. When the

eleventh amendment was adopted, it destroyed all judicial power in a court of the United States to render judgment against the state, except where it consented to be sued. The power which created the court withdrew its jurisdiction over the cause, and necessarily, therefore, all power to render judgment was taken away. The jurisdiction here is not given by state laws, and they cannot take it away, and a cause of action still remains. The only way in which the state laws could affect the exercise of federal judicial power here would be by such absolute destruction of the subject-matter of the litigation that no right remained to be settled as to any matter arising out of the repealed statute. The repealing statute has not accomplished that condition of affairs. The state has no power to relieve the carrier of liability, under completed transactions, for the excess charges while the repealed law was in force, and no power over the jurisdiction of this court, once it has attached, to give the carrier relief in that respect, so long as that liability remains.

### Immaterial Whether Statutes Allowing State to be Made a Party in Certain Cases is Valid or Not.

X. It is argued that the last enactment of the Legislature, which repealed the former mode of contesting rates and substituted an appellate proceeding in the chancery court of Montgomery county, or other state court having like jurisdiction, wherein the state of Alabama may appeal in certain cases, and the carrier may also appeal from the orders of the Commission reducing rates, in which latter event the Railroad Commission shall be the appellee, is void in toto, because the suit authorized against the Commission is, in effect, a suit against the state, and section 14 of the Constitution of the state of 1901 declares that the state shall never be made a defendant in any court of law or equity. Holmes v. State, 100 Ala. 291, 14 South. 51; Girls' Industrial School v. Reynolds, 143 Ala. 585, 42 South. 114. It is therefore insisted that there is now no valid law which authorizes any proceeding in equity by the carrier, which is necessarily confined to remedies at law against the grievance of which it complains. It is unnecessary, however, to discuss that branch of the question further than to say that a proceeding against the Commission in a court of justice to settle the reasonableness of rates is not a suit against the state, for the reasons heretofore stated. If the laws of the state providing for a review at the instance of the carrier in reality permitted a suit against the state by allowing the Commission to be sued, the statute, under the influence of the decisions cited above, would be void in toto. If the statute is not void as involving authority to sue the state, yet, if it prescribes an exclusive mode, the statute here would, nevertheless, be unconstitutional in that event also, since it is so framed as to prevent the carrier from having seasonable resort to preventive remedies of the courts to protect a property right from destruction. If the act be constitutional, and does not provide an exclusive remedy, it is cumulative merely, and effective only as prescribing the mode of obtaining equitable relief in the state courts against the enforcement of rates. The procedure there laid down cannot, of course, affect the procedure in the

courts of the United States in equity cases, which in no wise depend upon state statutes.

### Penalties Under System for Enforcing Rates Void.

XI. In Louisville & Nashville Railroad Co. et al. v. Railroad Commission of Alabama et al. (C. C.) 157 Fed. 944, the court said:

"Mindful of the irreparable injury and multiplicity of suits which would be imposed upon the carrier, if it resisted the enforcement of rates it considered unreasonable and had no other mode of testing the reasonableness of rates than meeting indictments as they are found and suits as brought, the Legislature of Alabama wisely provided a mode of settlement, by bill in equity against the Commission and the Attorney General, which in one suit would settle every question, and bind the state, the public, and the carrier alike, and authorized the court, in the meanwhile, to suspend the execution of the rate laws. This enabled the carrier upon properly indemnifying shippers and passengers, to obtain a judicial ascertainment of its rights without hazarding its whole estate upon the rightfulness of its challenge of the rates. Without some such provision, our rate laws would deter the carrier from going into the court at all, and practically destroy its right to a judicial review as effectually as if the statute had in so many words denied its right to resort to the courts. Statutes making no such provision as ours for contest of a right of property without risking any such loss would be unconstitutional."

See, also, Seaboard Air Line Railway Co. v. Railroad Commission et al. (C. C.) 155 Fed. 798.

The repeal of the statutes then in force, and the enactment in lieu of them, of a statute which makes no provision for the suspension of the rate statute, and, consequently, of the penalties, pending contest, and leaving liability for them if the contest is unsuccessful, and so framed in its details as to prevent any timely resort to a court of equity for injunction, and to terrorize the carrier from resorting to the courts, creates the very state of affairs which the court then said could not be brought about if the Constitution be observed. The Constitution of Alabama of 1901 (section 13) declares that:

"All courts shall be open, and every person for any injury done him in his lands, goods, person or reputation shall have a remedy by due process of law, and right and justice shall be administered without sale, denial or delay; that excessive fines shall not be imposed, and that no one shall be deprived of life, liberty or property without due process of law."

When it is declared that the courts shall be "open," something more was commanded than sessions of the court, at stated times, to hear and determine cases when brought in the courts. If a private person, claiming the right to have another use his property in a particular way for his benefit, should tell the owner of the property, when he went to law to prevent the enforcement of the claim, that the claimant would destroy his estate if he did not win his lawsuit, he would commit a serious offense both in law and in morals. The statutes here put the state in the attitude of making just such a threat. These statutes attempt to declare as the law of the land that a citizen may go into the court, if he wishes, for the protection of a right, but, if he fails, all his property shall pay the forfeit, no matter how bona fide his resort to the judicial tribunal. Such threats, clothed in the form of law, close the doors of the courts to most suitors as effectually as when physical force is used to drive them away. The usual results

161 F.—62

are shown in the petitions filed by the Southern Railway Company and its allied lines to withdraw the injunctions issued on their original bills. Justice, under such conditions, is not administered without sale. The legislation drives the property owner, against his will, either to stay out of the court or else to pay as the price for entering the court the value of the property he will lose, if unsuccessful in the suit. The penalties are designed to prevent resort to the courts. Different considerations might apply if the penalty were exacted after the owner of the property had been given his day in court. Of course, the general power of the state to prescribe penalties for the violation of its laws is not denied; but the scheme under which such penalties are enforced must have some just relation to the lawfulness of the conduct to be prevented and the nature of the right sought to be penalized. Defenses left open to all other persons similarly situated, to protect the exercise of a property right in the courts, must not be closed to him upon whom the penalty is visited. When a statute fixes a penalty upon the property owner for failure to perform a duty for the reward fixed by the statute, and prevents him from performing that duty under protest, and punishes him for going into the courts to recover his quantum meruit, the statute is neither more nor less than an effort to punish a suitor for resorting to the courts in defense of his property rights. The Legislature has no power to visit upon the property owner, for going into the courts of his country for the protection of a property right, any consequences other than those which ordinarily attach to all other persons under like circumstances, where they are the unsuccessful plaintiffs in civil suits.

### Excessive Fines.

The command regarding the imposition of fines is addressed more directly to the courts, but also imposes limitations upon the exercise of legislative power. The Legislature must not coerce the discretion of the judges, by fixing the minimum fine on conviction so high as to compel an excessive fine. The courts, in the exercise of the discretion the statutes give as to the amount of the fine, must not impose fines so heavy as to be out of all proportion to the nature and degree of the offense and the object sought to be accomplished by the penalty. The business here, upon the doing of which the penalties are imposed, is an entirely lawful one, and so is the act of transportation for which the reward in excess of that fixed by the statute is demanded. The only offense is the endeavor to obtain a larger amount than the statute fixes as the reward for the service. It is the occupation, at last, which is affected, and intended to be affected. The numerous penalties are really designed to punish the carrier for doing business at all, if there be a demand for more than the statutory charge. In dealing with the business, it is not treated as one business, but is carved up into as many businesses, for the purpose of punishment under the statute, as there are transactions in a given day. Making a test case even for a single day subjects the carrier to heavy fines for thousands of transactions. It could be fined over $1,000,000 a day. The imposition of a fine of $1,000,000 a day for the failure of a railroad company to take out a license to transact a business, which is lawful in itself, would

"shock the conscience" of an ordinary man. That, in substance, is what the penalties are designed to accomplish, for they really strike at the right to do business at all if the statute is not observed. The tests the authorities lay down for determining whether a fine is excessive, in a given case, are quite unsatisfactory. They all unite, however, in declaring, if the amount of a fine will shock the conscience, it is "excessive" in the constitutional sense. The reasons why such penalties cannot be enforced are powerfully stated by Mr. Justice Brewer, in Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92, which, though dicta in that case, are unanswerable. The same conclusion has been reached in a number of cases in the Circuit Courts. Mercantile Trust Co. v. Texas Pacific Railway Co. (C. C.) 51 Fed. 529; L. & St. L. R. R. Co. v. McChord (C. C.) 103 Fed. 216; Consolidated Gas Co. v. Mayer (C. C.) 146 Fed. 150; Ex parte Wood (C. C.) 155 Fed. 190. The Supreme Court of Alabama decided the same principle years ago in S. & N. A. R. R. Co. v. Morris, 65 Ala. 194, and has enforced it in a number of cases as late as Randolph v. Builders' & Painters' Supply Co., 106 Ala. 501, 17 South. 721. See, also, Wally's Heirs v. Kennedy, 2 Yerg. (Tenn.) 554, 24 Am. Dec. 511; Holden v. James, 11 Mass. 396, 6 Am. Dec. 174; Missouri v. Lewis, 101 U. S. 22, 25 L. Ed. 989; Railroad Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666. The scheme of penalties for which the statutes provide is unconstitutional, as matter of law, in view of the known, direct, and inevitable effect of the penalties upon the right at which they are aimed. The indictments, arrests, and suits for penalties have no warrant of law to support them, and must be enjoined, as would any other illegal act which threatens irreparable injury, irrespective of the reasonableness of the rates prescribed. The provisions of the statutes on these subjects are not so dependent or intermingled as to leave any room to doubt the Legislature intended to enforce the rule of action the statute prescribes as to the tariff rates, although the penalties for their nonobservance might be stricken down.

Statutes Preventing Use of Gates at Stations to Keep Out Intending Passengers, When Tickets are Not Sold at Statutory Rates.

XII. Another statute, whose constitutionality is challenged, is that which provides, when the carrier fails to keep for sale or to sell on demand at passenger stations tickets at the rates prescribed by the statute, or such as may thereafter be prescribed by the Commission, it shall be unlawful for the carrier to maintain any fence or gates to prevent intending passengers from reaching the trains, under a penalty of not less than $200 nor more than $1,000. So far as the statute undertakes to impose punishment for the nonobservance of any rate the Commission may fix in lieu of the one prescribed by the statute, it is unconstitutional for the reasons hereinafter stated. Its validity is further questioned, because "the natural and reasonable effect" of the statute is to prevent a carrier who does not sell tickets at the prescribed rates from using fences and gates against the crowds of sight-seers and idlers who generally go about trains at stations. The carrier would have no practical means of identifying intending passengers, except

their declarations, and many persons who had no purpose to take passage on the train would not scruple to assert they intended to do so in order to gain entrance to the stations. The inevitable result would be the carrier, for fear he might use the gates against the wrong persons, would not use them against any one who claimed to be an intending passenger. All persons who chose to go about arriving and departing trains, and declared their purpose to take passage, could and would enter the stations and swell the crowds on the inside, creating conditions of danger against which railroad carriers always find it necessary to guard in populous localities, both in their own interests and in furtherance of the public safety. If the statute had said in so many words that a carrier who refused to sell tickets at the prescribed rates should not take proper precautions for the protection of life and limb on his own premises, no one would doubt its invalidity. That would be a species of outlawry. The statute inevitably accomplishes the same result by indirection. Punishment of the carrier or its servants for refusing to keep or sell the tickets would have accomplished all the ends of the statute, if lawful. It is the direct and natural mode of compelling observance of the duty. The duty to be enforced is primarily due to a private individual, and it is not a legitimate exercise of the police power to so frame a statute, designed to enforce such a duty, that its execution unnecessarily involves danger to life and limb of the public, and deprives the owner of property of the right to police it for a lawful purpose. But, this aside, if the schedule of rates sought to be enforced is unreasonable, the prohibition against bars and gates, and the penalty for using them against passengers, is unauthorized and illegal, and execution of the statute could rightly be enjoined pending inquiry as to the facts, which determines whether it can ever be treated as a law.

The justification attempted for those features of the statute which declare that it shall be no defense to a suit to recover forfeiture for keeping intending passengers out of stations, that a restraining order pendente lite has been granted against the enforcement of the rates, or that the carrier has been enjoined from putting the rates in force, rests on the theory that, the statute having authorized intending passengers to use the state's name and declared that the suit shall be the state's suit, no court can have the power to enjoin the bringing or prosecution of such suit, no matter what the equities of the particular case. This theory is plainly untenable. When a state becomes a plaintiff, although the suit is brought to redress its own rights, it is bound by the rules of justice ordinarily applicable to other suitors. It cannot demand of the court in which it brings its suit to uproot the law of the land for it, or to depart from the principles upon which justice is administered between man and man. Walker v. United States (C. C.) 139 Fed. 409. The courts, both state and federal, have jurisdiction to determine whether the rates fixed by the Legislature or the Commission are just and reasonable, and enjoin their enforcement as the facts of particular cases may warrant. When a court, either state or federal, has obtained jurisdiction of the person and subject-matter, its judgments and decrees as to the validity of rates are just as binding

upon the state as upon private individuals. There is no power in the General Assembly to declare, when suits are brought by the state, that decrees of courts in prior suits regarding the same subject-matter of litigation shall not be respected, or that orders made in such suits to preserve the status quo as to rates pending inquiry as to the facts shall in subsequent suits be treated as nullities. Any doctrine which upholds such power necessarily sustains legislative authority to destroy the judicial power and independence, and ignores the Constitution, which forbids the Legislature to exercise any power properly belonging to the judiciary. Besides, the suits for which the act provides are in no proper sense the state's suits. The state, as such, has no pecuniary interest in the transportation of the passenger, or in the breach of duty to him in the refusal to sell tickets at the prescribed rates, or in any other way save the general concern the government has in the welfare of the people, which relation never makes the state the party really interested in the suit. The fact that the state may, in certain contingencies, share in the recovery, does not make the suit the state's suit. Missouri Railroad Co. v. Railroad Commission, 183 U. S. 53, 22 Sup. Ct. 18, 46 L. Ed. 78. The courts always look behind the form to the substance of the proceeding. When the state merely lends its name to an individual, no immunity of the sovereign can be set up to prevent the court in which the litigation is waged from disposing of the case according to its equities and merits between the real, substantial parties to the suit. The proceeding not being a suit by the state, a court of equity may control the suit after it is brought, or enjoin the bringing of it, when equitable principles and the nature of the case render it essential to the ends of justice, just as it would in cases between individuals. As said by the Supreme Court of the United States in Curtner v. United States, 149 U. S. 673, 13 Sup. Ct. 989, 37 L. Ed. 890:

"The same principle must be applied as if the litigation were between private parties."

That case reiterates the doctrine applied in the prior case of United States v. Beebe, 127 U. S. 338, 8 Sup. Ct. 1083, 32 L. Ed. 121. See, also, Miller v. State, 38 Ala. 600.

### Every Person Bound by Decree in Suit with Public Officials Adjudging Proper Rate.

XIII. Similar legislation along this line in another statute is based upon the idea that the shipper or passenger is not a party or privy to the judgment rendered by the courts in suits against public officers to determine the reasonableness of rates. The general principle that one not a party or privy to a judgment is not bound by it is, of course, admitted; but the principle has no application to decrees and orders made in this class of cases. The property, the manner of whose use is involved, is devoted to a public use, and, in consequence, all persons desiring transportation over it, have certain rights in the property. It is held under a franchise granted by the state. The property is impressed with a servitude. The servitude is for the benefit of every one who may have occasion to demand transportation, and the burden is

imposed upon the owner to operate the property for the public at just and reasonable rates. Primarily the owner may fix the reward he will claim; but, as this may be unjust and unreasonable, the Legislature may intervene and fix just and reasonable rates. When the Legislature does prescribe rates, it determines, subject to final judgment of the courts, the status of the property as regards a public right in these respects. A suit by the carrier to enjoin the enforcement of rates, waged with a public officer, is an effort by the owner of the property to fix its status as to the public in this respect. The judgment rendered in such a proceeding determines that status. Every member of society is represented in that proceeding by the public authorities, and is bound by the judgment, though not a formal party to it. It is "a case where the few represent the many." In this respect, though it is not, strictly speaking, a proceeding in rem, the suit has many of the characteristics of such a proceeding, and the judgment rendered therein, like the judgment in bankruptcy, which fixes the status of insolvency, or the judgment of naturalization, which adjudges the status of citizenship, binds all the world as to that status. No one can assail such a judgment or decree on collateral attack, except for want of jurisdiction in the court which rendered it. It is not meant to declare that a person or community aggrieved by a rate in fact unreasonable or unjust, approved and fixed by public authority, is without remedy; but he cannot change the status of the property, and of the rights of the public therein, as fixed by decree of a court in a proceeding to that end, by his private suit against the carrier, who is observing the rate declared by the court to be proper for the time being, and in that way overturn the effect of the judgment as a determination of the status of the property. He must first appeal to the public authorities to change the rate. Being unsuccessful in that, in a proper case, he can doubtless resort to his bill in chancery against the carrier and the representative of the public in the matter of rates, to have their enforcement enjoined as to him, and it may be, as to all other persons similarly situated, on the grounds stated, or because changed conditions make the rates improper. The Constitution putting the duty upon the carrier to transport at just and reasonable rates, and without unjust discrimination, and giving every person the right to demand such service, it cannot be that any person or community injured by unjust or discriminatory rates can be deprived of all judicial remedy against such rates, because the ratemaking tribunals approve them and refuse to change them.

## Commission is Administrative Body, and Exercises Only Administrative Functions.

XIV. The nature of the power exercised by the Commission in making and unmaking rates of its own, and whether power can be conferred upon the Commission to make and unmake rates made by the Legislature itself, and to substitute Commission-made rates in their stead, has been much discussed at the bar. It is conceded, of course, on all sides, that authority may be conferred upon an administrative body to fix a schedule of maximum rates; but some of respondents' counsel claim that the power exercised by the Commission is legis-

lative, and therefore the court cannot properly restrain pendente lite promulgation of Commission-made rates, changing the rates now before the court, whatever it might do after such changes are promulgated. Complainants deny that the power exercised by the Commission in fixing rates is legislative, and earnestly insist that the Legislature cannot confer unconditional power upon the Commission to alter rates fixed by the Legislature itself, and to set up others in their places in their discretion, and assert that in consequence of the exercise of such power by the Commission much more favorable classifications and rates have been fixed for other carriers in all respects similarly situated as complainants, whereby they have been denied the equal protection of the laws.

The delegation of legislative power to the Commission would plainly violate the fundamental law of Alabama. In Schultes v. Eberly, 82 Ala. 242, 2 South. 345, Clark & Murrell v. Port of Mobile, 67 Ala. 217, and Mitchell, Judge, etc., v. State ex rel., etc., 134 Ala. 412, 32 South. 687, the Supreme Court of Alabama has emphatically declared that the delegation of legislative power, except to municipal corporations, to which by immemorial custom a part of the legislative power of the state has always been delegated for the purpose of local administration, is wholly inadmissible. The Railroad Commission does not fall within the exception. It is not a municipal corporation, nor an agency for local purposes. Section 243 of the Constitution of Alabama of 1901 reads as follows:

"The power and authority of regulating railroad freight and passenger tariffs, the locating and building of freight and passenger depots, correcting abuses, preventing unjust discrimination and extortion, and requiring reasonable and just rates of freight and passenger tariffs, are hereby conferred upon the Legislature, whose duty it shall be to pass laws from time to time regulating freight and passenger tariffs, to prohibit unjust discrimination on the various railroads, canals and rivers of the state, and to prohibit the charging of other than just and reasonable rates, and enforce the same by adequate penalties."

When the section was under discussion in the constitutional convention of 1901, it was moved to amend the section so as to confer the power upon the Railroad Commission. It was objected, if this were done, it would take the power from the Legislature and put it within the keeping of the Commission. The amendment was voted down. The chairman of the committee reporting this article of the Constitution explained that the section, with the exception of the inclusion of canals and the power as to the location and building of freight and passenger depots, was taken verbatim from a section of the Georgia Constitution of 1877; the purpose in so doing being to authorize the Legislature to confer the same power, if it saw proper, upon the Commission of Alabama, as was conferred by the statutes of Georgia upon the Georgia Commission. There had been much agitation of this question at former sessions of the Legislature, as well as in the public prints and on the hustings, and the adoption of this section of the Georgia Constitution, and statutory power for the Commission as in that state, were urged as a remedy for the prevention of the evils of unreasonable rates and unjust discrimination. Georgia, whose Consti-

tution contained the provision which now forms section 243 of our Constitution of 1901 provided by statute for a Railroad Commission whose duty it should be to make just and reasonable rates of freight and passenger tariffs. It was sought to enjoin the execution of the statute on the ground that it was unconstitutional, since, under the Constitution, it was the duty of the Legislature to regulate the freight and passenger tariffs and it had delegated the power to the Commission. The Supreme Court of Georgia, however, in Georgia Railroad Co. v. R. R. Commission, 70 Ga. 694, sustained the statute. It said:

"It certainly was not contemplated that the details of rates to be fixed over many miles of railway in this state should be settled by the Legislature. The many influences that combine to cause changes in the ever-varying vicissitudes of trade and travel were neither overlooked nor forgotten by that body. The utter impossibility of controlling, by the Legislature, just and proper schedules for various roads, with their differences in length, locality, and business, appears to us to be so clear and manifest as that to have entertained it would be absolutely absurd, and especially so when it is remembered that schedules just and right for the months of winter may be ruinously unjust and wrong for the months of summer, and that such as are proper for the year of the meeting of the General Assembly might, in the succeeding year, well-nigh bankrupt every railroad corporation in the state."

The court further held that the Georgia act authorizing the Commission to make rates was not a delegation of legislative power. On this point it said:

"The difference between the power to pass a law, and the power to adopt rules and regulations to carry into effect a law already passed, is apparent and strikingly great; and this we understand to be the distinction recognized by all the courts as the true rule in determining whether or not in such cases legislative power is granted. The former would be unconstitutional, while the latter would not."

If the words of the section left any doubt as to its proper construction, that doubt would disappear in view of its history, and the familiar rule that a constitutional provision, copied from the fundamental law of another state, is presumed to have been adopted with the settled interpretation it had received in the state of its origin. Aside from this, it is clear from its language that the section does not authorize the grant of legislative power to the Commission. In the first place, the "power and authority" are "conferred upon the Legislature." The duty is put "upon the Legislature," and the particular mode by which it shall be discharged is also specified. The Legislature must discharge the duty by the passage of laws. It must pass these "laws from time to time." These laws are the means to cure "extortion and unjust discrimination." The purpose is plain, whatever instrumentalities may be employed to execute these laws, that the duty imposed upon them shall be merely to enforce the rules of conduct prescribed by these particular laws, under and according to the laws which impose them. The language and spirit of the section forbid us to impute to the framers of the Constitution any purpose to confer any power upon the Legislature to delegate to a Railroad Commission or any other department of government the exercise of the legislative function of declaring "what the law shall be." Giving power to a Railroad Commission like ours to fix rates is sustained because it is a mere administra-

tive body for ascertaining, in accordance with rules the law itself promulgates in advance, what, under the facts and circumstances of the particular cases, are just and reasonable rates. The conferring of power upon the Railroad Commission here to promulgate rates is not the delegation to that body of the power to make the law. The common law, the statutes, and the decisions of the courts have already declared the rules which fix the reasonableness of rates. The duty put upon the Commission is to apply rules and principles the law has already prescribed to the facts of particular cases, and by the application of these rules to the particular facts to ascertain as matter of fact what are just and reasonable rates in the given case. Undoubtedly the power which declares the rule of action and fixes the principles which determine when rates are reasonable is legislative, while the power exercised by the Commission in applying the principles the law has already declared to the facts of particular cases, to ascertain and declare reasonable rates, is judicial in its nature. The Commission, however, is a mere administrative body, or executive auxiliary. The fact that the exercise of judgment and discretion are requisite to the proper discharge of the duties committed to it does not make it a judicial body, in the constitutional sense; for the exercise of such faculties is requisite to the proper discharge of the duties committed to every functionary, and does not necessarily determine to which of the great departments of government it belongs. The Railroad Commission, in the exercise of its ordinary authority, in making and unmaking its own rates is a purely administrative body, and does not exercise legislative authority. The power being administrative, the court may enjoin its enforcement pendente lite, whenever essential to the ends of justice. The reason why it was held improper in Smyth v. Ames and Reagan v. Farmers' Loan & Trust Co., supra, to make a final decree enjoining the future exercise of power to make rates, was not because the power by a commission is legislative. It was held improper there, because the court itself, having no power to make rates, could not set up any rates of its own in lieu of the rates stricken down, and circumstances might so change as to make rates which are unjust to the carrier at one time perfectly just and reasonable at another. Aside from these considerations, injunctions in these cases against the future reduction of rates by the Commission will be entirely proper, if the Commission has no legal power to reduce the maximum rates now fixed by law.

XV. Has the Legislature attempted to delegate legislative power to the Commission in the authority conferred upon it to make and unmake rates and classifications established by statutes? The act of August 9, 1907, provides in the first section:

"That in all cases where any classification of railroads or of any articles of freight or any maximum rates or charges for the transportation of passengers or freight over any railroad in this state, have been, or may hereafter be prescribed by statute, or any prevailing rates or charges for such transportation have been, or may hereafter be, by statute made the maximum rates or charges, the Railroad Commission of Alabama shall have the power and is hereby authorized to change such classifications and such rates or charges, or any of them, from time to time as conditions may, in its judgment render expedient or proper so to do, whether the effect of such changes

be to increase or reduce any of the rates or charges, and to establish and order to be put in force in lieu thereof any new classification or rate or charge which it may deem reasonable and proper; and the classifications, rates or charges so established by it shall be the lawful classifications, rates or charges until further changed by said Railroad Commission."

Like power is given as to the rates and classifications in the acts known as the "Eight Group Acts."

### Legislative Power has been Attempted to be Delegated to the Commission as to Change of Statutory Rates and Classifications.

XVI. The will of legislators never becomes the law, unless expressed in the mode and form the Constitution commands. The Legislature, in framing a statute, may provide for its unchanged operation until it is repealed, or it may provide for contingencies arising after it goes into effect, which in its wisdom may require change in the law, and provide for the change, in view of the happening of these contingencies, upon the occurrence of which the lawmaker himself declares in the statute what the change shall be. But, whatever the intent of the lawmaker, a statute, in order to ripen into a law, must always be a perfect expression of the legislative will, upon every contingency with which the statute deals, as it leaves the hands of the lawmaking power. When the Legislature declares its will as to contingencies, it may lawfully make the taking effect of the statute in the first instance, or its suspension or abrogation afterwards, and the substitution of some other law, depend upon the ascertainment of some particular state of facts by an executive officer. But, to be a perfect expression of the legislative will as to these matters, the statute itself must ascertain or prescribe a state of facts which constitute the condition or contingency upon which the change may be made, and what change shall be effected in the prior law, when that contingency is ascertained. Under a statute so framed, the Legislature has delegated no legislative authority to the executive officer. It has simply made use of his services to ascertain a state of facts, upon the ascertainment of which the Legislature itself declares, in advance, its own judgment as to "what the law shall be" under the changed conditions. The contingency upon which the change shall take place in the operation of a law must be a state of facts which the Legislature either ascertains in so many words, or defines or prescribes by general definition, and upon the finding of which state of facts the Legislature, and not some other body, forms the opinion, and declares that it is expedient and proper to change the operation of the law. The propriety and expediency of changing a law is the very question which the Constitution commits exclusively to the wisdom of the Legislature, and it must express its own judgment and will in the statute as to these questions. If the opinion or judgment of some other department as to the happening of some undefined event, and the effect such event should have upon the legislative policy, is to determine whether there shall be a change in the law, it is the judgment and will of the officer as to the expediency of a change, and not the opinion and will of the lawmaking power, which effects the changes. The statute here makes the expediency and propriety of a change, which shall be made when the

officer so determines, depend solely upon the discretion and will of an executive officer, and not upon the happening of any state of facts upon which the Legislature itself has passed its judgment and uttered its commands. The statutes in that posture are neither more nor less than a legislative declaration that there shall be a change in the legislative will because an executive officer deems it expedient, and that because the executive officer so wills thereafter the legislative will shall be only what an executive officer prescribes. This is nothing more nor less than the entire abdication of the duty of the Legislature to determine the expediency and propriety of legislation, and the surrender of legislative power to an executive officer, to use as he pleases in the future.

The court has struggled hard to find some way, consistent with obedience to the Constitution, to avoid the consequences and inconveniences, both public and private, which must follow from striking down the powers here attempted to be conferred upon the Commission. Finding no escape on principle, the duty of the court is plain. It must enforce the Constitution. The Legislature doubtless intended in the passage of these statutes to leave the whole matter of rates and classifications in the keeping of the Commission, and thought it had done so. It could have done so by an absolute repeal of the schedules and classifitions fixed by it, leaving the Commission, as an administrative body, to work out under rules and principles fixed by the Constitution, the statutes, and the common law, what are reasonable classifications and rates, in view of the facts in the particular cases with which the Commission deals. The Legislature could also have retained the "Group Acts" as a general guide for the Commission, and yet given the Commission power to change them, by providing in those statutes that upon the happening of a certain state of facts therein declared or defined, not upon the mere opinion or judgment of the Commission on undefined conditions of which the commission is the sole judge, and upon which the Legislature itself made no declaration "what the law shall be," the Commission might thereupon change the classifications and rates, within certain limitations, which the statutes themselves would state or define. But nothing of that kind was provided for in any of the statutes. The Legislature has not repealed or changed them. The constitutional trouble with the statute is that the legislative power has specifically declared its will upon the wisdom and expediency of the particular classifications and rates, and put them upon the statute books as the law of the land. It takes the lawmaking power to repeal or change a law, as well as to make a law; and the power of repealing or changing a law, or substituting another law in its stead, cannot be delegated to any other department, much less to a statutory board. Turn the proposition over as we may, and scan it from every constitutional point of view, we are always confronted with the fact that, in order to change the laws now in existence as to rates and classifications, they must be repealed or altered by the legislative power which made them. The legislative power which made them has not repealed or altered them. It has merely attempted to let another body undo what the Legislature has done. It has not declared in any of those

statutes its own will as to "what the law shall be" on any changed state of facts which the lawmakers have defined or prescribed, nor, when that state of facts is ascertained, what shall be either the nature or extent of the changes which the lawmakers will shall result therefrom, except that the wisdom and judgment of the Commission shall be the legislative will as to the change. On these questions, upon which the Legislature must speak if the Constitution be obeyed, it has declared no will of its own as to "what the law shall be." It has simply declared to the Commission that it is authorized, for any reasons it may think of sufficient importance, to unmake what the Legislature has declared to be the law of the land, and set up other standards of its own, which shall stand as the law until again changed by order of the Commission. In short, it has referred the whole matter of "what the law shall be" to the Railroad Commission as a "committee with power to act," and declared that the legislative will as to the future shall be whatever the Commission may will and declare.

Of the wisdom of the Legislature's determining for itself what are just and reasonable rates and classifications, and imbedding those rates and classifications in statutes, whereby they become the law of the land and cannot be altered except by an act of the lawmaking power itself, the Legislature must determine for itself; but, when the Legislature does so determine, the Constitution fastens upon their act, and provides the only mode in which the requirements of such enactments can be undone or changed. While some inconvenience, both public and private, must result from following the Constitution in this case, the evil is of small consequence as compared with the greater evils which would result in allowing such departures from the fundamental law. It is vital to the welfare and happiness of the people that the law shall not be made and unmade, or changed, save by the lawmaking power itself. To-day it is the carrier and those who deal with him who are attempted to be subjected to the doctrine that administrative officers may change the law as enacted by the Legislature, and prescribe different rules of conduct from those made by the supreme lawmaking power, varying the law according to their own notions whenever, "in their judgment," it is "expedient and proper so to do." If such power can lawfully be conferred upon administrative officers in these cases, it cannot be denied to executive officers in other cases. It is an alarming doctrine to proclaim in a free country that the laws for the control of the rights and business of citizens, under the complex conditions of modern life, can be made to give place to different obligations and rules made by executive officers, "whenever conditions may, in their judgment, render it expedient or proper so to do." The whole matter is exhaustively discussed in Field v. Clark, 143 U. S. 694, 12 Sup. Ct. 505, 36 L. Ed. 294, wherein is quoted with approval the words of the Supreme Court of Ohio (Railroad Co. v. Clinton County Com'rs, 1 Ohio St. 88) that:

"The true distinction is between the delegation of power to make a law, which necessarily involves a discretion as to what it shall be, and the conferring of authority and discretion as to its execution, to be exercised under and in pursuance of law. The first cannot be done; to the latter, no valid objection can be made."

In the one case the official overrides the law and substitutes his own judgment for it; in the other, he does not change the law, but merely conforms to it. A late instructive case is State v. Great Northern Railway Company, 100 Minn. 445, 111 N. W. 289, 10 L. R. A. (N. S.) 250. Our own cases of Mitchell, Judge, etc., v. State ex rel., etc., 134 Ala. 392, 32 South. 687, and Harlan v. State ex rel., 136 Ala. 155, 33 South. 858, are conclusive on this point. Whether the legislative department of a state, under its Constitution, can delegate legislative power, involves no federal question. The decisions of the highest court of the state are binding upon the federal courts on such a question. Few cases can be found where a Legislature has ever attempted to authorize any other department of the government to strike down an explicit legislative command, and substitute, in its unshackled discretion, some other command; and no case can be found where such an attempt ever succeeded. See State v. Morris County, 36 N. J. Law, 72, 13 Am. Rep. 422.

## Preliminary Injunction Discretionary.

XVII. Complainants have the undoubted right to restrain the operation of the rates, if they will not produce a just return upon the value of the property devoted to intrastate commerce. The right, as a matter of law, is unquestioned. The only issue is whether the facts as ultimately shown will entitle complainant to injunctive relief on final decree. In this class of cases four dominant factors, roughly stated, must control the exercise of the court's discretion: First, what is the value of the property devoted to intrastate service? Second, what is the fair net income from the operations of the carrier, if done at reasonable rates, without unjust discrimination, after deducting cost of service, and excluding in the accounting credit to the carrier for interest paid on mortgages which represent debts incurred in the purchase of the property, or money which went into its construction, and any charge made out of the income for permanent improvements of the plant? Third, what percentage of profit upon the fair value of the property devoted to intrastate business is equitable and just, in view of the hazards of the business, the locality and conditions where it is carried on, and other matters which enter into the cost and value of the transportation done by the particular carrier? Fourth, what, in view of the issues raised by the parties and the proof submitted on the hearing, is the probability as to the adequacy or inadequacy of just compensation, from observance or nonobservance of the rates; and what will be effect upon the rights of the contending parties of granting or withholding the preliminary injunction?

In the earlier cases, when it was held that the Legislature could fix any schedules of rates it deemed proper, so long as it did not take the carrier's property by depriving him of any profit whatever, there was no ground to enjoin the enforcement of rates because the probable margin of profit was small, if it appeared there would be some profit. When, however, the earlier decisions were abandoned, and the Supreme Court declared that the Legislature could not make rates which would not permit "adequate" or "just" compensation, and that the courts were

the final arbiters of such questions, a different rule necessarily arose. The preliminary injunction was no longer to be denied merely because the proof shows some profit. The pertinent and controlling inquiry necessarily changed. The question then arose, in view of the legal presumption that statutory rates are reasonable, whether the volume of profit probable on the face of the situation creates, prima facie, a fair preponderance of probabilities that the business done under the reduced rates would afford adequate or just compensation upon the real value of the property employed in the business. In Tilley v. Railroad Company (C. C.) 5 Fed. 641, Justice Woods, under the doctrine then prevailing, held the court had no power to interfere with the rates, so long as any profit was probable. It was apparent in that case there would be a considerable profit. The Georgia Commission claimed the schedule allowed 8 per cent. upon the value of the property. The railroad company claimed that the value of the property was assessed entirely too low, and that the result of the tariff of rates upon the value of the railroad as fixed by the commission would amount to confiscation. So far as the percentum of compensation was concerned, it was really a difference between 8 and 10 per cent. profit. It being apparent that there would in any event be some profit, Justice Woods held, of course, that the courts had no power to interfere; for there could be no confiscation when there would be some profit. What he decided was that, some profit being apparent, and whatever it was being sufficient, if it amounted to any profit at all, the only way to determine whether the amount would be so small as to work confiscation, as claimed, would be to try the rates. Justice Brewer, while circuit judge, in Railroad Co. v. Dey (C. C.) 38 Fed. 664, quoted Justice Wood's language, saying:

"I do not indorse it as of universal application, but only under the circumstances of the present case. Where the effect of the rates is doubtful, with a probability that they will prove compensatory, and the amount of business to be thereby affected is comparatively small, I think the courts may as well wait for the test of experience."

In that case 4 per cent. of the local traffic was affected. Here the whole intrastate tariff is involved, and the aggregate sum of the reductions is very large. When Judge Brewer spoke of the rates proving "compensatory," he was speaking of them in the sense in which he used the term "compensatory" in a former case between the same parties (35 Fed. 879, 1 L. R. A. 744), in which that judge decided:

"The right of judicial interference exists when the schedule of rates established will fail to secure to the owners of the property some compensation from their investment. As to the amount of such compensation, if some compensation or reward is in fact secured, the Legislature is the sole judge."

Judge Brewer found on the second hearing there was "a probability" there would be sufficient income, according to the standard then prevailing, or, in other words, that the carrier would get "some compensation," all he was entitled to receive under the law at that time, and therefore refused the preliminary injunction. Under the present rule, when it is shown that the carrier will derive "some compensation," it does not at all follow that it is adequate, and therefore does

not necessarily raise any controlling presumption, in the particular case, that the carrier will receive such reward as the Constitution secures to him. Judge Brewer's decision in that case is, therefore, direct authority that, although it be apparent on the facts presented the carrier will receive some compensation, yet, if there is a probability that it will not amount to adequate compensation, there should be no experimenting, in the preliminary stages of the litigation, to determine the justice of a tariff which involves the whole body of rates.

Mr. Justice McKenna, then circuit judge, declined to experiment with grain rates in Southern Pac. Co. v. Board of Commissioners (C. C.) 78 Fed. 238. Circuit Judge McCormick declined to speculate as to the effect of rates in the cases reported in the Supreme Court under the title of Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014. Circuit Judge Shelby did the same thing in Palatka Waterworks v. City of Palatka (C. C.) 127 Fed. 161. Circuit Judge Pardee declined to experiment with rates in L. & N. R. R. Co. v. Railroad Commission (C. C.) 123 Fed. 947. In Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 80, 22 Sup. Ct. 30, 46 L. Ed 92, Circuit Judge Thayer dealt with a bill to enjoin the enforcement of charges for slaughtering cattle, and after final hearing dissolved the injunction and dismissed the bill. Yet he ordered the injunction reinstated, if appeal should be taken, in view of the heavy loss which would fall upon the stockyard companies if his decree should be reversed. His course met with the approval of the Supreme Court, which, in Hovey v. McDonald, 109 U. S. 150, 161, 3 Sup. Ct. 136, 143, 27 L. Ed. 888, discussed the power of the court "to order a continuance of the status quo, if the purposes of justice required it." The court there said:

"This power undoubtedly exists, and should always be exercised when irremediable injury may result from the effect of the decree as rendered;" but it is a discretionary power, and "its exercise or nonexercise is not reviewable here."

When complaint is made of threatened irreparable injury from the enforcement of reduced rates, there is no more legal or moral duty on the part of the court to decide that question against the complainant, by putting the rates in force at once, than there is to adopt a like course in the preliminary stages of any other litigation, when irreparable injury is threatened to any other kind of property right by any other means. Each case must depend upon its own facts and circumstances, and no useful purpose will be subserved by attempting to analyze the cases where the courts have tested the reasonableness of the rates by putting them in force, and where they have declined to do so, in the preliminary stages of the litigation. The duty of the courts is to protect property rights, and not speculate with them, pending investigation of the facts upon which the ultimate right depends, when the equities are matter of doubt, and there is any reasonable probability of irreparable injury if temporary relief be withheld. When a decision putting rates in force in the earlier stages of the litigation may amount to a practical denial of the right, although the complainant finally succeeds, a court of equity, especially when it can fully guard all the

rights of both parties meanwhile, should preserve the status quo as to the rates until final proof enables it to determine where the right lays, and gives it the means of making a final determination of the rights of the parties, which will justly settle and protect them from the beginning, without requiring either to hazard loss meanwhile. As has been frequently pointed out by other courts, what is said on this subject in San Diego Land Co. v. National City, 174 U. S. 754, 19 Sup. Ct. 804, 43 L. Ed. 1154, has reference only to the principles which govern the court in interfering with rates on final decree on full proof. The question of the duty or power of the court to preserve the status quo pending final decree was neither involved nor decided in that case. It would undermine one of the most beneficent and ancient principles of equity to hold that a court of equity, although it finds that there is a fair probability of irreparable injury, is yet, nevertheless, powerless to prevent it, unless it can go further and see beyond all doubt, in the preliminary stages of the litigation, that complainant is entitled to final decree. Such a doctrine would in effect require the court to render a decree as to the final right in the preliminary stages of the case, at a time when it has no means of determining the ultimate rights of the parties.

### What Per Cent. of Profit is the Carrier Entitled to Earn Upon the Investment?

XVIII. No court has undertaken to determine any exact percentage of profit which the carrier is entitled to earn upon the value of the property devoted to the service. It depends upon so many contingencies that the courts have deemed it best to lay down general principles only, and leave their application to the facts of the particular case. The general doctrine is stated by the Supreme Court in Smyth v. Ames, 169 U. S. 546, 547, 18 Sup. Ct. 418, 434, 42 L. Ed. 819 :

"The basis of all calculations as to the reasonableness of rates to be charged by a corporation must be the fair value of the property used by it for the convenience of the public; and in order to ascertain that value the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stocks, the present, as compared with the original, cost of construction, the probable earning capacity of the property under the particular rates prescribed by the statute, and the sum required to meet operating expenses, are all matters of consideration, and are to be given such weight as may be just and right in each case. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience; and, on the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

The carrier is made by law an insurer of freight, and is required to use the highest degree of skill known to the art to prevent injury to passengers. It must have and keep its equipment up to the standard of modern excellence. Necessity and policy alike demand that it maintain a sufficiently high standard of wages to attract and retain the services of competent and faithful men in all its departments. Its business is in a degree hazardous when best conducted, and shares for good or ill the fortunes of the communities and localities it serves, and it must

maintain and increase its facilities as their wants require. In all these matters its interests and those of the public are in a large sense, legally and morally, identical. If a schedule of rates does not permit the carrier to earn a sufficient income to properly discharge these duties, the rights of the public, as well as the private interests of the owners, are invaded. The right to remuneration for the cost of whatever is requisite to maintain its service so as to meet the just wants of the public and fully discharge the duties exacted of it by law, is, therefore, as vital to the public welfare as to the well-being of the property owner, and when we state the rights of the carrier, and enforce them in that respect, it is only another mode of stating and enforcing the rights of the public. The same principle is applicable to the right of the carrier to earn a fair amount, above the cost of service, upon the value of the capital employed in the business. It is well said in Beale & Wyman, Railroad Rate Regulation, § 406:

"It ought always be plain that those who invest their funds in some public employment are going to get a fair per cent. upon their investment, because unless they are assured of this, they will employ their money elsewhere, and many enterprises necessary for the public convenience will not be undertaken, nor will existing plants be extended. It is, then, not only due consideration for the rights of others who have already invested their money in public service companies, but also an enlightened selfishness with a view to the future, which dictates the policy that a reasonable return upon the value of the property used in the public service shall be held to be protected by the Constitution."

While the Supreme Court has not fixed any particular percentum of net profit the carrier is entitled to demand when his charges for the service are just, the state courts and the lower federal courts have generally adopted as the standard of an adequate return at least as high a measure of profit as the current rate of return upon enterprises of a similar character in the localities where the carrier's business is transacted. In L. & N. R. R. Co. v. Brown et al., Railroad Com'rs of Florida (C. C.) 123 Fed. 947, Judge Pardee held that a railroad company in that state, so long as its rates are reasonable, and its business is done without unjust discrimination, is usually entitled to earn an amount on the value of its road devoted to intrastate business equal to the legal rate of interest in that locality. In New Memphis Gas & Light Co. v. Memphis (C. C.) 72 Fed. 952, it was held that a gas company has a right to earn such gross revenue as will enable it to pay all legitimate operating expenses, to pay interest in valid fixed charges upon bonds or securities, so far as they represent expenditures actually made in good faith, and to pay reasonable dividends on stock that represents actual investment in the enterprise. In Spring Valley Waterworks Co. v. City and County of San Francisco (C. C.) 124 Fed. 574, where the rates fixed would not permit annual net earnings of over 4.4 per cent. on the value of the property employed in the service, it was held that the return allowed by the schedule of rates was too low to be reasonable and just, in view of the annual net income from capital invested in similar large enterprises on the Pacific Coast, which earned not less than 6 per cent. In Milwaukee Electric Railway & Light Co. v. City of Milwaukee (C. C.) 87 Fed. 577–585, where it was shown that 6 per cent. on real estate mortgages and like securities was the pre-

vailing rate, it was held that a schedule of rates which prevented earning that much upon the value of the property was unreasonable. The leading authorities are collected in Beale & Wyman, Railroad Rate Regulation. See Re Advance in Freight Rates, 9 Int. Com. Com'n R. 382; Canada Southern Railway Company v. International Bridge Company, L. R. 8 App. Cas. 723; Troutman v. Smith, 105 Ky. 231, 48 S. W. 1084; Cotting v. Kansas City Stockyards Co., 173 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92.

Some interesting questions have been here mooted, which do not call for decision, at least at this time. In Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, the Supreme Court declared that:

"What the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

When the rights of the public are protected by a schedule of just rates in that respect, has the Legislature the power, in the face of the prohibitions of the fourteenth amendment, to go further, either by fixing an express limitation in the statute, or by necessary operation of the rates for which it provides, and prevent the carrier from earning any profit above a certain percentum of the value of the property, although its business be done at just and reasonable rates for the services, and without unjust discrimination? Lochner v. New York, 198 U. S. 45, 46, 25 Sup. Ct. 539, 49 L. Ed. 937. Has the state any such right under its own Constitution? Section 243 of the state Constitution of 1901 vests "the power and authority" of preventing "unjust discrimination" and of "requiring just and reasonable rates" in the Legislature. The section specifically prescribes how this power shall be exercised. It declares that the duty of the Legislature shall be "to pass laws from time to time" regulating freight and passenger tariffs, and to "prohibit unjust discrimination," and to "prohibit the charging of other than just and reasonable rates, and to enforce the same by adequate penal ties." It particularizes the evil to be prevented, and specifies the mode of preventing it. Does or does not the affirmative grant of power as to this particular subject, and the mandatory requirements as to the mode in which it shall be exercised for the purpose of "requiring reasonable and just rates of freight and passenger tariffs," by necessary implication withdraw from the Legislature any power over the subject other than to require just and reasonable rates? The power to fix reasonable charges for the service is born of necessity, and specially conferred, to prevent extortion and injustice by the carrier, who is bound to serve customers who are compelled to deal with him. When that result is effected, is not all further power over the subject exhausted? If the Legislature attempted to go further, would it not assume these "other functions" which section 35 of our state Constitution characterizes as "usurpation and oppression"?

The property of railroad corporations belongs to the individual stockholders. The Constitution of the United States, leaving out of view for the present the equivalent provisions of the Constitution of the state, not only forbids the denial of their right to just compensation, but shields them as well against the denial of the equal protection

of the laws. The state fixes 8 per cent. per annum as the return for the use of property in the shape of loans of money, the medium by which the value of property and its various uses is measured, and does not in any way, save by the requirement as to just and reasonable rates, attempt to limit the percentum of profit gained upon the value of the property invested in street railway, waterworks, gas, electric, telephone, and telegraph companies, and manufacturing establishments in all their variety, mining enterprises, cotton compresses, cotton mills and other like enterprises. In this state of the law, can the owners of railroad property be made the subject of invidious discrimination in this respect, in order to limit the extent of their profit upon the value of the property used by them, by the enforcement of a schedule of rates, affecting the owners of railroad property alone, which prevents them from earning the usual current profit from the use of their property, which the owners of other property used in like investments are permitted to earn upon the value thereof? Would, or would not, that be a denial to them of the equal protection of the laws? That question was mooted, but not decided, in Covington Turnpike Co. v. Sandford, 164 U. S. 598, 17 Sup. Ct. 198, 41 L. Ed. 560. See, also, Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 22 Sup. Ct. 30, 49 L. Ed. 92; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; Smith v. L. & N. R. R. Co., 75 Ala. 449–451; Cooley, Constitutional Limitations, §§ 484, 486. Our state Constitution of 1901 (section 238), while reserving the power "to alter, amend, or repeal" the charters of corporations, is careful to provide that the power shall be exercised "in such manner, however, that no injustice shall be done the stockholders." While the Legislature of the state has no power to "alter or amend or repeal" the charters of foreign corporations, these complainants purchased their property under laws which provided that they should be subject in all respects to the laws of Alabama as the property and franchises of domestic corporations, and the state, as regards the rates of foreign corporations and the profit gained from their intrastate business, may exercise the same power over them as it can over its own corporations.

Whatever may be the proper decision of these questions, it is clear that the fundamental law, both state and federal, compels the Legislature to regulate rates "in such manner that no injustice shall be done" to the property owner. He must have "just" compensation. Any schedule of rates is forbidden which produces injustice. The quantum of injustice is immaterial. There must be "no injustice." All will admit that a schedule of maximum rates which confines the carrier's reward for the service to the amount expended in the physical act alone of receiving, moving, and discharging passengers and freight, without computing in the cost of that service the value of the use of its stations, tracks, roadway, bridges, and the service of its staff of officials who direct its business, would do injustice, both to the public and the carrier. It would not only take from the carrier the ability to discharge his important duties to the public, which the law imposes upon the highest considerations of the general welfare, but deprive it as well of any return for the use of a very large portion of the property it employs in its business. To conserve the rights both of the

carrier and the public, some return must be allowed the carrier for the use of every portion of his property necessarily employed in the business. When so many different kinds of property and service are involved simultaneously in the movement of the same freight or passenger train, it is impossible to ascertain, with any sort of mathematical certainty, what is the precise cost of rendering any particular service. The best standard which the courts and business men have been able to find for testing such questions is to ascertain whether, when the service is done at just and reasonable rates, the carrier obtains for the service as a whole a fair return upon the value of all the property employed in the business. The courts have, therefore, generally taken as the standard of proper return the legal rate of interest, contrasted with the current rate of profit from the use of other property in like kinds of business. While the percentum of profit allowed upon loans of money between private individuals is not, in many respects, a fair standard for determining just profits from the use of other kinds of property under conditions of greater hazard, yet the rate is the result of long experience, and is tantamount to a legislative declaration that such measure of profit is in general a just return upon investments in property. The evidence shows that the current rate of profit upon property used in business enterprises similar to railroads gives a net income, upon the value of such property, not lower than 8 per cent. per annum. Whether we take the legal rate of profit by way of interest on loans of money, or the rate of profit which common experience shows to be the average, and, therefore, approximately a just, return from the use of other forms of property, both modes lead to the same result. We can find no better standard by which to measure what is a fair and just return for the use of railroad property under the conditions governing the business of conducting railroad transportation in this state. The court, therefore, holds that these complainants can rightly complain of any schedule of maximum rates which prevents them from earning, upon the fair value of that portion of their property employed in intrastate business, a profit, above the necessary expense of conducting such business, equal to 8 per cent. per annum upon the value of the property so employed, so long as the business is done without unjust discrimination, and at just and reasonable rates. Any schedule of maximum rates which prevents them from earning that much net profit, under those conditions, denies that just compensation which the Constitutions, both state and federal, secure to them.

### Why Preliminary Injunction Should Issue.

XIX. Voluminous evidence has been offered as to the effect of the reduced rates, and the court has given much time to a very careful examination of the mass of testimony offered on that point. The labors of the court in this respect have been lessened by the exhaustive comments of counsel on both sides as to the tendencies of this mass of evidence. It would be impossible, without writing a book, to deal with all the phases of the testimony which counsel have presented and urged in support of their respective contentions upon the facts.

On a preliminary hearing the court should refrain, as far as possible,

not only from expressing, but from forming, any opinion as to the final merits. In passing upon this branch of the case at this time, the court will deal only with the dominant features which appear prima facie to be clearly established by the evidence. The value of the property employed in the business is one of the main factors upon which the reasonableness of the rates depends. The value of this kind of property depends upon so many considerations that testimony as to its value is largely what is denominated "opinion evidence," in which there is generally a wide margin of honest difference. Upon one valuation of a railroad the income under a schedule of rates may be entirely insufficient, while upon a less value it may be adequate. So, too, in finding what constitutes the net results of domestic business, as distinguished from interstate commerce, much depends upon the methods of keeping the accounts, and whether what is really one business is treated as the other business. All these are disturbing factors in the calculation. Until the court can ascertain the value of the property, as well as what method has been adopted in determining what is state and what is interstate business, it cannot determine whether any particular calculation leads with any certainty to the truth of the disputed issue. In argument counsel for respondents, tacitly at least, admitted upon the evidence as it now stands that the Nashville, Chattanooga & St. Louis Railway Company, under the rates prescribed, would conduct its business at an absolute loss. The resistance to a preliminary injunction has been mainly directed to the cases of the Louisville & Nashville Railroad Company, the South & North Alabama Railroad Company, and the Central of Georgia Railway Company. It is insisted in each of these cases that there has been a radical error in the mode of determining what constitutes interstate business, much of which it is insisted is in reality domestic business, and should be so treated in the calculations in ascertaining the volume of profit from domestic business. It is also insisted, as to the first two of the companies last named above, that the valuations put upon the property used in intrastate business are entirely too high, and that upon a fair valuation, and a correct method of keeping books, and treating as domestic business everything which is really such, the return upon the proportion of value devoted to intrastate business will be adequate. The affidavits filed on these points, mainly on the part of the complainants, make a printed volume of several hundred pages, dealing with the history of the railroad companies concerned, from the time of the building of the roads down to the present day, showing the vicissitudes of the various properties, and contain elaborate statements as to details, including the method of keeping accounts and of conducting business, the character of the tonnage, the cost of transportation, and the reasons which justify the present rates. Upon premises each draws from this evidence, respondents insist that it does not appear that complainants will not receive an adequate return under the reduced rates, and, therefore, they should be tried now; while complainants present a series of calculations showing, on the contrary, that in the most unfavorable view permissible under the evidence against complainants, some of them will have a net income of about 1 per

cent., while others will conduct their business at a loss of hundreds of thousands of dollars.

One of the most satisfactory tests, aside from putting a tariff into operation, as to the effect a reduction in rates would have upon the business of the carrier, is to take the business for two or three years preceding, if it can be assumed that the future business will be conducted at the same cost and in the same volume under like conditions, and then see what effect the reductions, if applied to the business, would have had upon the income of the carrier'in these years. The Supreme Court has approved this method as a very proper one. The evidence shows, without conflict, that the two years preceding the legislation of which complaint is made were the most prosperous years in the history of the carriers, and tends to show that during those years none of the complainants, though operating under a higher schedule of freight and passenger rates than those enacted at the last session of the Legislature, earned much above 3 per cent. per annum upon the value, which they insist is the true value, of their property devoted to intrastate commerce, and most of them much less. Indulging the widest possible latitude against complainants, under the evidence as to swollen estimates as to the value of the property, and errors in crediting income from certain classes of freight to interstate business, instead of domestic business, the evidence leaves scarcely any room to doubt that the most favorably situated of the complainants, under the reduced rates, will not earn as much as 4 per cent. upon the real value of their property devoted to interstate business. The calculations complainants make in the case of the Central of Georgia Railway Company are based upon the valuation of the property as fixed by the authorities for taxation. It is further alleged that the classifications made in the "Eight Group Act" are purely arbitrary, and wholly unjustifiable under the existing conditions, and that the effect of the scheme of classifications and rates is to give large advantages to other carriers, similarly situated as complainants, who decline to continue to litigate the rates, while invidious burdens are imposed upon the carriers who insist upon asserting their rights in the courts. If this be true, it would nullify the whole scheme of rates as to the complainants, regardless of the reasonableness of the rates complained of. Under these circumstances, is the court justified, in the exercise of a reasonable discretion, in ruling that the reduced rates shall be put into actual operation, pending final ascertainment of the facts upon which their reasonableness depends?

In 2 High on Injunctions, § 1512, it is said:

"If the question of fact upon which the injunction depends is evenly balanced upon affidavits on motion to dissolve, the motion should be denied, and the injunction retained until the final hearing."

In 22 Encyc. 978, the rule is thus stated:

"So, where the dissolution would work irreparable injury to the complainant, or greater injury to him than its continuance would cause to defendant, the injunction should be continued. If the continuance would work no injury, but will merely maintain the status quo, the injunction will not be dissolved."

Other authorities state the rule:

"That where there are questions of doubt on the facts, on which additional light is requisite to satisfy the court before deciding the rights of the parties, the dissolution of a restraining order should not be granted."

Indeed, this is the general language of the authorities, especially when, as here, the injunction is not ancillary to some other relief sought by the action, but is itself the principal relief desired, and a refusal of a preliminary injunction would be pro tanto a denial of the right, for the time being, no matter if complainants succeed on the final decree.

The whole country at this time is suffering from a severe depression, particularly in manufacturing and industrial enterprises, which has been fully reflected in its effect upon transportation companies. Their traffic has greatly fallen off, though there has been a general improvement, which it is to be hoped will continue; but the important fact cannot be lost sight of that the conditions now, or as they may reasonably be expected in the near future, are not near so favorable to the railroad companies as when the original bills were filed in these cases. The carriers have been compelled by the falling off of their business to curtail expenses in every possible way, and dispense with the services of hundreds of faithful employés. The general business of the country has not yet recovered from lack of confidence, which was the cause of the currency panic. This is a presidential year, when there is always a disposition on the part of men to wait before entering into new business enterprises. Who can prudently affirm, in view of all these considerations, that a reduction in the rates will produce more business, or, granting that it would, that the loss in rates would not more than counterbalance the increased profit in volume of business? The probabilities all point to decreased volume of business. If the new rates are enforced, pending final decree, the entire aggregate burden of the loss, although complainants may finally succeed, will be concentrated upon the carriers, and there is no way in which they can save themselves from heavy losses, except by preventive remedies now. On the other hand, the parties from whom the old rates are exacted pendente lite are numerous, and the injury, even though they lost the amount in each individual case, would be comparatively small. Is there any reason here why a preliminary decree cannot be made, which will not subject either of the parties to any risk in the final outcome, whatever it may be, and will mete out to each his exact right? The court can do equity between the parties in such a situation as this, at the present stage of the litigation, by making a decree which absolutely protects the rights of both parties. It will, therefore, order a preliminary injunction, upon the carrier's executing bond, with surety in an amount which the court will fix, to reimburse shippers and passengers for any excess rate exacted of them during the litigation, if complainants fail to make good their contention that the rates are unreasonable.

### States' Rights Not Involved.

XX. Nothing seems plainer than that "states' rights" are in no wise involved in the relief given in these cases. The principle here

applied is older than American institutions. Life would be intolerable in any government, claiming to be at all free, wherein the citizen had no effective redress against wrongs done by officials in the name of the law. No Anglo-Saxon people would ever submit to such a condition of affairs. While the people of the mother country submitted, as was inevitable, under their form of government, to the inviolability of the person of the monarch, and held him to be above the process of the law, and declared the "king could do no wrong," they nevertheless, from a very early period in their history, emphasized the instinct of personal liberty by the demand that the king's ministers be held personally responsible for any wrong done in his name, though they acted on the direct order of the sovereign, and made that doctrine a part of the British Constitution. The fiction that the king could do no wrong was completely offset by the other fiction that when he did wrong he had been badly advised, and that those who gave the bad advice were the responsible authors of the wrong. Centuries ago, the "law of the land" took the place of the "pleasure of the king," and the House of Commons impeached the advisers of the king, and the courts punished the lesser officials, and shielded the subject from their arbitrary acts. In our country no one person or department, or all combined, can embody the sovereignty of the people, or claim that they constitute the state. The departments of government, like the king, must act by agents, and the authority of those agents is bounded by the Constitution. When they exceed the limits of their trust, the law imputes their illegal acts, not to the state itself, but to the agent, who no longer speaks for the state, but becomes a trespasser and wrongdoer, who "falsely speaks and acts in its name." The principle is the same, whether applied to the acts of officials of the state or of the United States, and its maintenance is essential to liberty and free government. Can the righteousness of the principle change to unrighteousness, because one tribunal, rather than another, in a particular case expounds and enforces its teachings? The Constitution of the United States towers above the governments both of the states and of the United States. The doctrine has been repeatedly declared by the Supreme Court of the United States that:

"Nothing can be interposed between the individual and the obligation he owes to the Constitution and laws of the United States which can shield or defend him from their just authority; and the extent and limits of that authority the government of the United States, by means of its judicial power, interprets and applies for itself. If, therefore, an individual, acting under the assumed authority of the state, as one of its officers, and under color of its laws, comes into conflict with the superior authority of a valid law of the United States, he is stripped of his representative character and subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States." Ex parte Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216.

The objection to interference with unlawful acts of state officers by the federal courts, therefore, amounts only to this: There is nothing wrong in the principle itself, but the wrong is committed because a tribunal established by the fathers, in the exercise of its unquestioned jurisdiction over "controversies between citizens of different states"

and cases involving the application of the Constitution, applies this great principle to prevent citizens of Alabama from doing wrong, under color of an unconstitutional act, to citizens of this or a sister state. But how can it be a violation of the rights of the state for that tribunal to exercise such power, when the Constitution of the United States gives the jurisdiction in express terms? The argument, in its last analysis, is a protest against the principle of the Union, which creates tribunals in every state to which in certain cases citizens of the particular state as well as citizens of other states may resort for the protection of their rights. That the Constitution gives such power is not matter of fair dispute. The jurisdiction is given in so many words. Certainly the states surrendered all the powers which the Constitution confers upon the government of the United States. The lack of federal courts was one of the great evils which "crowned the defects" of the Confederation, whose fatal weakness and discord for a time caused lovers of liberty to despair of the experiment of republican government, and finally forced the states to take refuge from themselves in the Constitution, whereby a government supreme in its sphere was set up over the state governments and the people of the states. The right of the citizen of one state to sue a citizen of another, and sometimes of citizens of the same state to sue each other, in the federal court, if they desire, is imbedded in the Constitution, and cannot be destroyed without repudiating that instrument. The reasons which made the right a valuable one were universally recognized at the time, and few reflecting people will now deny that local conditions, of which these cases present striking illustrations, may make it eminently proper for the citizen to have a constitutional right in certain classes of cases to choose the forum in which to test his rights. The right of a federal court, like the right of a state court, in a proper case, to strike down a void legislative act, whether of Congress or of the state Legislature, in no way impugns "the right of a state to control its own affairs." It is vital to the protection of life, liberty, and property, and the pursuit of happiness that the Legislature, neither state nor federal, shall "control local affairs" by methods and means which the Constitution condemns. The people have never committed to either government any power to control local or general affairs outside of the law, or in defiance of the safeguards prescribed by the fundamental law. No thoughtful man wishes any person, no matter how humble, to bow to the behest of officials who have no valid authority for their exactions. Surely the state can have no interest in the execution of an unconstitutional law. When one of the state's statutes is refused operation by a court, whether state or federal, because it transgresses the fundamental law, state sovereignty is not insulted or its authority defied. The judgment of a court arresting affirmative action on the part of an officer in the execution of an unconstitutional act to the injury of the citizen does not interfere with any property of the state. It does not utter any command to the state. It does not compel the state to pay any debt or perform any contract. It does not control the exercise of any discretion committed to the officer under any valid laws; for the state can have no policy contrary to that of the fundamental law, and no citizen or official can ever be intrusted

with, or have any discretion to trample down, any of its commands. How, then, and wherein, is it possible for "states' rights" to be involved, much less assailed?

There are two grounds for the jurisdiction of the court in these cases: The first is that they invoke the application of the Constitution and laws of the United States; and the second is that the suits are "controversies between citizens of different states." If the fourteenth amendment had never been adopted, this court, in the suits wherein the plaintiffs are citizens of different states, could, by virtue of the constitutional provision giving jurisdiction of such suits, have afforded, in the administration of the state Constitution and laws, the identical relief which is now granted. Moreover, as to the controversies between citizens of different states, this court, if it had been administering the Confederate Constitution, would have had authority in the administration of the Constitution and laws of Alabama to grant the relief which has been so far afforded in these suits. The fourteenth amendment created no new rights, but simply created another power to protect them. All of its prohibitions as to the deprivation of life, liberty, and property without due process of law, and the denial of the equal protection of the laws, had been incorporated into our Constitution when the state was admitted into the Union. The able men who formed the Constitution of the Confederate States were quite familiar with the doctrine of the great cases of Osborn v. Bank, 9 Wheat. 738, 6 L. Ed. 204, and Ableman v. Booth, 21 How. 506, 16 L. Ed. 169. There is not a line in the Constitution of the Confederate States, where it deals with suits against the state or elsewhere, that indicates any purpose whatever to overrule or undermine the principles of these great decisions. Certainly, the Constitution of the Confederate States may be said to embody the principles on that side of the struggle which ended at Appomattox. It was not a struggle, in any sense, against the principles of the Union, but rather an effort by a part of the people of the United States, for reasons deemed satisfactory to themselves, to set up a separate government for certain of the states, which adopted as their fundamental law the fundamental law as made by our fathers, as construed by the Supreme Court at the time the Confederacy was formed. This was the spirit and the plan of government for which the people of those states then struggled. Yet some, forgetful of the history of the country and the devotion of the people of this section of our common country to the principles of the Union, now seek to revive the embers of a buried strife, and appeal to the tender memories which the heroism and sacrifices of those days always evoke to bolster up the contention that the true principles of states' rights require men to protest that the state is outraged, when the execution of an unconstitutional statute is arrested by one of the courts of our common country, if it happen that the responsibility of administering the fundamental law in that case falls upon the federal, instead of the state, court. Those who teach this doctrine also shut their eyes to the fact that one of the many causes which finally culminated in the civil strife was the resistance in some quarters of the Union to the enforcement by the federal courts of rights which the Constitution guaranteed, and whose enforcement by the federal courts was

·characterized then, as now, in some quarters, as unwarranted meddling with "local affairs" and an "insult to the sovereignty of the state." The just balance between the powers of the state and federal governments as to the execution of the laws of the Union and of the states in proper cases by the federal courts had been settled as firmly as a judicial decision could settle anything, long before the unhappy days of the Civil War, by the great judgments of Story and Marshall. Some words of Chief Justice Taney, who was a firm supporter of the rights of the states, may here be appropriately recalled:

"Nor is there anything in the supremacy of the general government or the jurisdiction of its judicial tribunals to awaken the jealousy or offend the natural and just pride of state sovereignty. Neither this government nor the power of which we are speaking were forced upon the states. The Constitution of the United States, with all the powers conferred by it on the general government and surrendered by the states, was the voluntary act of the people of the several states, deliberately done for their protection and safety against injustice from one another. * * * And their anxiety to preserve it in full force, in all its powers, and to guard against resistance to or evasion of its authority on the part of a state, is proved by the clause which requires the members of the state Legislature, and all executive and judicial officers of the several states (as well as those of the general government), shall be bound by an oath or affirmation to support the Constitution. This is the last and closing clause of the Constitution, and inserted when the whole frame of government, with the powers hereinbefore specified, had been adopted by the Convention, and it was in that form, and with those powers, that the Constitution was submitted to the people of the several states for their consideration and decision. * * * Now, it certainly can be no humiliation to the citizens of a republic to yield a ready obedience to the laws as administered by the constituted authorities. On the contrary, it is among his first and highest duties as a citizen, because free government cannot exist without it. * * * Nor can it be inconsistent with the dignity of a sovereign state to observe faithfully, and in the spirit of sincerity and truth, the compact into which it voluntarily entered when it became a state of the Union. On the contrary, the highest honor of sovereignty is untarnished faith. And certainly no faith could be more deliberately and solemnly pledged than that which every state has pledged to the other states to support the Constitution as it is, in all its provisions, until they shall be altered in the manner which the Constitution itself prescribes. In the emphatic language of the pledge required, it is to support this Constitution." Ableman v. Booth, **21 How.** 506, 524, 16 L. Ed. 169.

In accordance with the understanding with counsel, the court will not now make any decree or order as to the motions and pleadings which were proposed to be filed at the time of the argument. They will be treated as filed of that date, and upon some day upon which counsel may agree among themselves, after they have had opportunity to examine this opinion, the issues they desire to make may be presented in such mode as to them seems best, and formal judgment will then be rendered in conformity to this opinion.

NOTE.—The Supreme Court handed down its decisions in the Minnesota (Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. ——), and North Carolina (Hunter v. Wood, 209 U. S. 205, 28 Sup. Ct. 472, 52 L. Ed. ——), rate cases after the above opinion had been filed and printed for distribution among counsel. Otherwise, the court would merely have cited those decisions, instead of discussing at length the points wherein the cases involve the same constitutional questions.